# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

GREEN PARTY OF TENNESSEE )
CONSTITUTION PARTY OF TENNESSEE, )
                            )
        Plaintiffs, )
                            )
v. )
                            )
TRE HARGETT in his official capacity as )
Tennessee Secretary of State, and )
MARK GOINS in his official capacity )
as Coordinator of Elections for the )
State of Tennessee, )
                            )
        Defendants. )

CASE NO. 3:11-0692
JUDGE HAYNES

# MEMORANDUM

# TABLE OF CONTENTS

A.  Findings of Fact                                                          7

    1. Plaintiffs                                                          8

    2.  History of Minor Political Parties in Tennessee Elections          9

    3. Tennessee's Current Ballot Access Process                          11

    4.  Parties' Expert Proof                                             20

        a. Plaintiffs' Expert                                      20

        b.  Defendants' Experts                                    23

B. Conclusions of Law                                                        34

    1. Res Judicata and Collateral Estoppel                               40

    2. Standing                                                          44

    3. First Amendment Claims                                            46

        a. Tennessee's Party membership Requirement                56

        b. The Primary Requirement                                 60

        c. The 2.5% Signature Requirement                          64

        d. The 119 Day Deadline                                    72

        e. The Majority Party's Ballot Preference                  79

        f. The Bar of "Nonpartisan or Independent"                 83
        in Political Parties' Names

        g. Plaintiffs' Nondelegation Claim                         84

        h. Vagueness Claim                                         87

C. Conclusion                                                                88

Plaintiffs, Green Party of Tennessee ("GPT"), and Constitution Party of Tennessee ("CPT"), filed this action under 42 U.S.C. § 1983 against the Defendants: Tre Hargett, Tennessee Secretary of State, and Mark Goins, Tennessee's Coordinator of Elections. Plaintiffs are political parties seeking recognition and ballot access for their candidates in federal and state elections. The gravamen of Plaintiffs' complaint is that certain provisions of Tennessee's recently enacted ballot access statutes effectively exclude minor political parties from achieving recognition as a political party and ballot access for their candidates in violation of their First Amendment rights to vote, to express their political speech and to associate as a political party. Plaintiffs also assert a claim under the Equal Protection Clause of the Fourteenth Amendment for the State's preferential placement of certain party's candidates on the ballot.

Plaintiffs' specific claims are: (1) that Tenn. Code Ann. §§ 2-5-101(a), 2-1-104 (a)(24) and 2-3-107(a) effectively deny Plaintiffs the ability to qualify as a "Recognized minor party" and impose impermissible burdens on Plaintiffs' First Amendment right to associate as a political party; (2) that Tenn. Code Ann. § 2-1-104(a)(24)'s requirements for a "Recognized minor party" are unconstitutionally vague and constitute an improper delegation of undefined legislative authority to State election officials; (3) that Tenn. Code Ann. § 2-5-101(a)(1) setting a 119 day deadline for minor political parties' petitions for ballot access for its candidates, approximately four months prior to the primary, is unconstitutional as a matter of law; (4) that Tenn. Code Ann. § 2-13-202, requiring minority political parties to nominate their candidates for statewide offices by primary elections, intrudes upon Plaintiffs' First Amendment right to select their nominees and to control their internal affairs; and (5) that Tenn. Code Ann. § 2-5-208(d)(1), awarding a preferential position on the ballot to the current majority party, discriminates against Plaintiffs in

violation of the Equal Protection Clause of the Fourteenth Amendment.

This action is a sequel to an earlier action, Libertarian Party of Tennessee v. Goins, 793 F. Supp. 2d 1064 (M.D. Tenn. 2010), holding that Tenn. Code Ann. § 2-1-104(a)(30) violates Plaintiffs' First Amendment right to vote, Tennessee voters' First Amendment right to privacy of their political affiliation, and Plaintiffs' First Amendment right to associate as a political party. The Court concluded that Plaintiffs demonstrated that Tennessee's 2.5% requirement in Section 2-1-104(a)(29), coupled with the party membership requirement in Section 2-1-104(a)(30) and the State's election officials' 120[1] day deadline prior to the August primaries for petitions of new political parties, effectively precluded minor political party participation in state and national elections in Tennessee.[2] The Defendants did not appeal that decision, but the Tennessee General Assembly enacted changes to the State's ballot access laws that are at issue in this action.

Before the Court are the Plaintiffs' motions for summary judgment supported by their expert's report contending, in sum:

(1) that Tenn. Code Ann. § 2-1-104(a)(24) defining a "Recognized minor party" as a party supported by 2.5% of the voters in the last gubernatorial election, imposes impermissible burdens on Plaintiffs' First Amendment right to associate as a political party;

(2) that Tenn. Code Ann. § 2-1-104(a)(24), is unconstitutionally vague and constitutes an

---

[1]The reference to the 120 day deadline is derived from the holding in Libertarian Party of Ohio v. Blackwell, 462 F.3d 579 (6th Cir. 2006) that a deadline for minor parties' filing for State's ballot access 120 days before a primary violates the First Amendment. Tennessee's prior deadline was the first Thursday in March of the election year that is actually 147 days before the primary, the first Tuesday in August. Goins, 793 F. Supp. 2d at 1071. In Goins, the Court cited other decisions holding deadlines from 60 to 119 days unconstitutional. Id. at 1088.

[2]Before 2011, Tennessee statutes did not set the deadline for filing petitions for recognition as a statewide political party. The State Election Coordinator set the deadline. Goins, 793 F. Supp2d at 1070 n. 3.

4

improper delegation of undefined authority to State election officials;

(3) that Tenn. Code Ann. § 2-5-101(a)(1) setting a 119 day deadline prior to the August primaries for minor political parties' petitions for recognition and ballot access for its candidates effectively excludes Plaintiffs and is unconstitutional as a matter of law;

(4) that Tenn. Code Ann. § 2-13-107(d) barring minor political parties from using the terms "Nonpartisan or Independent" in their party's names violates Plaintiffs' First Amendment rights of free speech;

(5) that State election forms for candidates requiring signatories to a party nominee's petition to declare that the signatories are members of that party violates Plaintiffs' and voters' First Amendment rights to privacy of political beliefs; and

(6) that Tenn. Code Ann. § 2-5-208(d)(10), awarding preferential position on the ballot to the State's majority political party, discriminates against Plaintiffs in violation of the Equal Protection Clause of the Fourteenth Amendment.

(Docket Entry Nos. 19 and 20).

In response, Defendants submit affidavits of experts, as well as state and local election officials, contending that these state laws serve the following state interests:

"(1) requiring potential candidates to show some minimum level of support of their candidacy by the electorate; (2) halting the waste and confusion that might otherwise result from a lack of that showing; (3) avoiding disruption of the ballot and election preparation process; (4) assuring honest elections; and (5) avoiding disruption of ongoing voter education, poll worker training, and impending responsibilities to assure ballot accuracy and timely distribution of absentee ballots."

(Docket Entry No. 36, Defendants' Memorandum at 15). Defendants also contend with the prior ruling in Goins that the res judicata doctrine precludes Plaintiffs' challenge to the state law requiring political parties to select candidates for all statewide offices by primaries. Defendants' experts opine, in essence, that Tennessee's ballot access laws do not burden minor political parties' ballot access and that the minor political parties' poor political outcomes in Tennessee are the cause of their lack of ballot access. According to defense experts, those outcomes show

that ballot access for minor political parties' efforts at party recognition are acts of political futility, not state laws. Defendants' experts assert that America's "winner takes all" election rules cause voters to engage in strategic voting and thereby elect candidates of either the Democratic or Republican party that eventually absorb minor political parties. Finally, Defendants submit affidavits of state and local election officials on the practical needs and legal requirements to justify the time deadlines for petitions from minor political parties seeking recognition for its candidates.

In reply, Plaintiffs assert, in essence: (1) that Defendants' experts' opinions and conclusions conflict with applicable court decisions; (2) that under the res judicata doctrine, Goins' holding on the 120 day deadline for a minor political party's petition for recognition as a statewide political party, precludes the defense of the 119 day deadline; (3) that Defendants' experts fail to distinguish between candidate access and minor political party access; and (4) that the state and local officials' affidavits are insufficient to justify the intrusions upon Plaintiffs' rights under First and Fourteenth Amendments.

Plaintiffs filed motions for oral argument and an expedited ruling that the Court granted and set oral argument for January 9, 2012. (Docket Entry Nos. 32 and 33). Given the Defendants' proof disputing that the state laws posed any burden for Plaintiffs, the Court ordered the Defendants to identify specific facts in their generic references to lengthy affidavits upon which they rely, given the requirements of Local Rule 56.01(c).[3] On January 24, 2012, Defendants filed

---

[3]"In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute." Local Rule 56.01(c).

their response. (Docket Entry No. 44).

Based upon the facts and controlling legal authorities set forth below, the Court concludes that the provisions of the Tennessee ballot access statutes imposing the 2.5% signature requirement and the 119 day deadline prior to the August primary, alone and in combination, violate Plaintiffs' and their members' First Amendment rights to associate as a political party and Tennessee voters' rights to the opportunity to vote for such parties. The Court concludes that the State's "Nomination Form" for minor political parties' petitions requiring the signatory's affirmation that he or she is a member of the party, violates Plaintiffs' and the signatory's First Amendment right of association and privacy of the signatory's political beliefs. Further, the Court concludes that the State's requirement that minor political parties select their nominees by primary elections is an impermissible intrusion of the Plaintiffs' First Amendment right of association that includes the right to select their nominees. In addition, Tenn. Code Ann. § 2-13-107(d), barring the words "Independent" and "Nonpartisan" in the name(s) of political parties, violates new political parties' and their members' First Amendment rights of free speech. Tenn. Code Ann. § 2-1-104(a)(24) granting the State Coordinator of Elections authority to add to the requirements for a "Recognized minor party", is unconstitutional as an improper delegation of legislative authority awarded under Article 1, Section 4 of the United States Constitution and for its impermissible vagueness.

## A. Findings of Fact[4]

---

[4]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, under Supreme Court holdings, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). This section includes a modified version of the Court's findings in Goins that

### 1. Plaintiffs

### a. GPT

GPT was established in 1992-1993 and reconstituted in 1999-2000 with by-laws and rules for its nominating convention and Presidential candidate election. For nominating conventions, GPT's by-laws require that for state-wide offices, nominating conventions must be at a minimum of one month prior to any and all related State candidate filing deadlines. GPT membership requires "self-recognition and agreement to the Ten Key Values," and members obtain voting rights by submitting a signed copy of the 10 Key Value pledge form. GPT has an email listserv, newsletters and correspondence with approximately 500 persons. GPT has never had a candidate for a state-wide office in Tennessee that has received at least five percent of the number of votes cast for all candidates in the most recent election for gubernatorial or other state-wide office. Thus, GPT cannot obtain recognition as a state-wide political party in Tennessee. In 2000, Ralph Nader, GPT's presidential candidate, received .95% of all votes, i.e. 19,781.[5] GPT has had two presidential candidates since 2000, but those candidates were listed on the ballot as "Independent" candidates. Defendants note testimony that GPT has been unable to maintain "a core group together that went from election to election." Goins, 793 F. Supp.2d at 1073 (quoting Docket Entry No. 21-8, Culver Deposition at 3). Defendants also cite a reference in 2006 that some GPT members expressed their view that GPT could attain 41,329 registered voters to submit for party recognition by 2006.

---

Defendants did not appeal. Under the applicable law, the Court concludes that there are not any material factual disputes. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(a).

[5]www.tn.gov/sos/election/results/2000-11/us-state.pdf

**b. CPT**

CPT was established in 1992, but lacks a charter, by-laws, rules, records, formal registration of members, but considers persons on its mailing list to be members of the organization. CPT currently has 631 names on its mailing list. CPT does not maintain an office space or paid staff or have regular meetings, but may meet once every four years. Since 1992, CPT has endorsed a presidential candidate on the ballot in Tennessee, but as with Libertarian Party of Tennessee, its candidate was not identified on the ballot as a CPT candidate, but only as an independent candidate. CPT has never had a candidate for a statewide office and thus, has been unable to meet the five percent threshold of the number of votes cast for all candidates in the most recent gubernatorial election. In mid-August 2001, State election officials accepted CPT's petition that did not disclose whether the individuals signing the petition were CPT members. CPT does not maintain records of whether the person signing the petition was a CPT member. On September 6, 2001, CPT submitted 293 petition pages containing approximately 4200 signatures. On November 2, 2001, CPT submitted another 345 petition pages containing approximately 5000 signatures. The State election officials do not have any record of any additional petition pages submitted by CPT after November 2, 2001.

## 2. History of Minor Political Parties in Tennessee Elections[6]

In 1889, when state governments started printing ballots, minor political parties appeared on the ballot in every presidential and congressional election year in virtually all states. From

---

[6]This section is also a modified version of the Court's findings in <u>Goins</u> that Defendants did not appeal. 793 F. Supp. 2d at 1069-70. The historical record of political parties' participation in elections is relevant in these actions as "[p]ast experience will be a helpful, if not always an unerring, guide." <u>Storer v. Brown</u>, 415 U.S. 724, 742 (1974).

1889 until 1961, any new or minor political parties seeking access to the general election ballot in Tennessee had to nominate candidates by convention and notify Tennessee election officials to have their nominees placed on the November election ballot. Prior to 1961, minor political parties appeared regularly on the Tennessee ballot. In 1960, the Tennessee ballot listed four political parties, Democratic, Republican, Constitution, and Prohibition.

In 1961, the Tennessee legislature amended the State's election laws to allow only political parties that had either polled 10 percent of the vote in the last election or that submitted a petition signed by 5% of the vote cast in the last election to appear on the Tennessee ballot. Since the 1961 amendments, minor political parties appeared on the Tennessee election ballot only during the elections of 1968 and 1972, when George Wallace's American Independent Party qualified. In 1972, the Tennessee legislature reduced the five percent petition requirement for ballot access for political parties to 2.5 percent of the total vote in the last gubernatorial election.

Since 1972, minor political parties attempted to qualify as statewide political parties in Tennessee without success. The Populist Party tried unsuccessfully to obtain political party recognition in Tennessee in 1989-1990. GPT sought political party recognition in Tennessee in 1993-1994, but also was unsuccessful. The Reform Party's efforts at political party recognition in Tennessee in 1995-1996, 1997-1998, and 1999-2000, were unsuccessful. CPT's efforts at political party recognition in Tennessee in 1999-2000, 2001-2002, and 2003-2004 were each unsuccessful. In each attempt, the parties acquired several thousand voters' signatures, but these numbers were insufficient for party recognition under Tennessee law. Tennessee has a population of approximately 6.2 million people and purportedly has over 3,872,868 registered voters and 3,503,355 active voters. (Docket Entry No. 36, Defendants' Memorandum at 17).

10

In 2000 with the "Fair Ballot Access Act of 2000," the Tennessee legislature authorized

ballot access for the 2000 presidential election for candidates who polled 5,000 votes for the

presidential race in 1996. Qualifying candidates could have their political party's name printed

next to their names on the November 2000 ballot. After the 2000 election, a non-statewide

political party's name could be listed next to the name of its presidential candidate, if that party's

candidate received at least 5% of the votes in Tennessee's last presidential election. Tenn. Code

Ann. § 2-5-208(d)(1). In the 2000 presidential election, presidential candidates of the

Libertarian, Reform, and Green parties had their respective party name next to their candidates'

names, but their candidates were still listed on the election ballot under an "Independent"

heading. Since the 2000 general election, Tennessee and Oklahoma are the only states in which

only the Democratic and Republican parties have appeared on the election ballots.[7]

Other relevant historical facts are that in a March 27, 1984 letter, Tennessee elections

officials acknowledged that Tennessee statutes did not provide a specific date for when the new

party petition for recognition and ballot access is due. In addition, on September 17, 1984, the

then Tennessee Attorney General issued his opinion that the statutory requirements for a

"statewide political party" under then Tenn. Code Ann. § 2-1-104(28)(b) was unconstitutional.[8]

### 3. Tennessee's Current Ballot Access Process

The relevant statutes for Plaintiffs' claims are quoted and reviewed infra, but in sum,

---

[7]Goins, 793 F. Supp.2d at 1070 (citing Docket Entry No. 36, Defendants' Response to
Plaintiffs' Statement of Undisputed Facts at ¶ 15).

[8] The last page of this opinion and its reasoning were not provided by the parties, and the
Attorney General's office was unable to provide a complete copy for the Court to cite the full rationale
for that opinion. See Goins, 793 F. Supp.2d at 1070 n.4.

political parties seeking ballot access for their candidates with the party's name next to the candidate for any statewide office, must file their petition for ballot access as a "Statewide political party." For a "Recognized minor party," the deadline is the first Thursday in April of the election year, a 119 day deadline before the August primary. A political party presenting a candidate for statewide office must also select its candidate in the August primary election. To qualify as a candidate for any state or statewide office without party affiliation or as an independent in the general election, Tennessee's ballot access laws require the filing of a nominating petition signed by the candidate and twenty-five (25) or more registered voters who are eligible to vote to fill the office by the qualifying deadline, with the exception of independent Presidential candidates. For Presidential candidates, Tennessee requires a petition to be signed by the candidate and twenty-five (25) or more registered voters for each 11 electors allocated to Tennessee (i.e., 275 signatures of registered voters) to be listed as an independent candidate. Tenn. Code Ann. § 2-5-101(b)(1).

The current form of the "Nominating Petition" reads as follows:

## Nominating Petition For Prescribed by TCA §2-5-102(a)

We the undersigned registered voters of _____ in the county of _____, State
                  (for municipal elections)

Tennessee, (and members of the _____ Party, hereby nominate
                (for primaries)

_____, _____, _____ County as a candidate
    (name)             (address)

(for nomination) for the office of _____, _____ to be voted in
            (Office)    (division, part or district number)

the election to be held on the ____ day of _____. We request that such candidate's name be printed on the official ballot.

This petition was issued by _____, _____
             (Signature of administrator of elections, deputy or election commissioner)

(Date)

## TO BE COMPLETED BY CANDIDATE

I hereby direct that my name appear on the official ballot as follows:

_____ , _____ , _____ , _____
(Print Name)                          (Residential address of candidate)   (zip)
(Telephone)

_____ , _____ , _____
(Business address of candidate)      (zip)           (Telephone)

## FOR JUDICIAL CANDIDATES ONLY:

By my signature, I hereby certify that I am licensed to practice law in this state.

_____     _____

(signature of candidate)              SUPREME COURT REGISTRATION No._____

## NOMINATING SIGNATURES

**(Must be registered voters who are eligible to vote to fill this office)**

_____     _____

Signature of Voter          Address of Residence as Shown on Voter Registration

(Docket Entry No. 20, Exhibit A thereto) (emphasis added).

Beth Henry-Robertson, Tennessee's assistant coordinator of elections, describes the practical and legal requirements that Defendants cite to justify the State's 119 day deadline prior to the August primaries. Pertinent portions of Robertson's affidavit are repeated in the affidavits of state and two local election officials. In sum, Robertson cites the allocation of administrative duties among state and local election officials. State election officials verify that each signatory of a minor political party's petition is a registered voter on the State's computer database[9]. After state review, the petition is forwarded to local election officials who verify those signatures and addresses on the petition with local records and the addresses of the petition signatories. (Docket

_____

[9] Federal law, the Help Americans Vote Act , ("HAVA"), 42 U.S.C.§ 15301 et seq., requires this state database of all registered voters in Tennessee.

13

Entry No. 36-7 at 4-5 and Docket Entry No. 36-8 at 4). Robertson also cites compliance with

federal and state laws on mailing ballots to absentee voters and military personnel as well as

various training and other obligations of election officials to justify 119 day deadline.

6.      The deadline for candidates to qualify for the State and Federal Primary
Election in August is noon on the first Thursday in April. For the 2012 election
year, that date is **April 5, 2012. That is also the deadline for a political party to
qualify as a recognized minor party. Under new laws passed by the Tennessee
General Assembly this past legislative session, if a political party wants to
qualify as a recognized minor party they have to file a petition containing a
number of signatures of registered voters equal to 2.5% of the total number of
votes cast in the last gubernatorial election by the first Thursday in April,** the
same deadline for candidates to qualify for the August election. **Our Office then
has thirty (30) days to verify the signatures and determine whether a political
party has submitted enough valid signatures to obtain recognition as a
"recognized minor party".**

7.      . . . the State and county election offices need this time in order to get their
absentee ballots printed and timely mailed out to military voters and perform all of
the other tasks as discussed further herein. Prior to 2009, federal law required that
military ballots be mailed out only thirty (30) days before the election. **In 2009,
Congress passed the Military and Overseas Voters Empowerment Act
("MOVE"), 42 U.S.C. §1973ff-1(8), which requires us to mail these ballots out
no later than forty-five (45) days before the election. That deadline for the
August 2012 election is June 18, 2012. Thus, with the current filing deadline
of the first Thursday in April, there are approximately 51 business days
between this filing deadline and the deadline on which military ballots must be
mailed out.** In light of how long it takes for all of our 95 counties to get their paper
ballots for absentee voting printed and prepared for mailing to military voters
overseas in addition to all the other duties that our counties and this Office have to
perform during this same time period, if that deadline were moved any later in the
election cycle, many if not most of our counties would not be able to get their
military ballots mailed out by the deadline mandated by federal law.

9.      Specifically, with respect to the ballots, each county prepares the ballots for
that county. However, under state law, the **counties have to wait until after the
candidate withdrawal deadline before they can begin ballot preparation,
which is the seventh (7th) day after the qualifying deadline. Tenn. Code Ann. §
2-5-204(b)(1). Thus, for the August 2012 election, the counties cannot start
work on their ballot layouts until after April 13, 2012. Further, if a political
party submits a petition to obtain recognition as a recognized minor party, the
counties will have to wait until after May 5, 2012 (the deadline for the State**

14

**Election Office to determine if a political party has qualified as a recognized minor party) to begin the ballot layout process.**

10.     The counties have to prepare a ballot for each primary and for each type of system they use, e.g., paper ballots for absentee voting and machine ballots for Election Day and early voting. Thus, for the August election each county has to prepare at least five (5) different ballots: paper ballot for the Republican Primary; paper ballot for the Democratic Primary; paper ballot for the August General; machine ballot for the Republican Primary; and machine ballot for the Democratic Primary (a machine ballot for the August General election is not required as the poll workers can simply lock a voter out of the primary races). Obviously, if a political party qualifies as a recognized minor party, the counties will have to prepare two additional ballots- one paper and machine ballot for that party's primary.

11.     . . . **When the ballots come to our Office for approval, we have one employee who conducts the initial review of each ballot and then each ballot is double- checked by another employee. Depending upon the number of offices on the ballot, it takes on average about 20-30 minutes to conduct this review. As noted, for the August election, each county will have to prepare at least five (5) ballots which means that our Office will have to review at least 475 ballots (5 ballots x 95 counties).** If there are any municipal elections being held at the same time as the August election, the counties will also have to prepare and we will have to review those ballots, as well. Once a ballot has been approved, we then have to scan and send each approved ballot to the county and to their printer/vendor. In addition, we have to document for our records each ballot approval and notification to the counties. This usually takes an additional 10-15 minutes, so that on average, the entire process for reviewing and approving ballots takes approximately 30-45 minutes for each ballot.

12.     Once we have approved the ballots, the counties then have to get their paper ballots printed and their voting machines programmed and tested with the machine ballot. Many of our counties use the same printer to print their paper ballots. Indeed, it is my understanding that 60-70 of our counties use McQuiddy Printing Co., located here in Nashville, to print their paper ballots.

13.     Of course, **before any of the ballots can be developed, printed and prepared for mailing to military voters, it has to be determined which candidates have qualified, and if necessary, if any political parties have qualified to be a recognized minor party by submitting petitions with the requisite number of valid signatures. Thus, this determination requires the State and counties to go through the process of verifying signatures on the petitions. Since voters' permanent registration cards are maintained at the local (county) level, our Office does not do the actual verification of signatures. Instead, we review the petitions, separate out the signatures pages by county**

and then forward them to the appropriate county election offices where the actual verification is conducted by those offices. In verifying signatures, the counties are required to follow the provisions of Tenn. Code Ann. § 2-1-107. Once the counties have finished reviewing and verifying signatures, they report back the total number of valid signatures and then we determine whether a party has enough valid signatures to qualify as a recognized minor party. We have never had a political party submit a petition to qualify as a recognized minor party, so we do not know how long it would take for us to forward the signatures to the, counties for verification and how long it will take for the counties to respond to our request for the information; however, with the candidate petitions, which must have valid signatures from at least twenty-five registered voters, it usually takes us approximately one week after the qualifying deadline.

14.     **This process of signature verification for both candidates and political parties will be significantly complicated during the 2012 year because this is a redistricting year. None of the 95 counties will begin the process of implementing the redistricting plan adopted by the General Assembly until after the March 6, 2012 Presidential Preference Primary. This is a very time consuming process particularly for our larger counties and while the counties will be doing the actual implementation, we will spend a significant amount of time providing technical assistance to all 95 counties with respect to the redistricting procedures. Once each county has implemented the redistricting plan and prepared a map setting forth their new precincts, a copy of that map has to be filed with our Office. In addition to making those maps available for inspection by the public, we have to take the information from each of the 95 county maps and update/revise the statewide precinct list.**

15.     . . . . Although difficult to predict how much or how significant opposition will be to some of the precinct and polling place changes which our county election commission adopt, it must be noted that opposition does occur. When opposition to the changes occur, our Office must take the time to explain the authority of the election commission to make the determinations involved in drawing new precinct lines and selecting new polling places. This responsibility may involve extensive time due to the various conversations and/or correspondence which must be addressed to those voters and/or candidates affected. Furthermore, it is anticipated that with redistricting there will be counties who may need additional voting machines to be leased for use during the August 2, 2012 election. Our Office will assist counties in assessing the impact of the redistricting and drawing new precincts on the number of voting machines needed to meet the statutory requirements of Tenn. Code Ann. § 2-3-104 (which requires as nearly as possible having no more than one thousand (1,000) registered voters per voting machine).

16.     **We also spend a considerable amount of time assisting counties in**

16

determining the accessibility of polling places for voters with disabilities and in determining that polling places otherwise meet the requirements of Tenn. Code Ann.§ 2-3-107. Usually, we spend a couple of weeks assisting the counties with this task, however, because of redistricting; we anticipate that we may have to spend even more time in 2012 assisting the counties.

17.     As I mentioned, **this Office (and the county election offices) have other tasks and duties that we have to perform during this same time period that we are doing what is necessary to get the military ballots ready. For example, we have to set up an electronic database of the state and federal candidates to assure that the names of the candidates who do qualify and the names of their offices appear the same in each county. This database is necessary in order for us to be able to ensure that the way candidates and offices are listed consistently, particularly in multi-county districts.** The database is also necessary for us to have to use in approving the ballots when the counties send them in. It usually takes approximately one (1) week for us to get this database completely established.

18     . . . the Coordinator of Elections [is required] to conduct a training seminar for administrators, deputies and county election commissioners at least once a year and subsection (b) of this statute requires that the Coordinator of Elections and the State Election Commission prepare and administer a written examination on election laws at least once a calendar year to any county election administrator seeking certification. . . .

19.     Other employees in the Office are involved in actually writing, administrating and grading the certification exam for recently appointed Administrators. In past years, we have spent approximately two weeks in performing this task. In addition, a considerable amount of time is spent preparing the materials to be presented to county election officials at the June Election Law Seminar (as required by Tenn. Code Ann. § 2-11-201(18) (a)). We usually spend at least 2-3 weeks preparing and updating the materials for the seminar and then conducting the seminar in June.

* * *

21.     . . . **our Office is also charged with administering and implementing the provisions of the Help American Vote Act ("HAVA"). Among other things, HAVA requires that each state maintain a statewide voter registration database. This database is maintained by our Office. However, voter registrations and purges are all handled at the local (county) level. Thus, in order for us to maintain our statewide voter registration database, each county has to transmit to us on a daily basis voter registration and purge information so that we can update the database.** In addition, we receive information on a

regular basis from the State Department of Vital Records concerning deaths of registered voters, as well as information from the federal courts of the convictions of registered voters (counties receive this information from state courts). These voters have to be purged both from the statewide database and from the local county election office's permanent voter registration records. . . . . [State election officials] spend a considerable amount of time advising election officials on the purge process set out in Tenn. Code Ann.§ 2-2- 106 and the 90-day deadline, as well as responding to questions from affected voters.

22.    Additionally, while the voter registration records of convicted felons are purged upon conviction, state law does provide a process for a convicted felon to have his/her voting rights restored. *See* Tenn. Code Ann. § 2-2-139 and§ 40-29-203(d). This process requires that before a county administrator allows a convicted felon to become a registered voter, the administrator must verify with my Office that the person is eligible to register to vote under Tenn. Code Ann.§ 2-2-139. As such we are also spending time responding to inquiries from county administrators, convicted felons seeking to have their voting rights restored, and those officials who have the authority to complete the certificate of restoration form during this time period. Additionally, it is our experience that in presidential election years, the number of convicted felons who seek to have their voting rights restored increases significantly.

(Docket Entry No. 36-6 at 4-12). See also Docket Entry Nos. 36-8 and 36-7 for affidavits of

local election officials from Davidson and Montgomery Counties. In Davidson County, it

takes four and a half weeks to prepare the ballot layouts, print ballots and/or program the

machines and prepare and mail the ballots to military voters. (Docket Entry No. 36 at 19-20;

Exhibit 8, Tieche Affidavit at ¶ 17). According to Albert Tieche, the Davidson County

Administrator of Elections, it takes his staff approximately two weeks to prepare the ballots

and one week to print them and then ten days to two weeks to prepare the military ballots for

mailing after the ballots have been printed. Id.; Exhibit 8, Tieche Affidavit at ¶¶ 19, 22. In

Montgomery County, it takes two weeks to prepare military ballots for mailing after the ballots

have been printed. (Docket Entry No. 36 at 20; Exhibit 7, Koelman Affidavit at ¶ 18). Local

election officials are bound by Tenn. Code Ann. § 2-1-107 in verifying signatures on these

18

petitions. (Docket Entry No. 36-8 and 36-7 at 5).

Drew Rawlins, executive director of the Tennessee Bureau of Ethics and Campaign Finance, reports that in the 2010 gubernatorial election, 28 individuals filed as candidates for the office of Governor and of these persons, 18 filed appointment of political treasurer forms before the April qualifying deadline. (Docket Entry No. 36-13 at ¶ 4). Nine (9) ultimately did not qualify to appear on the ballot in the August primary election. Id. at ¶ 5. Michael McWherter, a Democratic candidate filed his appointment of political treasurer form on May 15, 2009, almost 11 months before the qualifying deadline. Id. at ¶ 6. One candidate, Basil Marceaus, filed his form on October 7, 2008, eighteen (18) months before the April deadline. Id. at ¶ 7. Two Republican candidates, then Congressman Zach Wamp and now Governor Bill Haslam, filed their forms in January 2009, over fifteen (15) months prior to the qualifying deadline. Id. at ¶ 7. A fourth candidate, Senator Ron Ramsey, a Republican, filed his form on March 4, 2009, thirteen (13) months prior to the qualifying deadline. Id. The fifth candidate, Joe Kirkpatrick, filed his form on May 19, 2009, eleven (11) months before the qualifying candidate. Id.

The Green Party of the United States has two Presidential candidates, Kent Mesplay and Jill Stein, as of May 24, 2011 and November 2, 2011. (Docket Entry No. 36 at 8; Exhibit 4). One of these candidates filed a declaration of candidacy with the Federal Election Commission. (Docket Entry No. 36 at 8; Exhibit 5). "The Constitution Party website announces that it national party convention to select its nominees for President and Vice President of the United States will be held in April of 2012 in Nashville."(Docket Entry No. 36-12 at 7). The American Elect party filed a petition under the Tennessee laws at issue here

19

seeking recognition as a political party. (Docket Entry No. 36 at 31; Exhibit-6, Henry-Robertson Affidavit at 14-15).

Todd Donovan, a defense expert who is a professor of political science at Western Washington University, states that "[i]n 2010 there were 16 candidates listed on Tennessee's ballot for [] the gubernatorial contest. Many other states would have only 2 candidates (a Democrat and a Republican). Likewise, there were 8 candidates competing for the US Senate seat who were listed on the 2008 Tennessee ballot. This high number of candidates reflects that the state has multiple options for non-major party candidates to achieve ballot access." (Docket Entry No. 36-10 at 32). Bruce Oppenheimer, another defense expert and professor of political science and public policy and education at Vanderbilt University, observes: "As of a year before the 2012 election, there is already active competition with announced candidates in Tennessee's 3rd Congressional District. Only indecision about the drawing of congressional district and state legislative district lines following the 2010 census is slowing active contests elsewhere." (Docket Entry No. 36-12 at 7).

### 4. Parties' Expert Proof

#### a. Plaintiffs' Expert

In his report filed in the earlier action, Plaintiff's expert, Richard Winger, reviewed minor political parties' experiences in Tennessee and cited his study of state ballot access laws and minority political parties' participation in other states. Winger characterized minor political parties' prospects for success of obtaining recognition as a state-wide political party in Tennessee as "impossible, or virtually impossible." Goins, 793 F. Supp.2d at 1073 (quoting Docket Entry No. 25-3, Plaintiffs' Amended Expert Report at 7).

For this action, Winger opines that Tennessee's requirement for primaries for minor political parties's candidates for statewide and federal offices effectively impairs minor political parties' viability and intrudes upon their internal affairs in the selection of their nominees or spokesperson.

> **Minor parties in the United States almost never have contested primaries, so providing them with their own primaries is wasteful. Professor Joseph P. Harris of the University of California at Berkeley was recognized during his lifetime as the nation's leading expert on election administration. He wrote in A Model Direct Primary Law,** a booklet published by the National Municipal League in 1951, "Recommendation Number 6. The use of the direct primary should be mandatory for political parties which polled 10% or more of the vote cast at the preceding general election. **Smaller parties should not be permitted to demand state conduct of their internal nominating processes and do not need it." He also wrote, "Minority parties rarely have any contests for nominations and it is unnecessary to require their use of the direct primary. Very small parties, indeed, commonly have difficulty filling up the ticket.** The benefits of government operation of a primary should be restricted to parties which have cast a minimum vote, say 10%, in order to avoid the needless expense of printing separate ballots for the very small parties in which contests are extremely rare."

> What Dr. Harris wrote in 1951 is still true. **Forty-two states have a procedure by which a newly qualifying party can appear on the general election ballot, even though that party did not participate in a government-administered primary.** States which once required newly-qualifying parties to nominate by convention, but which no longer do so, include Arkansas, Idaho, Kansas, Maine, Michigan, Montana, Nebraska, Nevada, and Wyoming. **Most states never have required newly-qualifying parties to nominate by primary.**

> **The rationale for requiring major parties to nominate by primary does not apply to minor and newly-qualifying parties. No nationally-organized party, other than the Democratic and Republican Parties, has elected one of its nominees to Congress since 1948. Although minor parties significantly influence the spread of new ideas, minor party nominees don't generally get elected to public office. Minor parties generally try to nominate their most effective spokesperson, but there is no general public expectation that the typical minor person will be elected in the general election. By contrast, when voters vote in Democratic or Republican primaries, these voters generally have some reasonable expectation that the primary winner may hold public office, so there is a more compelling reason to let major party nominees be**

> chosen via the primary process.

(Docket Entry No. 20, Winger Report at 28) (emphasis added). Winger further opines that "It is virtually unheard of for more than 3% of any state's primary voters to choose to participate in a minor party primary. In the overwhelming majority of instances at which states do provide primaries for minor parties, fewer than 1% of the primary voters choose a minor party primary ballot." Id. at 29.

Dr. Winger also cited the financial costs imposed on minor political parties' limited resources to collect the requisite voter signatures for petitions for state recognition as a barrier to recognition as a minor political party and to obtain ballot access for their candidates.

> **As a general rule candidates and parties must collect 1.5-1.75 times the number of signatures required by statute.**
>
> **The cost of signature collection by paid signature collection ranges from $1.50 to $2.00 per signature, whether valid or not. In states requiring more than 5,000 signatures, for a candidate or party, the cost of signature collection alone exceeds the revenue available to the party and effectively prevents that from obtaining ballot access. Moreover, even where the party or candidate has sufficient resources to collect the requisite number of signatures to obtain ballot access, the cost of signature collection represents such a burden that they rarely have sufficient funds to conduct an effective campaign. . . .**
>
> [M]y research has shown that if a state requires as many as 5,000 signatures, it will never have a crowded ballot, if "crowded ballot" is defined as a ballot with more than 9 candidates for a single office. . . .
>
> **[A]s many as six or more candidates have appeared on the general election ballot as candidates for statewide or federal office on at least 50 occasions since the principle of "avoiding voter confusion" was first enunciated, and there is no evidence that there was any voter confusion in those elections.**
>
> **Tennessee's new party petition signature requirement of 2.5% of the total votes case in the most recent gubernatorial election is the sixth most demanding in the nation ... (and) no new party has been able to gain ballot access in Tennessee since 1968.**

Id. (emphasis added).

Winger also opines on the negative impact of the "Independent" label on a ballot for a candidate who is a member or nominee of a minority political party.

> Having a party affiliation designated on the ballot is essential to the candidacy of a minor party candidate. This is especially important in establishing that the candidate is affiliated with an organized party. **For candidates with limited name recognition, having a party affiliation designated on the ballot is an extremely important "voter cue" to the positions and political philosophy of the candidate, and denial of that voter cue severely burdens the candidate and his party. No candidate having an identity or affiliation with a minor party has ever been elected to state office when forced to be listed on the ballot as an Independent candidate.**

Id. at 30 (emphasis added).

### b. Defendants' Experts

According to Donovan, one of the defense experts, Winger exaggerates the costs of signature collection given the use of volunteers. Donovan cites federal campaign laws and states accelerating their primary and caucusses dates to earlier in the year as causing the early identity of major political parties' nominees and an increase in public awareness and interest in political issues. In addition, Donovan identified the "winner take all" election rules as causing the lack of minority party access to the ballot.

> [D]ata from public opinion polls show that voter attention to presidential contests begins to increase as early as January of the election year, with interest peaking from early February through March before it declines thorough early summer. This would suggest voters do pay attention to high profile elections at a rather early stage of the process.
>
> * * *
>
> Furthermore, **a published study reporting a statistical analysis the relationship between filing deadlines and the success of ballot access for minor party independent US Senate and gubernatorial candidates in 2000 and 2004 found that filing deadlines did not predict the**

23

number of non-majority party candidates on state ballots. Thus, it does not appear to matter how early the petitions are due; other factors related to petitioning may be more important, including how much time is actually allowed to collect signatures. As noted above, Tennessee does not limit when petitioning may being.

The third claim (above) proposes that a new party would have to "pay" $120,000 to qualify for ballot status in Tennessee. This claim appears to be based on the assumption that the new party would have zero ability to mobilize volunteers, and/or on the assumption that the substance of the petition (granting a specific party ballot status) would be of such little interest to voters that volunteers would be unable to collect signatures. The $120,000 figure assumes that every single signature would need to be collected by paid, professional petitioners. Again, minor party experiences in other states do demonstrate success in collecting signatures for ballot access. Furthermore, America's experience with direct democracy demonstrates that citizen groups have been successful using volunteers (rather than paid petitioners) to gather signatures in many instances. Research has found that outside of California and Ohio, over 80% of initiatives that reached state ballots had relied on volunteers to gather at least 90% of signatures. This suggests that volunteer efforts are successful in places where the petitioning requirements are much more restrictive than in Tennessee.

The fourth claim (above) proposes that early filing deadlines are a burden on minor parties because the deadlines fall before major party candidates are known to voters. There was more support for this claim in pervious decades than today. Several things have changed the American political landscape in recent decades. Prior to the 1970s, the major parties nominated presidential candidate by conventions in the summer of presidential election years. Many convention delegates were chosen by state and local party officials and many were uncommitted. As a result, nominees were not known until after the summer nominating conventions. However, **beginning in the 1970s, the major parties moved to allocating convention delegates by public primaries and conventions. One consequence of this was a sharp increase in delegates pledged to specific candidates, with each candidates delegate share known months before the convention. In 1988 major party organizations in the states began "frontloading" the schedule of primaries and caucuses such that it was often became clear who a party's nominee would be, and the schedule compressed further over the next two decades.** By 2008, 70% of convention delegates were selected by March 2 (in 1976 only 10% were selected by that date). As a result, the parties presidential nominees are typically known to the public no later than

24

March.

In addition, campaigns for statewide and congressional offices have grown increasingly expensive over the last few decades. As a result, serious major party candidates now begin soliciting campaign contributions earlier than in the past given the demands of contemporary election costs. Over the same period, states have adopted more rigorous campaign finance reporting requirements. These often require that candidates who have begun fundraising file disclosure reports before they file as candidate seeking ballot status. Candidates who are fundraising for federal (congressional) offices must also file with the Federal Election Commission prior to filing for ballot access if they are soliciting contributions. All of this provides interested observers with information about the major party candidate poll in advance of when candidates file for office, and in advance of when major party primaries are conducted.

(Docket Entry No. 36-10 at 15, 18-20) (footnotes omitted).

Donovan also describes the justification and reasonableness of Tennessee's

deadline and signature requirements for minor political parties' petitions for recognition

for ballot access.

**Social scientists who study political parties and two party systems have determined that the most noteworthy barrier to the long-run success of smaller parties is winner-take-all (plurality) election rules.** Nearly every office contested in the United States is awarded to the candidate seeking the position who wins the most votes. In the winner-take-all elections that are the norm in the United States, votes cast for a third place or lower placing candidate have no effect on determining how much representation those candidates will receive.

Thus, **regardless of ballot access rules, candidates who are not affiliated with a major party (a major party being a party that represents a broad electoral coalition having a history of electoral success) face the task of convincing voters to support them when they have a very limited (if any) history of electoral success, and little chance of gaining office. Many voters tend to act strategically, and attempt to affect the outcome of an election by supporting candidates from one of the two major parties. A vote for a non-major party candidate can have the effect of increasing the chances that a voter's least preferred major party candidate could win.** Given that many voters make such calculations when casting ballots in winner-take-all

contests, their behavior seriously limits the short-term and long- term prospects for candidates who are not affiliated with a major party. Lacking an electoral system, such as proportional representation (PR), that is more favorable to candidates who capture smaller shares of the vote, non-major party candidates historically have had a difficult time maintaining themselves as viable political actors across time in places that use winner-take-all election rules. . . .

***

**Successful minor parties are also absorbed by one of the American major parties. Non major party political movements, then, are typically short-lived in the United States.**

The US electoral system--more so than the state ballot access laws that are the subject of this analysis--means that popular support for these movements, and their potential pool of candidates, fade over time. Scholars note that the national decline in minor (third) party activity in the United States since the 1930s is due the fact that most minor party voting from the 1800s through 1930 was for left-wing parties that were absorbed by the Democrats. Candidates from these parties tended to migrate to the Democratic Party after it adopted many the of New Deal policies.

Id. at 5-6, 8-9 (footnotes omitted).

Donovan also justifies the need to limit ballot access so as to avoid increasing the size of the ballot and to allow the voters to know the candidates "well before a general election." Id. at 12.

Crowded ballots create the potential for ballot design flaws such as Palm Beach County, Florida's infamous "butterfly ballot" that apparently failed to accurately translate voter intention into counted votes. The "butterfly ballot" failed because it listed candidates for the same office on two separate sheets of the ballot. If all candidates for an office are to be listed in a single column, on a single page, a crowded candidate field would require an increase in the physical size of the ballot (either the size of the paper or the number of pages), which may increase the likelihood that voters fail to complete their ballots. Crowded ballots may thus introduce voter fatigue, increase the potential for "position effects" in voting (where a non-trivial portion of a candidate's vote share is a function, in part, of how high the candidates is listed on the ballot) and complicate the administration of elections (by requiring different sets of ballots to be printed with candidate name rotation to eliminate position effects).

Petition requirements are a common method that states use to allocate ballot access to non-major party candidates. Administrative necessity requires petitions be received well before a general election. As part of conducting multiple elections each year (for local districts, municipality, state, and federal offices), state and local election officials are required to design ballots, manage voter rolls, maintain and test voting equipment, certify elections, manage recounts, and conduct myriad additional tasks associated with the administration of elections. Many tasks are conducted at the county level in offices with small staffs. Evaluating and certifying signatures on petitions (for candidates and for ballot measures) required of election administrators.

Id. at 11-12, 15-16 (footnotes omitted).

As to absentee ballots, Donovan cites the need to mail such ballots to citizens and military personnel overseas in time for those voters to return their ballot.

More recently, a 2004 report by the U.S. Election Assistance Commission of the United States Government on the recommended best practices for facilitating voting by uniformed U.S. Citizens overseas recommends that states should mail ballots "at least 45 days prior to the deadline for receipt of voted absentee ballots" because the 30 day advance date may not provide enough time for ballots to be returned. The US Congress subsequently passed the Military and Overseas Voter Empowerment (MOVE) Act in 2009. MOVE established standards for ballots in federal elections, including that ballots be mailed at least 45 days prior to a federal election. This means that officials now have a narrower time window to design, print, assemble and mail ballots than before MOVE. The MOVE Act is associated with increased voting by military personnel.

Id. at 13 (footnotes omitted).

Donovan also cites States' acceleration of their primary caucus and election dates that heighens political interest among voters. Id. at 19-20. Donovan describes the political futility of minor political parties in Tennessee seeking ballot access for their candidates:

In 2000, Tennessee listed minor party presidential candidates with their party affiliation on the ballot. Thus, Ralph Nader was identified as the Green Party candidate on the Tennessee ballot that year. This was a year when the Greens achieved heightened media attention, and when the party posted it highest national vote share ever.

[In Tennessee] [s]upport for the Green Party in 2000 in Tennessee and other neighboring states, as well as support for the Greens in the Pacific Northwest[,] [w]ith Nader identified as a Green candidate on the Tennessee ballot, the Green Party nonetheless polls a lower vote share than in neighboring states where Nader was also identified as the Green candidate. The Green Party ran even weaker in Tennessee (0.95% vs. 2.75% in the US) than it did in the neighboring region where the Green Party received its lowest electoral support in the nation. Conversely, the Green Party received much greater support in the west and in other regions, where state party systems have historically been more malleable and votes more supportive of minor parties.

The effect of muted public support for minor parties in Tennessee was not limited to the Green Party. Nationally the combined votes for all non-major party presidential candidates (independents plus the Green, Reform, Libertarian, and other minor party votes) was 3.75% in 2000. In Tennessee, with minor party labels listed on the ballot and with a very low threshold for qualifying presidential candidates, the combined non-major party vote total was only 1.56% in 2000. Again, this was the lowest for the region, and the region had lower support for minor parties than the national average.

Table 4 (below) illustrates that this effect was not limited to 2000. In 2008, a year with substantially lowered voting for minor parties nationally and for the Green Party and for the former Green candidate Nader, Tennessee continued to have lower support for the Green candidate (McKinney) and for all non-major party candidates in the presidential election than the national average. Western states, in contrast, again posted higher than average levels of support for minor parties. Table 3 and Table 4 can be considered in light of a state's signature petition requirement. These patterns suggests that even if every Green Party voter signed a ballot qualification petition in 2000, the party would have difficulty qualifying if signatures equal to 1% of votes cast were required for ballot status. Put differently, any regulation on minor party ballot access may be relatively more difficult for a minor party in Tennessee in part because of limited public interest in minor parties. These election results suggest there is simply less market demand for minor parties in Tennessee than in many other states. To put this in further perspective, the Green candidate for president (Nader) could receive 2.45% support in Idaho as a write in 2000, but only 0.95% in Tennessee as when listed as a Green candidate on the Tennessee ballot.

Id. at 26-28.

As to Tennessee's signature requirement and Plaintiffs' expert's comparative analysis with other states, Donovan challenges the correlation with other states and notes that Tennessee imposes lesser restrictions than other states on new political parties' petition efforts on gathering signatures, e.g. no geographical restrictions. Id. at 29. Donovan identified as a viable option for Plaintiffs and their candidates in Tennessee, ballot access as an independent candidate.

> By providing easy qualifying for as independent candidates, Tennessee's election regulations provide opportunities for non-major party candidates to appear on general election ballots.

> * * *

> **In 2010 there were 16 candidates listed on Tennessee's ballot for in the gubernatorial contest. Many other states would have only 2 candidates (a Democrat and a Republican). Likewise, there were 8 candidates competing for the US Senate seat who were listed on the 2008 Tennessee ballot. This high number of candidates reflects that the state has multiple options for non-major party candidates to achieve ballot access.**

Id. at 31, 32 (emphasis added).

Oppenheimer, the other defense expert, opines that minor political parties' lack of ballot access is caused by the political futility of minor political parties. Oppenheimer cites the "winner take all" election rules and the absorption of minor political parties' views by major political parties. In Oppenheimer's opinion, members of minor political parties should participate in a major political party as a political strategy in lieu of seeking ballot access as a political party.

> In an election system that features single member constituencies and plurality elections, there is a general disincentive for minor parties to invest in general elections as a means of achieving political influence. Unlike electoral systems in countries with proportional representation and

multi-member constituencies (in which minor parties may win seats with very modest percentages of the vote and thus will invest a great deal in achieving ballot access), minor parties in the United States know that it is highly unlikely for them to win office in a system where only the candidate receiving the most votes gets elected, and losing party candidates get nothing. It is clearly the biggest hurdle that minor parties and their candidates face in Tennessee and elsewhere, regardless of variation in costs of getting on ballots in different states. **There is no rationale for minor parties to incur the cost of party ballot access because there exist other vehicles for minor parties and their candidates to influence elections that are less costly and as, if not more, effective than party ballot access.**

\* \* \*

**The other part is that minor party candidates fare just as well when listed as independents on the ballot as they do when listed with a minor party label.** Contrary to the plaintiffs' assertion, there is no empirical evidence of an additional benefit in terms of winning votes for candidates running with a minor party label as opposed to running as independents. **The plaintiffs' claim that voters use a party label as a cue in selecting among candidates on the ballot is based on research about voting for major party candidates, not for minor party candidates. In fact, the success of minor parties and their candidates rests not on the party label but instead on the visibility of the candidates. The cue works in the reverse of the way it operates for major parties candidates.** Some examples provide appropriate illustration. In 1968, George Wallace ran as the candidate of the American Independent Party for president. As a highly visible individual, Wallace won 13.55% of the national popular vote. Four years later, the party nominee, John Schmitz, an obscure former California congressman, won 1.4% of the vote. It was Wallace rather than the party label that provided the cue for voters. More recently, Ross Perot fared better in 1992 running as an independent than he did in 1996 running as the nominee of the Reform Party. Again, success was linked to the varying popularity of the candidate not to the party label. **If having the party label on the ballot were worth more in terms of electoral performance of their candidates, minor parties in Tennessee would undertake the effort of getting ballot access.** In 2008 presidential election, for example, it made little difference in the percentage of vote minor party presidential candidates received in southern states whether they were running with a party label or as independents. **Green, Constitution, and other minor party candidates in states received similar percentages of the vote regardless if the party label was present with the candidate name or**

**the candidate was listed as an independent.** Only when they were Write-in candidates, and their names not on the ballot at all, did minor party candidates receive noticeably fewer votes. In some states minor party candidates for president in 2008 had to run write-in campaigns. That was not the case in Tennessee because of the minimal requirement for listing as an independent candidate.

### Ballot Structure

If Tennessee elections used party ballots rather than office ballots, the plaintiffs might have a marginal argument about the importance of party label. But **Tennessee has an "office" ballot, not a party ballot.** Voters view candidates grouped by office on the ballot, not in party lists. There is no single party lever, punch, or spot on the touch screen that allows voters to cast their vote for all the candidates of one party with a single action. **Voters must vote for each office separately. This ballot structure greatly reduces the role of party label in voting and leads votes to focus more on candidates. It results in lower levels of straight party voting and greater frequency of split tickets.** Campaigns in states with office ballots are more likely to be candidate driven rather than party driven.

. . . .

**With the growing use of direct primaries for candidate selection purposes, and especially in states with relatively open primary laws such as Tennessee, there is a strong incentive for potential minor party candidates to pursue major party nominations rather than to run as a minor party or independent candidates. In doing so, they can often change major party positions on issues, either by influencing other candidates in the major party primaries to alter their positions or by winning major party nominations.** The major parties have very little protection against these minor party or other insurgents.

In 2010 Tea Party supporters decided to influence the issue positions of the Republican Party. By entering candidates Republican primaries, rather than running as minor party candidates, Tea Party supporters forced mainstream Republicans to adopt Tea Party issue positions and in other cases won Republican nominations with Tea Party backed candidates. The effect on Republicans in state legislatures and the U.S. Congress and on the field of candidates seeking the 2012 Republican presidential nomination has been marked. Some would argue that the Tea Party movement has captured the Republican Party.

The major parties have become so permeable that it is not unheard of for

someone who holds positions that are so extreme as to be an embarrassment to the major party to win a major party nomination. In 2004 James L. Hart, a proponent of eugenics and other racist ideas, won the Republican nomination for the U.S. House of Representatives in Tennessee's 8th C.D. despite late efforts of Republicans disavowing him and running a write-in candidate in the primary. Republicans had to expend resources to prevent Hart from getting on the primary ballot in subsequent years. He won over 25% of the vote in the general election in 2004. Unlike a minor party candidate, a label is very helpful to a major party candidate. That is why running for major party nominations rather than running as minor party candidates is a more effective way of influencing American elections.

Even candidates who have been relatively successful competing as minor party candidates come to understand that seeking a major party nomination is a better alternative. In 1972, George Wallace chose to run for the Democratic presidential nomination rather than to run as a third party candidate as he did in 1968. . . . More recently, Ron Paul, a former Libertarian Party candidate for president, has contested for both the 2008 and 2012 Republican presidential nominations, minimally exposing a larger audience to his policy positions.

**In sum, other factors, not Tennessee's requirement ballot access law, explain the absence of minor parties on the ballot. Tennessee law makes it nearly costless for candidates of any party or no party to get on the ballot. Minor party candidates do not perform better when listed with a party label than as independents, and those disagreeing with the major parties' positions can be more effective competing for major party nominations in primaries than investing in minor parties.**

(Docket Entry No. 36-12 at 2, 3-5) (emphasis added).

Oppenheimer also opines that Tennessee's 119 day deadline prior to the primary may actually assist minor political parties to meet the signature requirements for party recognition and that Tennessee's primary requirement serves the public interest against party bosses' selection of candidates. Oppenheimer also discounts as baseless, concerns that major or other party members would vote in Plaintiffs' primary election for Plaintiffs' nominee.

32

**The Filing Deadline**

* * *

Before 1972 no presidential candidate had announced candidacy prior to a year before the general election. Now that would be considered too late to have a reasonable chance at a nomination. Candidates for the 2012 Republican presidential nomination had their first televised debate on May 5, 2011, a full eighteen months prior to the general election.

The change is not restricted to presidential nominations. The Tennessee Republican gubernatorial field was already well-established more than a year prior to the general election. Three of the four major candidates announced in early January of 2009, and the eventual Democratic nominee announced in April 2009. **As of a year before the 2012 election, there is already active competition with announced candidates in Tennessee's 3rd Congressional District. Only indecision about the drawing of congressional district and state legislative district lines following the 2010 census is slowing active contests elsewhere.**

Even one of the plaintiffs in this case recognizes that the calendar for campaign activity starts far earlier now. **The Constitution Party website announces that it national party convention to select its nominees for President and Vice President of the United States will be held in April of 2012 in Nashville. How can April be enough to nominate its candidates but too early for sufficient public interest to stimulate the gathering of names on a filing petition?**

In fact, the requirement **the April filing deadline may assist minor parties in their efforts to build support by getting them to contact voters sooner when major parties and their candidates are also actively engaged in organizing, raising money, getting media attention, and meeting with voters.**

* * *

Most of the arguments in favor of using primary elections rather than conventions or other means for the selection of candidates are as applicable to minor parties as they are to major parties. The progressive reformers who pushed for the direct primary a little over a century ago argued that democratic principles are best served when participation in the selection of party candidates is open to the largest number of citizens rather than just party insiders. **Conventions and caucuses involve only a relatively small number of people whom party bosses too frequently control. Thus, they end up selecting candidates that insiders favor and are not necessarily "popular" choices.**

**For individual citizens participation in conventions and caucuses is a far more costly undertaking than voting in primaries in terms of time commitment and transportation. . . .**

\* \* \*

**The concern that major parties would undermine the candidate selection processes of minor parties if minor parties were required to have primary elections to select their candidates is lacking foundation in logic or fact.** It is a classic "the monster is under the bed" fear. **There is no incentive for a major party to urge some of its members vote in a minor party primary and choose nominees who adhere to the positions of the major party rather than those of the minor party.** That would only make the minor party candidates more attractive to voters who might otherwise support the candidates of the major party. In addition, such a scheme, if per chance it were successful, would expose the major party to extensive negative publicity. In fact, the plaintiffs' provide no evidence of major parties actually undermining the primary election of a minor party. Even if there were merit in this concern, it would be just as easy for a major party to undermine the nomination process of a minor party that used a convention to select its candidates.

Id. at 6-7, 8 (emphasis added).

According to Defendants, their experts agree that the causes of the lack of minor political parties' ballot access in Tennessee are: "(1) plurality elections and single member constituencies ...(2) ease of ballot access for independent or non-major-party candidates... (3) Tennessee's 'office' ballot [listing candidates in a columnar fashion for each office]... (4) underlying political environment of the state ... and; (5) lack of underlying public interest in minor parties in the state." (Docket Entry No.36, Defendants' Memorandum at 25) (citations to pages of experts' reports omitted). In Defendants' view, these factors preclude Tennessee ballot laws as unreasonable barriers to minor political parties' ballot access.

### B. Conclusions of Law

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme

Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

<u>Id</u>. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a "material fact" for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But see Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which

it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire

36

record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986). Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). In this district, the parties must provide specific references to the proof upon which they rely. See Local Rule 56.01(c) requiring each party to provide a statement of undisputed facts to which the opposing party must respond.

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

\* \* \*

Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it. upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated.

> It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . ."

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) (citation omitted).

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily appropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the

party must prevail as a matter of law.'

6.　　As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.　　The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.　　The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.　　The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.　　The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

## 1. <u>Res</u> <u>Judicata</u> and Collateral Estoppel

As a threshold issue, albeit on different issues, the parties assert that the <u>res judicata</u>

doctrine bars certain of their adversaries' contentions. Plaintiffs contend that <u>Goins</u> precludes the

Defendants' defense of the 2011 amendments that, in effect, reinstate the 120 day deadline for

the filing of minor political parties' petitions for recognition and ballot access for their

candidates. Defendants contend that <u>Goins</u> precludes Plaintiffs' challenge to the requirement that

Plaintiffs must run candidates for all state and statewide offices in the August primary election.

In actions under federal law, the judicial doctrines of <u>res judicata</u> and collateral estoppel

bar an action that is based upon legal claims and/or facts asserted in a prior federal action. The

<u>res judicata</u> doctrine bars parties "from relitigating issues that were or could have been raised in

that action." <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980). Under the collateral estoppel doctrine,

"once a court has decided an issue of fact or law necessary to its judgment, that decision may

preclude relitigation of the issue **on a different cause of action involving a party to the first**

**case.**" <u>Id.</u> at 94 (citing <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979) with emphasis

added). Federal law on <u>res judicata</u> and collateral estoppel obtains if the prior action involved a

federal claim. <u>Allen</u>, 449 U.S. at 94-95. Res judicata attaches to "a prior suit in which a Court

entered a final judgment on the merits." <u>Fellowship of Christ Church v. Thorburn</u>, 758 F.2d

1140, 1143 (6th Cir. 1985). Here, <u>Goins</u> involved a federal law claim and there was a final

decision on the merits that the Defendants did not appeal.

In <u>City of Canton, Ohio v. Maynard</u>, 766 F.2d 236 (6th Cir. 1985), the Sixth Circuit

explained the "two branches of [the] <u>res judicata</u>" doctrine.

> As a general proposition of law, there are two branches of res judicata, claim
> preclusion and issue preclusion. Under the claim preclusion branch, an earlier

final judgment on the merits precludes a party from raising an issue in new litigation that should have been advanced in the earlier proceedings. **Under the issue preclusion branch, "parties are precluded from relitigating an issue of law or fact which was necessarily decided in a previous final judgment."**

Id. at 238 (emphasis added and citations omitted).

The absence of identical parties in the prior action does not necessarily avoid the preclusive effects of the res judicata doctrine, if the defendants in the latter action stand in substantial privity with the defendants in the former action.

> Smith's issues relating to his parole revocation were properly dismissed under the doctrine of res judicata. Smith had a fair opportunity to fully litigate his parole revocation claims in a mandamus/habeas corpus action brought before the Ohio Court of Appeals, Tenth Appellate District. . . . Smith argues that claim preclusion does not apply in this case because the defendants in the state action differed from the defendants in the instant case. However, both Capots (as director) and Flannery (as parole officer) are privies of the OAPA and thus satisfy the requirements for res judicata.

Smith v. Capots, 78 F.3d 585, No. 94-3842, 1996 WL 99322, at *2 (6th Cir. March 6, 1996) (unpublished).

In Goins, a Section 1983 action, the Defendants were the Secretary of State and State Election Coordinator who are also parties in this action. At issue in Goins was the Tennessee Coordinator of Elections's deadline for minor political parties' petitions for recognition as a "statewide political party" that the Defendants set because there was not any statutory deadline. In Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989), a § 1983 action, the Supreme Court ruled that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Thus, the State was the party to Goins.

The dominant issue in Goins was whether Tennessee's deadline violated the 120 day

41

deadline held unconstitutional by Blackwell. Given that the 120 day deadline was not set by

statute and that the named Defendants set the deadline, the Court concludes that the Defendants

had a full opportunity to present evidence of whatever practical or legal justifications for

Tennessee's prior deadline of 147 days or any other deadline to enable the State and local

election officials to perform administrative functions. The Defendants could have presented the

proof that they submitted in this action on how much time was necessary to serve the State's

interests to meet any deadline. Most, if not all of the proof submitted from state and local

election officials, as well as their experts in this action, are based upon facts and laws known to

Defendants prior to January, 2010 when the Defendants moved for summary judgment in Goins

(Libertarian Party of Tennessee v. Thompson[10], 3:08cv63 at Docket Entry No. 21) and prior to

the Court's September 20, 2010 decision in Goins. After the Court's ruling in Goins, the

Defendants had the opportunity to file a motion under Fed. R. Civ. P. 59 to present any new legal

development or facts, but elected not to do so.

The only material difference from Goins cited by the Defendants is the MOVE Act that

Defendants state: "In 2009, Congress passed the Military and Overseas Voters Empowerment

Act ("MOVE"), 42 U.S.C. §1973ff-1(8), which requires us to mail these ballots out **no later

than forty-five (45) days before the election.**" (Docket Entry No, 36-6 at ¶ 7) (emphasis

added). The MOVE Act has its origins in the Federal Voter Act of 1955, former 42 U.S.C. §

1973cc et seq. and the "Overseas Citizens Voting Rights Act of 1975", former 42 U.S.C. §

1973dd et seq. In 2009, Congress passed amendments, among other provisions, to add "absent

uniformed services voter" and to extend its provisions from general elections to include

---

[10]Goins's predecessor.

42

"primary" and "runoff elections", 2009 Pub. L. 111-84, § 577(a)(1)(C), § 578(a)(1)(C) and

579(a)(1)(C). Although these provisions were to take effect for federal elections in November

2010, the amendments were passed on October 28, 2009. Thus, these provisions of MOVE were

enacted about 2 months prior to the filing of the Defendants' motion for summary judgment in

Goins on January 15, 2010 (Libertarian Party of Tennessee, 3:08cv 63 Docket Entry No. 22) and

almost a year prior to the Court's ruling on September 20, 2010. If overlooked, the Defendants

could have cited the MOVE Act in a Rule 59 motion to alter or amend, but failed to do so. In any

event, the MOVE Act does not contain any 45 day deadline, as represented. The 45 day deadline

is cited in a best practices report by the U.S. Election Assistance Commission. (Docket Entry No.

36-10 at 13). Thus, the Defendants had ample opportunity in the Goins litigation to raise any

facts or legal issues posed by MOVE.

In these circumstances, the Court concludes that the claim preclusion branch of the res

judicata doctrine precludes proof on any administrative issues to justify the State's 119 day

deadline that is in effect, indistinguishable from the 120 day deadline in Blackwell and at issue

in Goins. Yet, in the event of an appeal and to avoid unnecessary costs and delay for the parties,

the Court considers the merits of this 119 day deadline.

As to Defendants' contention that Plaintiffs cannot relitigate the requirements of Tenn.

Code Ann. § 2-13-202 requiring a "Statewide political party" to run candidates for Governor,

Congress and the General Assembly in a primary, Goins addressed the issue of the number of

offices to be fielded with candidates and upheld this statute, reasoning that a party seeking

recognition as a "Statewide political party", could reasonably be required to field candidates for

these offices. 793 F. Supp.2d at 1089-90. Yet, since Goins, the General Assembly created a new

category of political parties, the "Recognized minor party" in Tenn. Code § 2-1-104(24). Thus, the Court concludes that the enactment of the new Section 2-1-204(24) for this new political party category presents the need to evaluate Section 2-13-202's primary requirement for these offices.

## 2. Standing

Defendants contend that Plaintiffs GPT and CPT lack standing to challenge Tenn. Code Ann. §2-13-107(d) of the 2011 amendments that precludes the use of the terms "Nonpartisan or Independent" in the name of a political party. Defendants argue that neither GPT nor CPT asserts any intention to use such term(s) for their parties' ballot names. Plaintiffs conceded that point, but argue that this statute deprives them of that right to use such terms and that denial confers standing upon them for this challenge.

The threshold requirement for any civil action is a "case or controversy" under Article III of the Constitution asserted by a plaintiff who has standing to raise the issue. In determining whether a "case or controversy" exists and whether the named plaintiff has standing to complain, the Supreme Court stated in Warth v. Seldin, 422 U.S. 490 (1975):

> We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of 'a real need to exercise the power of judicial review' or that relief can be framed 'no broader than required by the precise facts to which the court's ruling would be applied.'

> \* \* \*

> The rules of standing, whether as aspects of the Art. III case-or- controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts

demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.

Id. at 508, 517-18 (citation and footnote omitted); accord County of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991) ("At the core of the standing doctrine is the requirement that a plaintiff [must] 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'") (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).

This "threat of injury" must be both "real and immediate" not "conjectural" or "hypothetical." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983). As a general rule, standing should be determined as a preliminary matter through an examination of the facts at the time of the motion. Haskell v. Washington, 864 F.2d 1266, 1276 (6th Cir. 1988). A potential exception may lie where the issues of standing and the merits are inextricably intertwined. City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 243 n.5 (1983).

Although the defendants cite several decisions on standing, the Court concludes that the standing issue must be determined by those decisions that address standing in the context of ballot access. In Williams v. Rhodes, 393 U.S. 23, 28 (1968), the Supreme Court held that the Socialist Labor Party had standing to challenge Ohio's restrictions on minor party ballot access, including the petition signature requirement, although that party had not filed any petition with signatures. In Storer v. Brown, 415 U.S. 724, 738 n.9 (1974), the Supreme Court found that independent presidential and vice-presidential candidates had standing to challenge California's ballot access notwithstanding their failure to file any petition with signatures seeking ballot recognition. See also Stevenson v. State Board of Elections, 794 F.2d 1176 (7th Cir. 1986) (independent candidate in general election to state and county offices had standing to challenge

Illinois' early filing deadline without showing submissions of petition with signatures); Rainbow Coalition of Oklahoma v. Oklahoma State Election Board, 844 F.2d 740 (10th Cir. 1988) (minority parties who contested Oklahoma's petition requirements and filing deadline for third parties had standing despite their lack of compliance with statutes). In this Circuit, an affiliate of LPT that presented evidence that a state's ballot access requirements were impossible to meet, was held to possess standing to challenge the state statutes at issue. Libertarian Party of Kentucky v. Ehrler, 776 F. Supp. 1200, 1203 (E.D. Ky. 1991).

Moreover, under Blackwell, the constitutional "inquiry is not whether each law individually creates an impermissible burden **but rather whether the combined effect of the applicable election regulations** creates an unconstitutional burden on First Amendment rights". 462 F.3d at 586 (citing Williams, 393 U.S. at 34) (emphasis added). Thus, as a matter of law, in ballot access controversies, all relevant statutes impacting ballot access of minority political parties must be evaluated collectively. In this context, the Court concludes that GPT and CPT have standing to challenge this statutory bar against the use of "Nonpartisan" or "Independent" in a political party's name that clearly impacts a minor political party's ballot access. Absent such standing, the Court would remain obligated to consider this statute's effect on a minor political party's access to the ballot.

### 3. Plaintiffs' First Amendment Claims

Plaintiffs challenge several Tennessee election statutes as violating their First Amendment rights to vote and to associate as political parties. From the Court's review of the 2011 Tennessee amendments, the Tennessee General Assembly made the following changes: that the petition deadline for recognition as a political party is now the first Thursday in April of the

46

election year, as opposed to the prior law's deadline of the first Thursday in March of the election

year, and that changes the deadline to 119 days from 147 days from the August primary. <u>See</u>

Tenn. Code Ann. § 2-5-101, as amended by Public Acts ch. 182 §§ 1-7 (2011). The General

Assembly maintained the 5% signature requirement of the vote in the most recent gubernatorial

election to be a "statewide political party," but created a a 2.5% signature requirement for new a

"Recognized minor party". The General Assembly also deleted from Tenn. Code Ann. § 2-1-

104(a)(29)(B) the requirement that a signatory to the minor political party's petition assert that

the signatory is a member of the party. As stated earlier, this requirement of affirming party

membership is now in the candidates' "Nominating Petition." <u>Supra</u> at 12. The General

Assembly added a bar to political parties' use of the words "Nonpartisan" and/or "Independent"

in their political names and established a preferred ballot position for the majority party.

For Plaintiffs' constitutional challenges, the language of the pertinent Tennessee revised

statutes with the citation is as follows :

> (11) "Majority party" means the political party whose members hold the largest number of seats in the combined house of the general assembly;

> (12) "Minority party" means the political party whose members hold the second largest number of seats in the combined house of the general assembly;

> Tenn. Code Ann. § 2-1-104(11) and (12).

> **(24) "Recognized minor party" means any group or association that has successfully petitioned by filing with the coordinator of elections a petition which shall conform to requirements established by the coordinator of elections, but which must at a minimum bear the signatures of registered voters equal to a least two and one-half percent (2.5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor, and on each page of the petition, state its purpose, state its name, and contain the names of registered voters from a single county.**

> Tenn. Code Ann. § 2-1-104(24).

**"Statewide political party"** means:

(A) **A political party at least one (1) of whose candidates for an office to be elected by voters of the entire state in the past four (4) calendar years has received a number of votes equal to at least five percent (5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor**.

Tenn. Code Ann. § 2-1-104(31)  (emphasis added).

(a) Candidates shall qualify by filing all nominating petitions, including any duplicate nominating petitions, by the deadlines set out in the schedule in this section. **The qualifying deadline for any office not included in this section shall be twelve o'clock (12:00) noon, prevailing time, on the third Thursday in the third calendar month before the election.**

**(1) Independent and primary candidates for any office** to be filled at the regular November election for which a primary is required to be held at the regular August election **shall qualify by filing such candidates' nominating petitions no later than twelve o'clock (12:00) noon, prevailing time, on the first Thursday in April**.

Tenn. Code Ann. § 2-5-101(a)(1) (emphasis added).

(d)(1) **Notwithstanding any other provision of this chapter or this title, on general election ballots, the name of each political party having nominees on the ballot shall be listed in the following order: majority party, minority party, and recognized minor party, if any.** The names of the political party candidates shall be alphabetically listed underneath the appropriate column for the candidate's party. A column for independent candidates shall follow the recognized minor party, or if there is not a recognized minor party on the ballot, shall follow the minority party, with the listing of the candidates' names alphabetically underneath.

Tenn. Code Ann. § 2-5-208(d)(1) (emphasis added).

(a) **"To be recognized as a minor party, a petition as required in § 2-1-104 must be filed no later than twelve o'clock (12:00) noon on the qualifying deadline as established in § 2-5-101(a)(1) in the office of the coordinator of elections.** The petition shall be accompanied by the name and address of the person or the names and addresses of the members of the group or association filing the petition to form the minor political party."

. . . .

(c) **Upon filing the required petition, candidates seeking to represent the minor party must file nominating petitions as any other candidate for the desired office no later than twelve o'clock (12:00) noon, prevailing time, on the qualifying deadline as established in § 2-5-101(a)(1). If the coordinator of elections determines the petition meets the statutory requirements to be declared a recognized minor party,** the candidates seeking to represent such minor party shall be placed on the regular August primary ballot for such minor party. If the coordinator of elections determines the petition fails to meet the statutory requirements to be declared a recognized minor party, the candidates seeking to represent such minor party shall be placed on the regular November general election ballot as independent candidates.

(d) **The name used by the minor party** shall not be or include the name of any statewide political party then in existence or any word forming any part of the name of any statewide political party then in existence, and **shall not include the word "independent" or "nonpartisan."** The coordinator of elections shall redact any portion of a minor party name that violates this section.

Tenn. Code Ann. § 2-13-107(a), (c) and (d) (emphasis added).

(a) **No person's name may be shown on a ballot as the nominee of a political party for the offices named in § 2-13-202 or for any office to be voted on by the voters of a county, unless the political party:**

(1) **Is a state-wide political party or a recognized minor party; and**

(2) **Has nominated the person substantially in compliance with this chapter.**

Tenn. Code Ann. § 2-13-201(a) (emphasis added).

**Political parties shall nominate their candidates for the following offices by vote of the members of the party in primary elections at the regular August election:**

(1) Governor;
(2) Members of the general assembly;
(3) United States senator; and
(4) Members of the United States house of representatives.

Tenn. Code Ann. § 2-13-202 (emphasis added).

Plaintiffs assert that, individually and in combination, these statutes impermissibly burden

and effectively deprive them of their First Amendment rights to free speech, to vote, to associate

49

so as to form a political organizations in Tennessee, and to secure ballot access for their candidates.

Citizens' rights to form a political party is a fundamental value of the First Amendment. "Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." California Democratic Party v. Jones, 530 U.S. 567, 574 (2000); see also Tashjian v. Republican Party of Conn., 479 U.S. 208, 214 (1986) (recognizing as fundamental "'[t]he right to associate with the political party of one's choice'") (citation omitted). Moreover, statutes restricting "the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively." Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986). These rights are intertwined with: "'the rights of voters and the rights of candidates [and] do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical correlative effect on voters.'" Anderson v. Celebrezze, 460 U.S. 780, 786 (1983) (citation omitted). Under the First Amendment, a voter's ability to cast an effective vote "'is of the most fundamental significance under our constitutional structure.'" Burdick v. Takushi, 504 U.S. 428, 433 (1992) (citation omitted). In Anderson, the Supreme Court emphasized the importance of ballot access and voting rights:

> Our primary concern is with the tendency of ballot access restrictions to "limit the field of candidates from which voters might choose." Therefore, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.'"

460 U. S. at 786.

As to the significance of the denial of ballot access for minor political parties' candidates,

"[t]he right to form a party for the advancement of political goals means little if a party can be

kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right

to vote is heavily burdened if that vote may be cast only for one of two parties at a time when

other parties are clamoring for a place on the ballot." Williams, 393 U.S. at 31. "Competition in

ideas and governmental policies is at the core of our electoral process and of the First

Amendment freedoms. New parties struggling for their place must have the time and opportunity

to organize in order to meet reasonable requirements for ballot position, just as the old parties

have had in the past." Id. at 32. "In our political life, third parties are often important channels

through which political dissent is aired." Id. at 39 (Douglas, J., concurring). In another decision,

the Court stated:

> Any interference with the freedom of a party is simultaneously an interference
> with the freedom of its adherents. All political ideas cannot be channelled into the
> programs of our two major political parties. History has amply proved the virtue
> of political activity by minority, dissident groups, who innumerable times have
> been in the vanguard of democratic thought and whose programs were ultimately
> accepted. . . .The absence of such voices would be a symptom of grave illness in
> our society.

Sweezy v. New Hampshire, 354 U.S. 234, 250-51 (1957) (Warren, C.J.).

In Green Party of Arkansas v. Martin, 649 F.3d 675 (8th Cir. 2011), the Eighth Circuit

identified the general principles of a State's authority to regulate elections and the limits on that

authority.

> "The States possess a 'broad power to prescribe the "Times, Places and Manner of
> holding Elecions for Senators and Representatives," Art. I, § 4, cl. 1, which power
> is matched by state control over the election process for state offices.' " Wash.
> State Grange v. Wash. State Republican Party, 552 U.S. 442, 451, 128 S.Ct. 1184,
> 170 L.Ed.2d 151 (2008) (quoting Clingman v. Beaver, 544 U.S. 581, 586, 125
> S.Ct. 2029, 161 L.Ed.2d 920 (2005)). Therefore, it is beyond question that "States
> may condition access to the general election ballot by a minor-party or
> independent candidate upon a showing of a modicum of support among the

potential voters for the office." Munro v. Socialist Workers Party, 479 U.S. 189, 193, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986). Although the power of the States to regulate the electoral process is expansive, that power may not be implemented in a manner that violates the Constitution. See Wash. State Grange, 552 U.S. at 451, 128 S.Ct. 1184 (citing Williams v. Rhodes, 393 U.S. 23, 29, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)). Thus, each State must "observe the limits established by the First Amendment rights of the State's citizens," Eu v. San Francisco County Democratic Central Committee, 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (quoting Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986)), including "the right of citizens to associate and to form political parties for the advancement of common political goals and ideas," Timmons v. Twin Cities Area New Party, 520 U.S. 351, 357, 117 S.Ct. 1364, 137 L.Ed.2d 589 (citing Colorado Republican Federal Campaign Committee v. Federal Election Commission, 518 U.S. 604, 616, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996)); Norman v. Reed, 502 U.S. 279, 288, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992); Tashjian, 479 U.S. at 214, 107 S.Ct. 544). Indeed, "[r]epresentative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views. The formation of national political parties was almost concurrent with the formation of the Republic itself." Cal. Democratic Party v. Jones, 530 U.S. 567, 574, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000).

Id. at 680.

As the Sixth Circuit observed, "[t]his does not mean . . . that all state restrictions on political parties and elections violate the Constitution" and "states 'may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'" Blackwell, 462 F.3d at 585 (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997)). Yet, where a "State...is controlled by the political parties in power, [those parties] . . . 'presumably have an incentive to shape the rules of the electoral game to their own benefit.'" Id. at 587 (quoting Clingman v. Beaver, 544 U.S. 581, 603 (2005) (O'Conner, J., concurring)). "'In short, the primary values protected by the First Amendment . . . are served when election campaigns are not monopolized by the existing political parties.'" Id. at 589 (quoting Anderson, 460 U.S. at 794).

As to the standards for evaluating Plaintiffs' constitutional challenges to State ballot access laws, "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group." Anderson, 460 U.S. at 793. Strict scrutiny applies if the state law "burdens the rights of political parties and their members." Eu v. San Francisco County Democratic Cent. Committee, 489 U.S. 214, 222 (1989). "To the degree that a State would thwart this interest by limiting the access of new parties to the ballot, [the Court has] called for the **demonstration of a corresponding interest sufficiently weighty to justify the limitation.**" Norman v. Reed, 502 U.S. 279, 288-89 (1992) (emphasis added). Yet, "minor barriers between voter and party do not compel strict scrutiny." Blackwell, 462 F.3d at 604 (citing Bullock v. Carter, 405 U.S. 134, 143 (1972)). Although state voting regulations "are not automatically subjected to heightened scrutiny," id. at 585, the Sixth Circuit cited decisions of district courts in this Circuit and other Circuits that applied the "strict scrutiny" standard to similar ballot access laws setting percentages and deadlines for recognition of minor political parties. Id at 590-91.

In any event, the Supreme Court summarized the analytical framework for assessing constitutional challenges to these ballot access laws:

> [Courts] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

Anderson, 460 U.S. at 789.

The Sixth Circuit restated the standard of judicial review as corresponding to the extent of the injuries caused by the cited state law:

> First, the court looks at the "character and magnitude of the asserted injury" to petitioner's constitutional rights. Anderson, 460 U.S. at 789. The court must then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Id. **If petitioner's rights are subjected to "severe" restrictions, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'"** Burdick v. Takushi, 504 U.S. 428, 434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)). But if the state law imposes only "reasonable, nondiscriminatory restrictions" upon the protected rights, then the interests of the state in regulating elections is "generally sufficient to justify" the restrictions. Id. (quoting Anderson, 460 U.S. at 788).

> The first step under the Anderson/Burdick framework is to determine whether this burden on the associational rights of political parties is "severe." . . . [T]o accurately apply this test, we must first determine the exact nature of the burden placed upon minor political parties and their voter-supporters.

*  *  *

> Thus, though the court's role in reviewing election regulations is limited, it is also vital in that it protects interests that may not be adequately represented in the political process.

*  *  *

> The key factor in determining the level of scrutiny to apply is the importance of the associational right burdened. Restrictions that do not affect a political party's ability to perform its primary functions-organizing and developing, recruiting supporters, choosing a candidate, and voting for that candidate in a general election-have not been held to impose a severe burden.

*  *  *

[T]he Supreme Court

> focus[es] on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity.

Anderson, 460 U.S. at 793 (quoting Clements v. Fashing, 457 U.S. 957, 964

(1982) (plurality opinion)).

Id. at 585-86, 587, 588, (footnotes omitted).

The core relief sought is Plaintiffs' right to have their names next to their candidates' names on the ballot. Under Schrader v. Blackwell, 241 F.3d 783 (6th Cir. 2001), there is not any absolute right to this relief, if the challenged statute is reasonable. Moreover, citing Schrader, the Blackwell stated, "However, when a candidate wishes to appear as one party's standard-bearer and voters want to exercise their constitutional right to cast a ballot for this candidate, the Court has viewed state-imposed restrictions on this fundamental process with great skepticism." 462 F.3d at 588. As observed by the Sixth Circuit:

> The Supreme Court has acknowledged that **"[t]o the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise."** Tashjian v. Republican Party, 479 U.S. 208, 220, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). In declaring Ohio Revised Code § 3505.03 unconstitutional in Rosen, this court determined that **"[o]nce a State admits a particular subject to the ballot and commences to manipulate the content or to legislate what shall and shall not appear, it must take into account the Federal and State Constitutions regarding freedom of speech and association, together with the provisions assuring equal protection of the laws."** 970 F.2d at 175.

Schrader, 241 F.3d at 789 (emphasis added).

Significantly, in analyzing the statutes and the alleged burdens on the political parties at issue here, the "inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights." Blackwell, 462 F.3d at 586 (citing Williams, 393 U.S. at 34). Yet, given the Supreme Court and Sixth Circuit precedents, one of Tennessee's ballot access statutes at issue can be addressed separately.

55

### a. Tennessee's Party Membership Requirement

Of the Plaintiffs' multiple challenges, the Court addresses first Tennessee's "Nomination Petition", an election form that requires a signatory voter on a new political party's petition for recognition and ballot access for its candidates, to assert that he or she is a member of that party. To provide context, in <u>Goins</u>, a prior Tennessee state statute at issue provided:

> (B) For one (1) year after petitioning successfully, a political party which has a membership equal to at least two and one-half percent (2.5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor as shown by petitions to establish a political party filed with the coordinator of elections **and signed by registered voters as members of the party** and certified as to registration of the signers by the county election commissions of the counties where the signers are residents.

Tenn. Code Ann. § 2-1-104(a)(29)(B) (emphasis added).

Although that statutory language was deleted in the 2011 amendments, the "Nominating Petition", in relevant part, still requires affirmation of party membership. The current form of the nominating petition reads, in pertinent part, as follows:

### Nominating Petition For Prescribed by TCA §2-5-102(a)

We the undersigned registered voters of _____ in the county of _____, State
(for municipal elections)

Tennessee, **(and members of the** _____ **Party, hereby nominate**
(for primaries)

_____, _____, _____ County as a candidate
(name)                                (address)

(for nomination) for the office of _____, _____ to be voted in
(Office)                    (division, part or district number)

the election to be held on the ____ day of _____. We request that such candidate's
name be printed on the official ballot.

This petition was issued by _____, _____
(Signature of administrator of elections, deputy or election commissioner)

(Docket Entry No. 20, Exhibit A thereto) (emphasis added).

Included in a citizen's First Amendment right to vote is the voter's right to privacy of the voter's political affiliation, particularly for ties to a minor political party. In Brown v. Socialist Workers '74 Campaign Committee (Ohio), 459 U.S. 87 (1982), Ohio required all political parties to file a report disclosing their financial contributors. The Supreme Court held this Ohio statute unconstitutional as applied to the Socialist Workers Party given the history of governmental hostility to that party. Id. at 88, 101-02. In so holding, the Supreme Court reasoned as follows:

> **The Constitution protects against the compelled disclosure of political associations and beliefs. Such disclosures "can seriously infringe on privacy of association and belief guaranteed by the First Amendment."** Buckley v. Valeo, supra, 424 U.S. at 64. . . . "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." . . . The right to privacy in one's political associations and beliefs will yield only to a "subordinating interest of the State [that is] compelling," and then only if there is a "substantial relation between the information sought and [an] overriding and compelling state interest." Gibson v. Florida Legislative Comm., supra, 372 U.S., at 546.

> In Buckley v. Valeo this Court upheld against a First Amendment challenge the reporting and disclosure requirements imposed on political parties by the Federal Election Campaign Act of 1971. 2 U.S.C. § 431 et seq. (1976). 424 U.S., at 60-74. The Court found three government interests sufficient in general to justify requiring disclosure of information concerning campaign contributions and expenditures: enhancement of voters' knowledge about a candidate's possible allegiances and interests, deterrence of corruption, and the enforcement of contribution limitations. The Court stressed, however, that in certain circumstances the balance of interests requires exempting minor political parties from compelled disclosures. The government's interests in compelling disclosures are "diminished" in the case of minor parties. Id., at 70. Minor party candidates "usually represent definite and publicized viewpoints" well known to the public, and the improbability of their winning reduces the dangers of corruption and vote-buying. Ibid. At the same time, the potential for impairing First Amendment interests is substantially greater:

> **"We are not unmindful that the damage done by disclosure to the associational interests of the minor parties and their members and to supporters of independents could be significant. These movements are less likely to have a sound financial base and thus are more vulnerable to falloffs**

> in contributions. In some instances fears of reprisals may deter contributions to the point where the movement cannot survive. The public interest also suffers if that result comes to pass, for there is a consequent reduction in the free circulation of ideas both within and without the political arena." Id. at 71 (footnotes omitted).

> We concluded that in some circumstances the diminished government interests furthered by compelling disclosures by minor parties does not justify the greater threat to First Amendment values.

Id. at 91-93 (emphasis added and footnotes and citations omitted).

Earlier, in Anderson v. Mills, 664 F.2d 600 (6th Cir. 1981), the Sixth Circuit held

unconstitutional a Kentucky state law providing that a voter's signature on a petition for a state

candidate's petition for ballot access, stating the voter's "desire . . . to vote for the candidate." In

holding this law unconstitutional, the Sixth Circuit reasoned as follows:

> Although the U.S. Constitution does not specifically guarantee that a person has a right to a secret ballot, such a right has been recognized as one of the fundamental civil liberties of our democracy. This principle takes on such significance because it safeguards the purity of our election process by eliminating the fear of scorn and ridicule, as well as lessening the evils of violence, intimidation, bribery and other corrupt practices which can be incumbent in non-secret elections. In order to protect the secrecy of the ballot, many states have enacted constitutional provisions dictating that all ballots must be cast under the cloak of complete privacy. . . .

> . . . .

> Since it is clear that the right to a secret ballot is cherished in our political system, this Court must carefully scrutinize any claim that it is being abridged. If the "desire to vote" provision does seriously infringe upon such a right, it cannot survive.

> * * *

> [T]his provision, as did the lack of partitions and the thin ballots, results in publicizing the way one intends to vote. Certainly, it can be claimed that the latter two were actual revelations for whom the subscriber voted, while the former is only a declaration of one's desire and intention to vote in a future election. However, we refuse to adopt such an artificial distinction because all such

practices jeopardize the right to secrecy of the ballot. **The declaration operates to discourage citizens from participation in the electoral process simply because they do not wish people to know how they will vote. Such a revelation invokes the fears sought to be quelled by the secrecy of voting laws in this country, and subjects an elector to the pressure of his neighbours, employers, and social peers. Since the declaration abridges the right to a secret ballot in such a direct and unacceptable manner, it cannot stand.**

Id. at 608-09 (emphasis added).

Citing Brown and Mills, other courts have also held various state laws unconstitutional under the First and/or Fourteenth Amendments for requiring or adversely impacting a voter because the voter signed a political party's petition. A West Virginia law deemed a voter's signature on a minor political party's petition for ballot access to forfeit that voter's right to vote for any other candidate, and the Fourth Circuit held that law to violate the First and Fourteenth Amendments. Socialist Workers Party v. Hechler, 890 F.2d 1303, 1309 (4th Cir. 1989). Several district courts have held various state laws that require disclosure of a voter's affiliation with a minor political party unconstitutional under the First and/or Fourteenth Amendments. See Workers World Party v. Vigil-Giron, 693 F. Supp. 989, 994-98 (D.N.M. 1988) (by signing a part recognition petition, voters represent that they are "members of the political party submitting the petition"); Libertarian Party of Nevada v. Swackhamer, 638 F. Supp. 565, 566, 568-69 (D. Nev. 1986) (enjoining Nevada statute providing that by signing a minor political party's petition for ballot access, the voter signatories were "declaring that they represent a political party"); Libertarian Party of Nebraska v. Beerman, 598 F. Supp. 57, 63-64 (D. Neb. 1984) (holding unconstitutional a Nebraska law that voter signing ballot access petition was required to "pledge to support the new party"); Libertarian Party of South Dakota v. Kundert, 579 F. Supp. 735, 737-39 (D.S.D. 1984) (South Dakota law that by signing a ballot access petition the voter was making

59

a "statement that the subscribers thereto have affiliated one with another for the purpose of forming the party" held unconstitutional); North Carolina Socialist Workers Party v. North Carolina State Board of Elections, 538 F. Supp. 864, 867-68 (E.D.N.C. 1982) (North Carolina law that a voter signing a new party's political petition would automatically change the voter's political affiliation held unconstitutional).

Applying the principles of Brown and Mills and the cited district court decisions here, the Court concludes that Plaintiffs' First Amendment right to associate as a political party and Tennessee voters' First Amendment rights to privacy of their political affiliation are violated by this state compelled disclosure in the "Nominating Petition" for a minor party's candidates. The relevant focus for this membership requirement is its effect when the minor political party members attempt to collect voter signatures on this "Nomination Petition." At that point, the State's invasion of the voter's political privacy occurs and the form creates a chilling effect on the potential voter's support of a minor political party. As the Supreme court stated, all the State can require is a "showing of a modicum of support **among the potential voters**," Munro, 479 U.S. at 193 (emphasis added), not party members. Thus, the Court concludes that the State lacks a legitimate interest in this form's requiring the disclosure of a signatory's party membership.

### b. The Primary Requirement

Despite its multiple challenges to Tennessee's ballot access laws, Plaintiffs argue that significant parts of their challenges become moot, if Plaintiffs are not required to select their candidates for the general election by a primary election, as required by Tennessee law. The relevant statute is Tenn. Code Ann. § 2-13-202 that provides as follows:

> **Political parties shall nominate their candidates for the following offices by vote of the members of the party in primary elections at the regular August**

**election:**

(1) Governor;
(2) Members of the general assembly;
(3) United States senator; and
(4) Members of the United States house of representatives. . . .

Id. (emphasis added). With the plural "Political Parties," this statute applies to both "Recognized

minor parties" and "Statewide political parties." Defendants note that under Tenn. Code Ann. §

2-7-115(b) only voters who are members of the party or declare their allegiance to the party may

vote in the party's primary. A person may be challenged in either instance. Tenn. Code Ann. §

and 2-7-126. Thus, Defendants argue that Tennessee's primary is a semi-closed primary that is

permissible under relevant precedents.

A political party has the First Amendment right to select its nominees. Timmons v. Twin

Cities Area New Party, 520 U.S. 351, 359 (1997) ("The New Party's claim that it has a right to

select its own candidate is uncontroversial," and citing Cousins v. Wigoda, 419 U.S. 477 (1975)

("party, not State has the right to decide who will be State's delegates at party convention").

California Democratic Party v. Jones, 530 U.S. 567, 578 (2000), addressed California's blanket

primary system under a law, Proposition 198, that allowed members of the opposing party to

select the minor party's nominee. There, the Court found "a clear and present danger" to minor

political parties in such a primary system as "the evidence in this case demonstrates." Id. "The

impact of voting by nonparty members is much greater upon minor parties, such as the

Libertarian Party and the Peace and Freedom Party." Id. "[A] single election in which the party

nominee is selected by nonparty members could be enough to destroy the party." Id. at 579. The

Supreme Court then reasoned:

In sum, Proposition 198 forces petitioners **to adulterate their**

candidate-selection process-the "basic function of a political party," ibid.-by opening it up to persons wholly unaffiliated with the party. Such forced association has the likely outcome-indeed, in this case the *intended* outcome-of changing the parties' message. We can think of no heavier burden on a political party's associational freedom. Proposition 198 is therefore unconstitutional unless it is narrowly tailored to serve a compelling state interest.

* * *

Respondents' legitimate state interests and petitioners' First Amendment rights are not inherently incompatible. To the extent they are in this case, **the State of California has made them so by forcing political parties to associate with those who do not share their beliefs. And it has done this at the "crucial juncture" at which party members traditionally find their collective voice and select their spokesman. The burden Proposition 198 places on petitioners' rights of political association is both severe and unnecessary."**

Id. at 582, 586 (emphasis in original and added) (citation omitted).

Defendants argue that Tennessee's primary system is a akin to the "semi-closed" primary that renders Tennessee's system distinguishable from Jones and more like the Supreme Court's decisions in Clingman, and Tashjian. Yet, the Supreme Court observed that to vote in the primaries in Tashjian "[v]oters also had to act by registering themselves in a particular party" and in Clingman, voters had to "register as Libertarians or Independents to participate in LPO's primary" 544 U.S. at 592, 593. Moreover, Clingman, 544 U.S. at 585 and Tashjian, 479 U.S. at 210, involved acts by political parties requesting the State to open their closed primaries to allow independents voters to participate in their primaries. Here, the State is initiating this action by state law imposing these requirements upon Plaintiffs.

Moreover, here, at the time of voting, the voter can simply declare affiliation with the party to vote in Plaintiffs' primary election. Tennessee's cited primary law does not assure that the nonparty members are "registered independents" as in Clingman, and Tashjian. Although a

challenge to such a declaration is permitted under Tennessee law, given Plaintiffs' limited support and resources, the Court concludes that Plaintiffs' prospects for realistic challenges across the State at the time of the primary voting would be, at best, nominal. As discussed below, in a State with similar laws, the voter's declaration is controlling, thereby rendering the challenge process a nullity.

Defendants cite <u>Mississippi State Democratic Party v. Barbour</u>, 529 F.3d 539, 541 (5th Cir. 2008) involving a similar Mississippi law allowing a person to vote in a party's primary, if the voter, who is not a registered party member to vote, "intends to support the nominations" in the party's primary. The Mississippi law also allows challenges to such voters. <u>Id</u>. at 541 n.3. There, the State attorney general opined that notwithstanding the challenge provision, "the stated intent of the voter is controlling". <u>Id</u> at 542. Contrary to Defendants' assertions, the Fifth Circuit did not address the merits of these laws, and its actual holding was the party's lack of standing to assert claims of candidates. <u>Id</u>. at 545-48. The only court to consider the merits of this statute was the District Court that found these laws to violate that party's First Amendment right of association. <u>Id</u>. at 543. The Court concludes that Tennessee's primary system is not factually similar to a "semi-closed primary" and <u>Jones</u> controls.

Yet, as the Supreme Court earlier observed: "Neither can we take seriously the suggestion made here that the State has invidiously discriminated against the smaller parties by insisting that their nominations be by convention, rather than by primary election." <u>American Party of Texas</u>, 415 U.S. at 781. Thus, the State has a legitimate interest in avoiding voter confusion that a political party settle any intra-party disputes about its nominee prior to the general election and thereby serve that state interest in avoiding voter confusion about the nominees on the ballot.

63

The Defendants' experts argue that the purpose of primaries was to eliminate party bosses' control and allow more voter participation in the selection of the party's nominee. Those historical references are to the major political parties. First, as the Supreme Court observed that in evaluating these ballot access laws, there are "obvious differences in kind between the needs and potentials of a political party with historically established broad support . . . and a new or small political organization." American Party of Texas, 415 U.S. at 782 n.13. Second, to follow these experts and to adopt the State's rationale to coerce minor political parties to engage in primaries where nonparty members could vote, would be to overrule Jones.

Based upon Timmons and the holding in Jones, the Court concludes that Tennessee cannot force Plaintiffs, as minor political parties, to select their nominees by primary election and to compel Plaintiffs to do so violates Plaintiffs' First Amendment right of association, including the right to select the nominees or spokespersons for their parties. Thus, the Court concludes that Tenn. Code Ann. § 2-13-202 cannot be enforced by the State upon Plaintiffs. In light of American Party of Texas, the State can require the Plaintiffs and any minor political party to nominate their nominees by convention. This conclusion renders moot any consideration of whether Section 2-13-202's requirement that a "Recognized minor party" field candidates for all of the listed offices in Section 2-13-202 violates Plaintiffs' First Amendment rights.

### c. The 2.5% Signature Requirement

Under Tennessee 2011 amendments, to satisfy the petition requirements for a "Recognized minor party" in Tenn. Code Ann. § 2-1-104(24), Plaintiffs must collect 2.5% of the votes in the last gubernatorial election that undisputedly translates to 40,039 valid signatures of registered voters. Plaintiffs note that only five states have a higher petition signature requirement

than Tennessee, and except for Alaska, those States' populations far exceed Tennessee's population. Plaintiffs also contend that the rule of thumb is that Plaintiffs must actually collect between 1.5- 1.75 times the minimum number of signatures required to assure compliance with a state laws. Thus, Plaintiffs assert that as minor parties, Plaintiffs must actually collect in excess of 60,000 signatures for state recognition and ballot access for its candidates. Plaintiffs' proof is that to collect the necessary signatures, minor parties party must utilize paid persons to collect signatures at market cost of between $1.50-2.00 per signature yielding $120,000 in costs to meet Tennessee's 2.5% requirement. (Docket Entry No. 20, Winger Report at 29). This amount depletes Plaintiffs' resources for its electoral activities. Although the Defendants dispute this amount, the Court does not deem this dispute a material factual dispute in light of the applicable law.

As to the requested percentage of signatures, the Defendants cite and as the Court observed in Goins, multiple decisions of the Supreme Court and Circuit courts upholding as high as five percent (5%) of the total vote for political party recognition and ballot access as constitutional. See e.g., American Party of Texas, 415 U.S. at 789 ("Demanding signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face"); Storer, 415 U.S. at 739-40 (5% requirement not facially unconstitutional); Jenness v. Fortson, 403 U.S. 431, 438-39 (1971) (upholding Georgia statue requiring signatures of 5% of registered voters before independent candidates could be placed on ballot). To be sure, other circuits have upheld higher percentage requirements. Cartwright v. Barnes, 304 F.3d 1138, 1141-42 (11th Cir. 2002) (reaffirming constitutionality of Georgia 5% signature requirement); Rainbow Coalition of Okla. v. Oklahoma State Election Bd., 844 F.2d 740, 741-42, 744 (10th Cir. 1988) (upholding

Oklahoma statue requiring signatures of 5% of the number of votes cast in the most recent election)

Other Circuits have upheld state laws requiring 2% to 3% of the total vote for ballot access as a recognized political party. Swanson v. Worley, 490 F.3d 894, 905 (11th Cir. 2007) (upholding Alabama statute requiring independent candidates obtain signatures of 3% of vote in last gubernatorial election); Rogers v. Corbett, 468 F.3d 188, 195 (3rd Cir. 2006) (uphold Pennsylvania statutes requiring candidate of minor political party obtain signatures of 2% of vote in last election); Libertarian Party of Florida v. Florida, 710 F.2d 790, 792-95 (11th Cir. 1983) (upholding Florida statute requiring minor party candidate obtain signatures of 3% of all registered voters to appear on general election ballot). The Court agrees that for a facial challenge, the 2.5% requirement alone is a reasonable state regulation for the reasons set forth by the esteemed late jurist William M. Leech, sitting as Special Justice in Tennessee Libertarian Party v. Democratic Party, 555 S.W.2d 102, 103-05 (Tenn. 1977). Goins focused on the percentage requirement of this statute and prior case law. Unlike in Goins, Defendants present empirical evidence from their experts that must be considered.

Here, citing empirical evidence, Defendants' experts opine, in essence, that for Plaintiffs, as minor political parties, to obtain significant voter support in Tennessee, is an act of political futility. In American Party of Texas where minority candidates had to obtain 1% of the vote for governor at last general election, 415 U.S. at 782, the Court stated: "what is demanded may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot," 415 U.S. at 783. Yet, aside from mere percentages, the Court deems probative that in American Party of Texas, the Supreme Court

stated: "The District Court recognized that any fixed percentage requirement is necessarily arbitrary, but we agree with it that the required measure of support -1% of the vote for governor in the last general election and in this instance **22,000 signatures-falls within the outer boundaries of support the State may require before according political parties ballot position.**" 415 U.S. at 783 (emphasis added). Here, Tennessee far exceeds this outer limit of 22,000 signatures in <u>American Party of Texas</u>. Given the significantly higher 2 million voters in Texas, Tennessee's outer limit should be significantly lesser than 22,000.

In <u>Blackwell</u>, Ohio's political party registration signature requirement was one percent of the total vote cast in the previous election or 30,000 signatures. The Sixth Circuit observed that: "The evidence in the record shows that in Ohio, elections have indeed been monopolized by two parties, and thus, the burdens imposed by the state's election laws are 'far from remote.' . . . Ohio is among the most restrictive, if not the most restrictive, state in granting minor parties access to the ballot. Of the eight most populous states, Ohio has had by far the fewest minor political parties on its general election ballot.'" 462 F.3d at 589 (citing <u>California Democratic Party v. Jones</u>, 530 U.S. 567, 578 (2000)).

This empirical proof from Plaintiffs' and Defendants' experts converts Plaintiffs' challenge into or resembles an "as applied" challenge. The Defendants also submitted proof beyond historical facts. The Defendants' expert proof cites electoral outcomes for minor political parties in other States and Tennessee's electoral outcomes for minor political parties that show lesser support for minor political parties in Tennessee than in other States. With the"Winner take All" electoral rule, Defendants' experts opine that Plaintiffs face political futility in gathering the voter support to meet Tennessee's 40,039 signature requirement. Plaintiffs' expert opinion was

that based upon Tennessee's historical record, minor political parties' prospect for success of

obtaining recognition as a state-wide political party in Tennessee is "'impossible, or virtually

impossible.'" Goins, 793 F. Supp.2d at 1073 (quoting Docket Entry No. 25-3, Plaintiffs'

Amended Expert Report at 7).

Thus, these undisputed facts satisfy the Court that Tennessee 2.5 % signature requirement

to be a "Recognized minor party", that requires 40,039 signatures of registered voters, in its

effects, constitutes an undue and impermissible burden upon Plaintiffs' First Amendment rights

to associate as minor political parties and to secure ballot access for their candidates for whom

Tennessee voters would have the opportunity to vote.

As to the state interests that justify this 2.5% requirement, Defendants cite various

administrative burdens upon state and local election officials, the most significant is the

verification of signatories to a minor political party's petition for ballot access. To be sure,

verification of signatures is a legitimate state interest, but the State has imposed this burden upon

itself. Thus, this burden is a reflection of the State's excessive signature requirement.[11] As to

administrative burdens, Blackwell, addressed, but did not decide similar administrative concerns

to justify Ohio's 120 day deadline:

> The State argues that a filing deadline 120 days in advance of the primary election
> allows a reasonable amount of time to process a petition for the registration of a
> political party. **In that 120 days, the State must certify the signatures on the**

---

[11] In American Party of Texas, the Supreme Court employed hypotheticals to assess
signature requirements. 415 U. S. at 786. Here, assuming the signatories each had three names,
120,117 names would need to be transcribed. At 60 words per minute, typists would need 2002
minutes to prepare a list of all signatories' names. That amount converts to 33 to 34 hours and
depending on the number of typists, 3 to 4 business days to prepare. With a typed list, the State's
computer database could search that list of names and it would be unlikely that such a computer
search would take three weeks or consume the full 30 days that state election officials assert that
they need to verify registration of the petition's signatories.

**petition; allow for administrative appeals; print, distribute, and proof ballots; and prepare and mail absentee ballots. It is true that a 120-day period may be a reasonable amount of time to process the registration of a political party; however, this is not the inquiry before us.fn12 Rather, we must examine whether mandating that this 120-day period take place in advance of a March primary, resulting in a filing deadline one year in advance of the general election, promotes a compelling state interest. We find it does not**.

> FN12. **Though we need not rule on this issue, the great weight of authority from other circuits indicates that a filing deadline 120 days in advance of the primary may fall short of being even a reasonable state interest.** *See supra* Part III.A.1 (discussing cases from other courts).

462 F.3d at 593 n. 12 (emphasis added).

Blackwell's observations and citations to other decisions on similar administrative concerns create grave doubts about the reasonableness of Defendants' proof of administrative concerns. As discussed earlier, the cited federal laws have been in effect for decades, including ballots to be mailed to overseas voters. Defendants' proof of administrative concerns is, in large measure, speculative in nature because a minor political party has never been able to satisfy the 2.5% signature requirement. Conserving state resources alone cannot justify a limitation or barrier to minor political parties' ballot access. Bullock v. Carter, 405 U.S. 134, 144-45, 147-49 (1972).

At the core of these administrative burdens is the state and local election officials verification of 40,039 signatures. Those burdens would be substantially lessened, if state and local election officials had fewer signatures to verify. Tennessee requires only 2,500 voter signatures for ballot access in the primary for a candidate of a statewide political party. Tenn. Code Ann. § 2-5-205(a)(2). Tennessee requires only 275 signatures for an individual to be listed on the general election ballot as a candidate for President of the United States. Tenn. Code Ann.

§ 2-5-101(b)(1). Tennessee's 25 signature requirement for independent candidates in the general election produced 16 candidates for governor without presenting any ballot problems. (Docket Entry No. 36-10 at 32). To add two or three candidates to the prior Tennessee ballots would not present a complex or confusing ballot. In fact, Tennessee placed a minor party candidate with his party's name next to his name on the ballot and the label "Independent" candidate. Supra at 8. If Tennessee deems 25 and 275 signatures a sufficient modicum of support to run for Governor and President of the United States and only 2500 signatures to run as a candidate in a party's Presidential primary, the Court is at a loss to understand the justifications for the 40,039 signatures for Plaintiffs, as minor political parties, particularly given that Tennessee's 40,093 signatories that almost doubles American Party of Texas's outer limit of 22,000 signatories.

Defendants' experts deemed the ballot access of independent candidates to be the functional equivalent or meaningful alternative for ballot access for minor political parties and their candidates.[12] If so, then the Court is at a loss to understand the justifications for the 40,039 signatures for Plaintiffs' recognition as political parties and their candidates' ballot access and the relatively minimal showing of 25 signatories for the same candidate as independent. Statistical disparities in a party's candidates' qualifying for ballot access can violate the First Amendment. In Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 186 (1979), the Supreme Court struck down, as a First Amendment violation, an Illinois ballot access law for statewide elections that required a political party to secure 63,000 signatures for ballot access for its candidates in Chicago, but only 25,000 signatures in other counties. In a strikingly similar controversy, in Citizens to Establish a Reform Party v. Priest, 970 F. Supp. 690 (E.D.

---

[12] If minor party candidates qualifies, then there is not any burden. Munro, 479 U.S. at 196-97.

Ark. 1996), that was cited in <u>Blackwell</u>, albeit on other grounds, the District Court ruled

unconstitutional a 3% signature requirement with similar historical effects of exclusion of minor

political parties from the ballot, as in Tennessee. In <u>Priest</u>, Arkansas also had an alternate method

for ballot access as an independent candidate. For such an alternative, the District Court held:

> The Arkansas Legislature's unequal treatment of the procedures required for
> demonstration of support of a new political party and corresponding provision for
> an independent candidate constitute a violation of the Equal Protection Clause of
> the Fourteenth Amendment of the United States Constitution. Secretary of State
> Priest is, therefore, enjoined from enforcing Ark.Code Ann. §§ 7-1-101(1) and
> 7-7-203(g)[.]

<u>Id.</u> at 699.[13]  The District Court's remedy was that "Plaintiffs are deemed to have qualified as a

new political party in view of the 17,262 signatures validated by Secretary of State Priest on

February 16, 1996." <u>Id.</u>

Based upon these facts and precedents, the Court concludes that the State lacks a

legitimate state interest to justify the continuing burden of this 2.5 % of registered voters upon

minor political parties and their candidates' access to the ballot for voters' consideration. All the

State can require is a "showing of a modicum of support **among potential voters.**" <u>Munro</u>, 479

U.S. at 193 (emphasis added). Thus, "if there are other, reasonable ways to achieve those goals

with a lesser burden on constitutionally protected activity, a State may not choose the way of

greater interference. If it acts at all, it must choose 'less drastic means.'" <u>Dunn v. Blumstein</u>, 405

U.S. 330, 343 (1972).  <u>Bulluck v. Carter</u>, 405 U.S. 134, 145 (1972) ("[A] State cannot achieve its

objectives by totally arbitrary means; the criterion for differing treatment must bear some

relevance to the object of the legislation.").

---

[13] "[B]allot access cases are equally cognizable under the First Amendment" and "the
Equal Protection analysis in arriving at a decision". <u>Goldman-Frankie v. Austin</u>, 727 F.2d 603,
606 n. 2 (6th 1984)(citing Anderson).

As to the defense expert's opinions on the minor political party's futility in Tennessee, the First Amendment is the cornerstone for other constitutional rights in the Bill of Rights and the Constitution. Without the First Amendment's right of access to the courts, enforcement of constitutional rights and provisions could be rendered meaningless. The First Amendment rights of free speech, of petition for redress and to associate are critical to our democratic principles. These fundamental rights and their enforcement cannot be conditioned upon political expediency nor limited by contemporary political outcomes. "A candidate who wishes to be a party candidate should not be compelled to adopt an independent status in order to participate in the electoral process." McClain v. Meier, 637 F.2d 1159, 1165 (8th Cir. 1980) (citing Storer, 415 U.S. at 745, "[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."). "All political ideas cannot and should not be channeled into programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups which innumerable times have been at the vanguard of democratic thought and whose programs were ultimately accepted. ... The absence of such voices would be a symptom of grave illness in our society". Sweezy. 354 U.S. at 250-51. The Court concludes that its decision on the  First Amendment must be based upon constitutional values, not political values or political expediency.

### d. The 119 day Deadline

Plaintiffs also challenge that the 119 day deadline before the August primary, alone and in combination with the 2.5% signatory requirement, as excessive burdens upon their First Amendment rights to associate. According to Plaintiffs, this deadline requires collection of signatures when voter interest is low. Plaintiffs argue that this 119 day deadline in April

purportedly freezes the political status quo before the issues in an election have been framed. Plaintiffs insist that the timing of this deadline does not allow new parties to articulate an alternate response to those issues before the major political parties nominate their candidates.

Aside from the Court's conclusion on the 2.5% signature requirement, <u>Blackwell</u> requires the Court's consideration of the 2.5% signature, coupled with Tennessee's 119 day deadline. The constitutional "inquiry is not whether each law individually creates an impermissible burden **but rather whether the combined effect of the applicable election regulations** creates an unconstitutional burden on First Amendment rights." <u>Blackwell</u>, 462 F.3d at 586 (citing <u>Williams</u>, 393 U.S. at 34) (emphasis added).

As an initial issue, Defendants cite as a significant distinction that this 119 day deadline applies to both major and minor political parties. The Court disagrees because, as the Supreme Court observed in evaluating state ballot access laws, that there are "obvious differences in kind between the needs and potentials of a political party with historically established broad support . . . and a new or small political organization[.]" <u>American Party of Texas</u>, 415 U.S. at 782 n.13

The combined effect of Tenn. Code Ann. §§ 2-5-101(a)(1)and (2), 2-13-107(a), 2-13-201(a) and 2-13-202 requires petitions to obtain recognition as a "Recognized minor party" to be filed at least 119 days before the August state primary, i.e., the first Thursday in April of the election year, creating the 119 day requirement. Without extending this analysis, the Court does not discern any meaningful distinction between Ohio's 120 day deadline in <u>Blackwell</u> and Tennessee's 119 day deadline.

As stated in <u>Blackwell</u>, the Sixth Circuit cited and relied upon decisions in other Circuits and district courts holding State deadlines of 60 days and 90 days prior to a primary as creating

burdens for minor political parties and voters. 462 F.3d at 586 (citing Council of Alternative Parties v. Hooks, 121 F.3d 876, 880 (3d Cir. 1997) (60 day deadline before primary an undue burden because "the election is remote and voters are generally uninterested in the campaign"); McLain v. Meier, 851 F.2d 1045, 1050-51 (8th Cir. 1988) (Nebraska's February deadline 90 days prior to the primary unconstitutional). Significantly, Blackwell and Goins cited other district courts in this Circuit that have stricken state deadlines for lesser periods of time than Tennessee's 120 day deadline. Cripps v. Seneca County Bd. of Elections, 629 F. Supp. 1335, 1342 (N.D. Ohio 1985) (deadline of 75 days before the primary for independent candidates violates the First Amendment).

Of particular note is that Blackwell and Goins cited approvingly Libertarian Party of Kentucky v. Ehrler, 776 F. Supp. 1200, 1205-06 (E.D. Ky. 1991), holding Kentucky's 119 day deadline for filings by minor political parties prior to the Kentucky primary was unconstitutional as an undue burden on voters and minor political parties.

Tennessee's 119 day deadline is justified by the state and local election officials' verification of the registration, signatures and address on the new political party's petition. Defendants also interpose compliance with federal and state laws on absentee ballots, access for handicapped citizens and training of state and local officials to justify the 119 day deadline. Yet, as discussed earlier, supra at 42-43, with the exception of military personnel, the laws requiring mailing ballots overseas have been in effect since at least 1975. As to access for handicapped citizens, the Americans with Disabilities Act on the State's and counties' obligations to make reasonable accommodations for voting by disabled citizens was enacted in 1990. Defendants cite administrative costs and training responsibilities, but as discussed earlier, Blackwell observed

that other courts found comparable administrative concerns insufficient to justify unreasonable filing deadlines. Because a minor political party's petition has never been subjected to this process in Tennessee for decades, Defendants' proof of estimates of the administrative burdens are speculative. Given that the core of these administrative burdens is premised on the 40,039 signature requirement and based upon the language from <u>Blackwell</u>, quoted <u>supra</u> at 68-69, the Court concludes that these administrative concerns that have actually existed for decades, do not pose undue burdens on the state and local election officials to justify the 119 day deadline.

Aside from administrative concerns, Plaintiffs challenge the adverse political consequences with the timing of this 119 day deadline as arising at a time of less desirable environment for spurring political interests among citizens. In <u>Anderson</u>, the Supreme Court recognized this adverse impact of a State's early registration on a presidential candidate and voters:

> An early filing deadline may have a substantial impact on independent-minded voters. In election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time. Various candidates rise and fall in popularity; domestic and international developments bring new issues to center stage and may affect voters' assessments of national problems. Such developments will certainly affect the strategies of candidates who have already entered the race; they may also create opportunities for new candidacies. Yet **Ohio's filing deadline prevents persons who wish to be independent candidates from entering the significant political arena established in the State by a Presidential election campaign-and creating new political coalitions of Ohio voters-at any time after mid-to-late March. At this point developments in campaigns for the major-party nominations have only begun, and the major parties will not adopt their nominees and platforms for another five months. Candidates and supporters within the major parties thus have the political advantage of continued flexibility; for independents, the inflexibility imposed by the March filing deadline is a correlative disadvantage because of the competitive nature of the electoral process.**

* * *

"Since the principal policies of the major parties change to some extent from year to year, and since the identity of the likely major party nominees may not be known until shortly before the election, this disaffected 'group' will rarely if ever be a cohesive or identifiable group until a few months before the election." Indeed, several important third-party candidacies in American history were launched after the two major parties staked out their positions and selected their nominees at national conventions during the summer.

\* \* \*

The name of the nominees of the Democratic and Republican parties will appear on the Ohio ballot in November even if they did not decide to run until after Ohio's March deadline had passed, but the independent is simply denied a position on the ballot if he waits too long. Thus, **under Ohio's scheme, the major parties may include all events preceding their national conventions in the calculus that produces their respective nominees and campaign platforms, but the independent's judgment must be based on a history that ends in March.**

460 U.S. at 790-91, 791-92, 799-800 (emphasis added) (citations and footnotes omitted).

Although Anderson involved a political candidate, the Sixth Circuit applied Anderson to a political party's ballot access claim. Goldman-Frankie, 727 F.2d at 605-06.

"The right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamouring for a place on the ballot.'" Anderson, 460 U.S. at 787 (citing Williams, 393 U.S. at 31). As a measure of voter interest and the education of voters on the political issues, the Supreme Court expressly recognized that time deadlines far removed from actual elections are insufficient State interest in a voter access action arising out of Tennessee:

**Given modern communications, and given the clear indication that campaign spending and voter education occur largely during the month before an election**, the State cannot seriously maintain that it is 'necessary' to reside for a year in the State and three months in the county in order to be knowledgeable about congressional, state, or even purely local elections.

Dunn, 405 U.S. at 358 (emphasis added) (footnote omitted). Dunn held Tennessee's one year

residency requirement for voters violated the equal protection clause of the Fourteenth Amendment. Id. at 342, 352, 360.

In Blackwell, Ohio's political party registration requirement amounted to only one percent of the total vote cast in the previous election. 462 F.3d at 583. Yet, this fact did not preclude the Court's conclusion that Ohio's 120 day deadline rendered Ohio's scheme unconstitutional where the 120 days deadline was a year prior to the general election. In Blackwell, the Sixth Circuit recognized the impact of the timing of state filing deadlines for minor political parties:

> Deadlines early in the election cycle require minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized. In this case, the LPO needed to find more than thirty thousand Ohio residents to sign its petition to appear on the 2004 ballot more than one year in advance of the election. Early deadlines also have the effect of ensuring that any contentious issue raised in the same year as an election cannot be responded to by the formation of a new political party. The combination of these burdens impacts the party's ability to appear on the general election ballot, and thus, its opportunity to garner votes and win the right to govern.
>
> * * *
>
> We find both the reasoning and the conclusions of these courts to be compelling. Ohio's deadline in the November preceding the election is the earliest of any deadline reviewed by a federal court. **It is 120 days in advance of the primary election and 364 days ahead of the general election for which the party wishes to appear on the ballot. This deadline imposes a severe burden on the First Amendment rights of the LPO.**

462 F.3d at 586, 591.

Here, the time differential between the State's 119 day deadline and the Tennessee general election is 7 months. See New Alliance Party of Ala. v. Hand, 933 F.2d 1568, 1576 (11th Cir. 1991) ("No one can seriously contend that a deadline for filing for a minor party and its candidates seven months prior to the [general] election is required to advance legitimate state

interests."). The practical effect of Tennessee's 2.5 % signature requirements would force a minor political party to commence its petition activity 10 to 12 months or more before a general election in Tennessee. Although Ohio's 120 days deadline in Blackwell created a 12 month differential, Anderson and the decisions approvingly cited in Blackwell recognize the adverse impact on voters and minor political parties of a deadline of 119 days or less prior to the primary.

In addition, a comparison of minor political parties' participation in Tennessee elections prior to the enactment of these statutes, with minor political parties' participation after these statutes were enacted in 1961, reveals the undue burden and adverse impact of these State laws on minor political parties, their members and Tennessee voters. In addition, Plaintiffs have proven their and other minor political parties' multiple unsuccessful efforts at obtaining recognition as a statewide political party in Tennessee. Plaintiffs' expert proof is that compliance with Tennessee's requirements for recognition as a statewide political party is "impossible, or virtually impossible." Goins, 793 F. Supp.2d at 1073 (quoting Docket Entry No. 25-3, Amended Expert Report at 7). "[T]he State may not act to maintain the 'status quo' by making it virtually impossible for any but two major parties to achieve ballot position for their candidates", Clements v. Fashing, 457 U.S. 957, 965 (1982) (J. Rehnquist), nor adopt a system that "freezes the status quo." Jenness, 403 U.S. at 439 and American Party of Texas, 415 U.S. 787.

Under these circumstances and based upon the authorities cited, the Court concludes that Tennessee's 119 days deadline, alone and in combination with the 2.5% requirement of Section 2-1-104(a)(24), unduly burdens Plaintiffs' First Amendment rights to vote and to associate as a political party and Tennessee voters' rights to have the opportunity to vote for alternative political parties. This deadline serves to create a monopoly for the two party system in

Tennessee, an impermissible effect under Blackwell.

To be sure, Defendants' experts challenge the core rationale of these decisions on deadlines months prior to a primary or general election as inconsistent with the contemporary political environment. In sum, Defendants' experts cite changing federal campaign finance laws and fundraising, earlier declarations of candidacies by members of the major political parties and States' acceleration of their caucus and primary dates as trends that create interest in the public about political parties. In defense experts' views, these trends allow the minor political parties to assess, in a much earlier time frame, their candidates and the major parties' political positions prior to April. These experts opine that these trends also generate sufficient interests among the citizenry to enhance or assist minor political parties in soliciting support from the public. Defense experts also suggest that minor parties' viable option is to pursue either absorption by the major party or to have their candidates run in the majority party or as independent candidates.

The Court draws guidance from the Supreme Court's decisions cited supra at 71-72, and observation that there are "obvious differences in kind between the needs and potentials of a political party with historically established broad support . . . and a new or small political organization." American Party of Texas, 415 U.S. at 782 n.13. Moreover, "[a] candidate's appearance without a party affiliation is not a substitute for appearing under a party name, and it does not lessen the burden imposed by Ohio's restrictions on minor parties". Blackwell, 462 F.3d at 592.

### e. The Majority Party's Ballot Preference

Plaintiffs assert an Equal Protection claim that Tenn. Code Ann. § 2-5-208(d)(1), awarding a preferential position on the ballot to the current majority party, discriminates against

Plaintiffs in violation of the Equal Protection Clause of the Fourteenth Amendment. This statute

provides as follows:

> **Notwithstanding any other provision of this chapter or this title, on general
> election ballots, the name of each political party having nominees on the
> ballot shall be listed in the following order: majority party, minority party,
> and recognized minor party, if any.** The names of the political party candidates
> shall be alphabetically listed underneath the appropriate column for the
> candidate's party. A column for independent candidates shall follow the
> recognized minor party, or if there is not a recognized minor party on the ballot,
> shall follow the minority party, with the listing of the candidates' names
> alphabetically underneath.

Tenn. Code Ann. § 2-5-208(d)(1) (emphasis added).

As a general rule, a State has the authority to organize its election ballot. United States v.

Classic, 313 U.S. 299 (1941). In Rosen v. Brown, 970 F.2d. 169 (6th Cir. 1992), an unanimous

opinion authored by the late Ted Milburn, a jurist from Tennessee, the Sixth Circuit considered

an Ohio law that prohibited the use of the word "Independent" with a nonparty candidate. Citing

expert testimony, the Sixth Circuit found that by listing the major political party's name next to

its candidate's name, the State provided a "voting cue" to Democratic and Republican candidates

rendering "it virtually impossible for Independent candidates to prevail in the general election."

Id. at 176. In pertinent part, the Sixth Circuit reasoned:

> Once a State admits a particular subject to the ballot and commences to
> manipulate the content or to legislate what shall and shall not appear, it must take
> into account the provisions of the Federal and State Constitutions regarding
> freedom of speech and association, together with the provisions assuring equal
> protection of the laws.
>
> * * *
>
> The voter interests at stake are basic associational rights secured against state
> action by the First and Fourteenth Amendments, and any restriction on ballot
> access by candidates necessarily burdens the rights of their supporters.

\* \* \*

[P]laintiffs' three expert witnesses ... show that **the State infringes upon the right of supporters of Independent candidates to meaningfully vote and meaningfully associate by providing a "voting cue" to Democratic and Republican candidates which makes it virtually impossible for Independent candidates to prevail in the general election.**

\* \* \*

Ohio concedes that "General election ballot designations are simply government provided information designed to inform voters of the political party affiliation of each candidate...." Appellant's Brief, pp. 7-8. The state asserts that it may inform voters of the political party affiliation of each party candidate because it "has a compelling interest in supporting its party system by regulating the election process ... and [a] legitimate interest in protecting political parties...."

One of the electoral interests which states may protect by reasonable regulation is the integrity of established and formally recognized major political parties; however, this interest may not extend to the effective exclusion of Independent and new party candidacies. See Cromer, 917 F.2d at 823. The qualitative difference between an Independent candidacy and a party candidacy justifies differences in treatment.

\* \* \*

Ohio produces a ballot which gives a "voting cue" or "clue" to Democratic and Republican candidates but excludes such a "voting cue" to Independent or third-party candidates.

Id. at 175, 176, 177 (citations omitted).

Two other Circuits hold that a ballot position based upon the parties' vote in the last election to be unconstitutional. Sangmeister v. Woodard, 565 F.2d 460, 465-67 (7th Cir. 1977) (election officials' giving their party's candidates preferential placement at top of the ballot unconstitutional); McClain, 637 F.2d at 1169 (placing incumbent first on ballot unconstitutional). See also Graves v. McElderry, 946 F. Supp. 1569, 1579-80, 1581-82 (W.D. Okla. 1996). Contra, New Alliance Party v. New York State Bd.of Elections, 861 F. Supp. 282, 287 (S. D. N.Y. 1994); Tsongas v. Sec'y of Commonwealth, 291 N.E.2d 149, 153 (Mass. Jud. Ct. 1972); Clough v.

Guzzi, 416 F. Supp. 1057 (D. Mass. 1976). The Seventh Circuit upheld the placement of major political parties on the ballot before minor political parties, to avoid "a very real risk of voter confusion." Bd. of Election Comm'rs of Chicago v. Libertarian Party of Illinois, 591 F.2d 22, 26 (7th Cir. 1979). Yet, promoting stability of two parties is an impermissible state interest that the First Amendment does not recognize. Williams, 393 U.S. at 31-32.

Defendants insist that the Plaintiffs must prove actual prejudice from this preferential placement statute. Yet, in Rosen, the Sixth Circuit had expert proof of such prejudice from multiple experts. This Court cannot ignore Rosen's precedential effect about the actual prejudices of ballot preference. Second, empirical evidence in the social sciences corroborates the Sixth Circuit's and other circuits' holdings on the prejudicial effects of preferential ballot placement. Joanne M. Miller & Jon A. Krosnick, "The Impact of Candidate Name Order on Election Outcomes", 62 Pub. Opinion Q., Vol. 62 No.3, 291, 293-94, 308-09 (1998). More than a decade later, Rosen's findings of prejudice from preferential ballot placement continue to be viable. See Laura Miller, "Election by Lottery: Ballot Order, Equal Protection, and the Irrational Voter", 13 N.Y.U. J. Legis. & Pub. Pol'y 373, 405 (2010) (collecting empirical social science studies). As the latter article concludes:"Substantial empirical evidence points to the conclusion that ballot order effects, particularly in relatively low salience elections, are both statistically significant and large enough in magnitude to alter the outcomes of elections." Id.

To be sure, in Timmons, the Supreme Court stated that a State may enact laws that "favor the traditional two party system". 520 U.S. at 367. Yet, the preferential ballot placement here favors the majority party, and empirical evidence is that such laws favor the preferred party, not both parties. As the Sixth Circuit stated where a "State...is controlled by the political parties in

power, '[those parties] presumably have an incentive to shape the rules of the electoral game to their own benefit.'" Blackwell, 462 F.3d at 587 (quoting Clingman v. Beaver, 544 U.S. at 603 (O'Connor, J., concurring)).

Based upon Rosen and the historical results for minor political parties in Tennessee, the Court concludes that Tenn. Code Ann. § 2-5-208(d)(1)'s preferential placement of the majority party candidates on election ballots provides an impermissible "voting cue" that violates Plaintiffs' First Amendment rights as well as the First Amendment rights of Tennessee voters. Plaintiffs' proposed remedy of placement of candidates based upon public drawing of lots or other random method would serve "the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." Norman, 502 U.S. at 288. As the Eighth Circuit observed: "[W]e do not now undertake on this record to determine which rotation arrangement is financially and administratively feasible, although we feel obligated to stress the constitutional requirement that position advantage must be eliminated as much as possible." McClain, 637 F.2d at 1169.

Thus, the Court concludes that Tenn. Code Ann. §2-5-208(d)(1) violates the First Amendment rights of Plaintiffs, other political parties and Tennessee voters.

### f. The Bar of "Nonpartisan or Independent" in Political Parties' Names

Tenn. Code Ann. § 2-13-107(d) that is in the 2011 amendments to Tennessee's ballot elections laws provides as follows:

> (d) **The name used by the minor party** shall not be or include the name of any statewide political party then in existence or any word forming any part of the name of any statewide political party then in existence, and **shall not include the word "independent" or "nonpartisan."** The coordinator of elections shall redact any portion of a minor party name that violates this section.

83

Id. (emphasis added).

Under Timmons, 520 U.S. at 364, "[S]tates certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election process" and may bar "frivolous or fraudulent candidacies." Bullock, 405 U.S. at 145. Political parties cannot use the ballot "to send a particularized message, to its candidate and to voters, about the nature of its support for the candidate." Timmons, 520 U.S. at 362. As a matter of law, to preclude the use of the term "Independent" party would appear to violate Rosen. As a factual matter, in past elections, Tennessee allowed the political party "American Independent Party" to be on the ballot in 1972. In addition, minor political party candidates have been listed on the ballot with the term "Independent" next to their names. Supra at 11. The term "Nonpartisan" is not shown to carry any more of a message than "Democratic" and "Republican." Given Tennessee's history of ballot names and the absence of any showing of a particularized message or false or misleading characteristics, the Court cannot discern the state's legitimate interest in the suppression of the use of these terms in a political party's name. Thus, the Court concludes that Tenn. Code Ann. §2-13-107(d) violates a minor political party's and its members' First Amendment right of free speech.

### g. Plaintiffs' Non-Delegation Claim

For these claims, Plaintiffs contend that in Tenn. Code Ann. § 2-1-104(a)(24)'s definition of a "Recognized minor party," the General Assembly delegated to the State Coordinator of Elections, but that statute does not "delineate the general policy" nor articulate "intelligible standards" for the Coordinator's exercise of the "delegated" authority nor fix "the boundaries of this delegated authority." Specifically, Plaintiffs argue that Tenn. Code Ann. § 2-1-104(a)(24)

sets only the minimum number of signatures and thus, under this statute, the Coordinator of Elections may require higher number of signatures. Coordinator of Elections could also require that signatures on petitions be notarized or that signature collectors be registered voters. Plaintiffs cite this statute's failure to fix the date by which relevant regulations must be published and assert that any delay in promulgating may leave insufficient time for Plaintiffs to collect petition signatures or to secure ballot access. Finally, Plaintiffs challenge this statute's failure to prescribe language for a qualifying petition so as to allow the Coordinator of Elections or Plaintiffs to determine if a petition is acceptable.

Tenn. Code Ann. § 2-1-104(a)(24) provides that minor parties must "conform to requirements established by the coordinator of elections, but which must at a minimum bear the signatures of registered voters equal to at least two and one-half percent (2.5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor."

Under the non-delegation doctrine, a legislature "is not permitted to abdicate or transfer to others the essential legislative functions with which it is thus vested." Panama Ref. Co. v. Ryan, 293 U.S. 388, 421 (1935). "The non-delegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of government." Mistretta v. United States, 488 U.S. 361, 371 (1989). To satisfy constitutional standards, a "delegating" statute must clearly delineate the powers delegated and the limits of its delegated powers. See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472 (2001) ("[W]hen Congress confers decisionmaking authority upon agencies, *Congress* must 'lay down by legislative act an *intelligible principle* to which the person or body authorized to [act] is directed to conform.'") (emphasis in original and added); Am. Power Light Co. v. SEC, 329 U.S. 90, 105 (1946) (stating that delegation is

"constitutionally sufficient if Congress clearly delineates the *general policy*, the public agency which is to apply it, and the *boundaries of this delegated authority*") (emphasis added).

Here, Article 1, Section 4, of the United States Constitution, generally referred to as the "Elections Clause," provides, in relevant part, that: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." In Libertarian Party of Ohio v. Brunner, 567 F. Supp.2d 1006 (S.D. Ohio 2008), the Secretary of State issued a "Directive" on the requirements for nominating petitions filed by minor party candidates because in Blackwell the Sixth Circuit declared the applicable Ohio laws unconstitutional. Id. at 1010. The Secretary of State sought to cure the statutory defect cited in Blackwell. In a challenge to the Secretary's authority to issue this directive, the District Court concluded that under Article I, Section 4 of the United States' Constitution, only the State legislature can establish the time, place and manner of conducting elections. Id. at 1012. Thus, the District Court held that the Secretary of State's directive was unconstitutional, reasoning:

> "The Secretary of State's authority does not . . . extend to filling a void in Ohio's election law. . . . The general, statutory authority to direct the conduct of electors cannot, as to Articles I and II of the Constitution, serve as a substitute for state legislative action regarding the election of federal officials."

Id. at 1012-13. Moreover in DeLaney v. Bartlett, 370 F. Supp.2d 373, 382 (M. D. N.C. 2004), the District Court specifically held that a statute is unconstitutional where "candidates cannot be sure from the text of the statute whether their petitions will qualify." Id. at 384.

Thus, given the absence of statutory standards for the exercise of the State Elections Coordinators's discretion and that the subject of regulation is explicitly identified in Article 1, Section 4, of the United States Constitution, the Court concludes that Section 2-1-104(a)(24) does not qualify as a permissible delegation of legislative authority.

86

### h. Vagueness Claim

Plaintiffs assert a vagueness claim that is akin to their nondelegation claim in that Section 2-1-104(a)(24) lacks any provisions that provide guidance on the scope or limits of Tennessee Coordinator of Elections' authority. Although this claim is moot in light of the Court's conclusion of the nondelegation claim, the Court briefly addresses the merits to avoid the costs of another appeal.

A statute is unconstitutionally vague if persons of "common intelligence must necessarily guess at its meaning and differ as to its application," Connally v. Gen. Const. Co., 269 U.S. 385, 391 (1926), or fails to give "a person of ordinary intelligence fair notice" of conformity with the statute's requirements, United States v. Harris, 347 U.S. 612, 617 (1954), or if it "encourages arbitrary and erratic" enforcement by public officials. Papachristou v. City of Jacksonville, 405 U.S. 156, 162, (1972). "The vice of unconstitutional vagueness is [] aggravated where ... the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution...." Cramp v. Board of Public Instruction, 368 U.S. 278, 287 (1961). "Laws must provide explicit standards for those who apply them." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

The vagueness test is applied more stringently where First Amendment rights are affected as described by the Supreme Court:

> "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. *If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.*"

Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982) (emphasis added).

Beyond the minimum signature provision, Section 2-1-104(a)(24) grants the State Coordinator of Elections unfettered discretion to establish party qualifying petition requirements that the legislature failed to establish, rendering this statute unconstitutionally vague. City of Chicago v. Morales, 527 U.S. 41, 51-52 (1999) (Enactments that are so imprecise that officials have unfettered discretion in their application are void for vagueness.); see also Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 772 (1988) (holding unconstitutional a statute giving unfettered discretion to city's mayor to grant or deny permits to place news racks on public property). This vagueness doctrine was applied in an election controversy. See Deoro v. Delaware Co., No. 08-5762, 2009 WL 2245067, at *2 (E.D. Pa. July 27, 2009) ("Granting unfettered discretion to [] officials [] is unconstitutional because it can lead to 'arbitrary deprivations of [constitutionally protected] interests' and/or create the potential to abuse power at the expense of another.") (citation omitted).

Given Supreme Court holdings that ballot access limiting restrictions must be narrowly tailored to achieve a legitimate state interest, the Court concludes that the undefined discretion of the State Coordinator of Elections in Section 2-1-104(a)(24) fails for vagueness.

### C. Conclusion.

For these reasons, the Court concludes that alone and in combination, Tennessee's 2.5% requirement and 119 day deadline for ballot access as a "Recognized minor party" and its candidates violate Plaintiffs' First Amendment rights to associate and Tennessee voters' rights to vote for such parties' candidates. The Court also concludes that the State's "Nominating Petition" form impermissibly compels the signatory's affirmation that he or she is a member of the party in violation of Plaintiffs' and the signatory's First Amendment right of association and

privacy of the signatory's political beliefs. The Court further concludes that the State's requirement that minor political parties select their nominees by primary elections is an impermissible intrusion of the Plaintiffs' First Amendment right of association that includes the right to select their nominees. Tenn. Code Ann. § 2-13-107(d) barring the words "Independent" and "Nonpartisan" in the name(s) of political parties violates the First Amendment rights of free speech of minor political parties and their members. Finally, Tenn. Code. Ann. §2-1-104(a)(24) is unconstitutional as an improper delegation of legislative authority conferred on the State by Article 1, Section 4 of the United States Constitution and, in the alternative, that the undefined discretion of the State Coordinator of Elections in § 2-1-104(a)(24) fails for vagueness.

As to the appropriate relief, based upon the precedents in <u>Blackwell</u>, the Court deems any deadline in excess of sixty (60) days prior to the August primary for the filing of petitions for recognition as a political party is unenforceable. As to the number of signatures required for recognition as a political party, given the State's acceptance of 25 signatures for candidates for Governor and 275 signatures for President of the United States, the Court deems GPT's past electoral support of almost 20,00 votes and CPT's almost 10,000 signatories to constitute a significant showing of support to justify their recognition as political parties and to have their parties' names next to their candidates on the general election ballot. The Defendants shall be required to conduct a public random drawing for the order of placement of the political parties' candidates' names on the general election ballot.

The Defendants are enjoined from enforcement of the state statutes requiring Plaintiffs to select their nominees by primary, awarding ballot preference to the majority party and the use of "Independent or Nonpartisan" in a political party's name. The Defendants must revise the

89

"Nomination Petition" to delete the reference that the signatory is a member of the party.

An appropriate Order is filed herewith.

**Entered** this the _____ day of February, 2012

William J. Haynes, Jr.
United States District Judge