# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

GREEN PARTY OF TENNESSEE,　　　　)
CONSTITUTION PARTY OF　　　　　　)
TENNESSEE　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　Plaintiffs,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　No. 3:11-cv-00692
　　　　　　　　　　　　　　　　　)　　　Chief Judge Haynes
　　　　　　　　　　　　　　　　　)
TRE HARGETT in his official capacity as　)
Tennessee Secretary of State, and MARK　)
GOINS, in his official capacity as　　　　)
Coordinator of Elections for the State of　)
TENNESSEE,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　Defendants.　　　　　　　　　)

## M E M O R A N D U M

Plaintiffs, Green Party of Tennessee and the Constitutional Party of Tennessee, filed this

action under 42 U.S.C. § 1983 against the Defendants: Tre Hargett, Tennessee Secretary of State,

and Mark Goins, Tennessee's Coordinator of Election. Plaintiffs are political parties that seek

recognition and ballot access for their candidates in Tennessee's state and national elections.

Plaintiffs' original claims were: (1) that Tenn. Code Ann. §§ 2-5-101(a), 2-1-104 (a)(24) and 2-3-

107(a) effectively deny Plaintiffs the ability to qualify as a "Recognized minor party" and impose

impermissible burdens on Plaintiffs' First Amendment right to associate with its members as a

political party and effectively preclude ballot access for their candidates; (2) that Tenn. Code Ann.

§ 2-1-104(a)(24)'s requirements for a "Recognized minor party" are unconstitutionally vague and

constitute an improper delegation of undefined legislative authority to State election officials; (3)

1

that Tenn. Code Ann. § 2-5-101(a)(1) setting a 119 day deadline for minor political parties' petitions for ballot access for its candidates, approximately four months prior to the primary, is unconstitutional as a matter of law; (4) that Tenn. Code Ann. § 2-13-202, requiring minority political parties to nominate their candidates for statewide offices by primary elections, intrudes upon Plaintiffs' First Amendment right to select their nominees and to control their internal affairs; and (5) that Tenn. Code Ann. § 2-5-208(d)(1), awarding a preferential ballot position for the current majority party, discriminates against Plaintiffs in violation of the Equal Protection Clause of the Fourteenth Amendment. This action has a significant legislative history that is set forth below.

### A. History of this Litigation

This action is a sequel to an earlier action, Libertarian Party of Tennessee v. Goins, 793 F. Supp. 2d 1064 (M.D. Tenn. 2010), holding that Tenn. Code Ann. § 2-1-104(a)(30) requiring membership to sign a minor party's recognition petition violated those Plaintiffs' First Amendment right to vote, Tennessee voters' First Amendment right to privacy of their political affiliation, and Plaintiffs' First Amendment right to associate as a political party. The Court also concluded that those Plaintiffs demonstrated that Tenn. Code Ann. §2-1-104(a)(24) requiring signatures of registered voters representing 2.5% of the vote in the last gubernatorial election, coupled with the party membership requirement in Section 2-1-104(a)(30) and the State's election officials' 120[1] day deadline prior to the August primaries for petitions of new political parties, imposed an undue

---

[1]The reference to the 120 day deadline is derived from the holding in Libertarian Party of Ohio v. Blackwell, 462 F. 3d 579 (6th Cir. 2006) that a deadline for minor parties' filing for State's ballot access 120 days before a primary violates the First Amendment. Tennessee's prior deadline was the first Thursday in March of the election year that is actually 147 days before the primary, the first Tuesday in August. Goins, 793 F. Supp. 2d at 1071. In Goins, the Court cited other decisions holding deadlines from 60 to 119 days unconstitutional. Id. at 1088.

burden on Plaintiffs' First Amendment rights and effectively precluded minor political party participation in state and national elections in Tennessee.[2] The Defendants did not appeal that decision, but the Tennessee General Assembly enacted changes to the State's ballot access laws that are at issue in this action.

On July 20, 2011, Plaintiffs filed this action challenging Tennessee's amended ballot access statutes for minority political parties and asserting the claims outlined supra. In earlier proceedings, Plaintiffs filed motions for summary judgment on their claims (Docket Entry Nos. 19 and 20) that included a reference to their expert report. (Docket Entry No. 37, Defendants' Response to Plaintiffs' Statement of Undisputed Facts). The Defendants filed their response in opposition with their affidavits and experts' reports. (Docket Entry Nos. 36 through 36-4 and Docket Entry No. 39-14). On February 3, 2012, the Court granted summary judgment for Plaintiffs, concluding, in sum:

> that Tennessee's 2.5% signature requirement in Tenn. Code Ann. § 2-1-104(24), and 119 day deadline for minor parties' ballot access for their candidates as a "Recognized minor party", violated Plaintiffs' First Amendment rights to associate and Tennessee voters' rights to vote for such parties' candidates;

> that the State's "Nominating Petition" form and Tenn. Code Ann. § 2-5-102(a), violated Plaintiffs' and the signatory's First Amendment rights of association and privacy of the signatory's political beliefs by impermissibly compelling the signatory to assert support for the a minor political party's nominee's petition and that the signatory is a member of the party;

> that the State's requirement in Tenn. Code Ann. § 2-13-202 that minor political parties select their nominees by primary elections, is an impermissible intrusion of the Plaintiffs' First Amendment right of association that includes the right to select their nominees;

_____

[2] Before 2011, Tennessee statutes did not set the deadline for filing petitions for recognition as a statewide political party. The State Election Coordinator set the deadline. Goins, 793 F. Supp2d at 1070 n.3.

3

that Tenn. Code Ann. § 2-13-107(d), barring the words "Independent" and "Nonpartisan" in the name(s) of political parties, violates the First Amendment rights of free speech of minor political parties and their members; and

that Tenn. Code Ann. §2-1-104(a)(24) is unconstitutional as an improper delegation of legislative authority conferred on the State by Article 1, Section 4 of the United States Constitution and, in the alternative, that the undefined discretion of the State Coordinator of Elections in § 2-1-104(a)(24) fails for vagueness.

(Docket Entry No.45, Memorandum at 88-89). As pertinent here, the Court also concluded that the ballot preference statute, Tenn. Code Ann. § 2-5-208(d)(1), created "an impermissible 'voting cue'" and violated the Equal Protection Clause. Id. at 82-83. The Court directed the Defendants to conduct a random public drawing to determine the order of the parties' candidates on the November 2012 general election ballot. Id.

On March 13, 2012, Defendants moved for a partial stay of the Order for the random drawing given the Defendants' appeal. On March 16, 2012, the Court denied that motion. (Docket Entry Nos. 59 and 60). The Defendants then moved for the Sixth Circuit to stay the Order for the random public drawing, and the Sixth Circuit granted that motion. Green Party of Tennessee v. Hargett, 493 Fed. Appx. 686, 690 (2012). During the appeal, the Tennessee General Assembly amended the Tennessee ballot access statutes, effective May 2012, and Plaintiffs submitted new evidence on appeal. The Sixth Circuit reversed in part and remanded two of Plaintiffs' ballot-access claims for reconsideration. The Sixth Circuit's remand requires reconsideration of two claims: (1) Plaintiffs' challenge to Tennessee's amended statutory requirements for party recognition and ballot access for minor political parties' candidates, and (2) Plaintiffs' challenge to Tennessee's ballot preference statute mandating the listing of the political parties' candidates on the general election ballot, namely, majority party, minority party, and recognized minor party. Green Party of Tennessee v.

4

<u>Hargett</u>, 700 F.3d 816, 824, 827 (6th Cir. 2012). As the Sixth Circuit explained:

> The plaintiffs' ballot-access challenge boils down to two separate claims: (1) that the party-primary requirement impermissibly burdened their right to select their own nominees; and (2) that the party-primary requirement, the 119–day filing deadline, and the 2.5% signature provision combined to deny them access to the ballot. Because Tennessee now gives minor political parties the option to select their nominees for office under their own internal rules, the first of these claims is moot.
>
> Whether the second claim is also moot is a different question. The district court held that the 2.5% signature provision was unconstitutional both in combination with the 119–day filing deadline and standing alone. That provision—which is still in effect today—was therefore a core component of the "controversy" below. Because at least this component of Tennessee's ballot-access laws remains unconstitutional under the district court's analysis, the plaintiffs' second claim is not moot.
>
> * * *
>
> In our view, the district court should be given this opportunity here. The court should be able to evaluate the various components of Tennessee's election laws as part of the larger framework for providing ballot access to minor political parties ...That framework has fundamentally changed since the district court decided the case because the party-primary requirement is no longer mandatory, the petition-filing deadline has moved from seven months before the general election to only three months before, and minor-party candidates are no longer required to submit nominating petitions meeting the 2.5% signature provision and 119–day filing deadline unless their party chooses to hold a primary election.
>
> These changes are significant enough to warrant remanding the ballot-access claim to the district court for reconsideration. As part of its reconsideration, however, the district court must take into account that the 2.5% signature requirement, standing alone, is not unconstitutional on its face. See, e.g., <u>Am. Party of Texas v. White</u>, 415 U.S. 767, 789 (1974) ("Demanding signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face."); <u>Jenness v. Fortson</u>, 403 U.S. 431 (1971) (upholding a Georgia law requiring independent and minor-party candidates to secure supporting signatures amounting to at least 5% of the total voters from the last election).
>
> * * *
>
> The plaintiffs also challenged as facially unconstitutional Tennessee's provision that "on general election ballots, the name of each political party having nominees on the ballot shall be listed in the following order: majority party, minority party, and

5

recognized minor party, if any." Id. § 2–5–208(d)(1). In striking down this provision, the district court concluded that the State's "preferential placement of the majority party candidates on election ballots provides an impermissible 'voting cue' that violates Plaintiffs' First Amendment rights as well as the First Amendment rights of Tennessee voters." Green Party, 882 F.Supp.2d at 1016, 2012 WL 379774, at *52. The court based its conclusion largely on two empirical studies, one of which found "'that ballot order effects, particularly in relatively low salience elections, are both statistically significant and large enough in magnitude to alter the outcomes of elections.'" Id. (quoting Laura Miller, Election by Lottery: Ballot Order, Equal Protection, and the Irrational Voter, 13 N.Y.U. J. Legis. & Pub. Pol'y 373, 405 (2010)).

On appeal, the State stresses the facial nature of this challenge. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Courts do not usually grant this "strong medicine ... because such efforts do not seek to invalidate laws in concrete, factual settings"

. . . . The State presumptively uses what is known as a "party block" ballot form for general elections, meaning that "all of the candidates for a party are listed in a single column." Miller, 13 N.Y.U. J. Legis. & Pub. Pol'y at 388 & n.77; see Tenn.Code Ann. § 2–5–206(b)(2) (mandating the "party block" ballot form for general elections, subject to certain exceptions). This form is distinct from an "office block" ballot form, "in which candidates are listed vertically under the heading of the office they seek." Miller, 13 N.Y.U. J. Legis. & Pub. Pol'y at 388. The study cited by the district court analyzed elections "in states that use the 'office block' ballot form in general elections," but not elections in states that use the "party block" form. Id. As for the "party block" states, the study's author hypothesized that, "[g]iven the salience of the party label with this type of ballot, one should expect that positional effects would be minimal." Id. Consequently, the evidence on which the district court relied provided no basis to hold that Tenn.Code Ann. § 2–5–208(d)(1) is unconstitutional on its face.

While the State's appeal was pending, however, the plaintiffs received our permission to file an exhibit of a sample general-election ballot from Washington County that uses the office-block format. But this exhibit is not sufficient to alter our conclusion that the district court wrongly held that the party-order provision is facially unconstitutional. The significance, if any, of Washington County's general-election ballot format or any other Tennessee ballots that might use the office-block format is not for us to decide in the first instance, especially because such a format appears to conflict with the presumptive "party block" ballot specified in Tenn.Code Ann. §

6

2–5–206(b)(2). See Taft Broad. Co. v. United States, 929 F.2d 240, 243–44 (6th Cir.1991) (listing cases stating the general rule that issues not litigated in the trial court are not appropriate for appellate consideration). Rather, the district court is the best forum in which to further develop the factual record as necessary.

Id. at 823-24, 826-27.

## B. Parties' Motions on Remand

Since remand, Plaintiffs renew their motion for summary judgment (Docket Entry No. 73), and Defendants also move for summary judgment (Docket Entry No. 82). In their motion, Plaintiffs contend, in sum: (1) that the 2.5% signature requirement for a new minor political party's petition to qualify for ballot access for their candidates in the general election is unconstitutional and (2) that Tenn. Code Ann. § 2-5-208(d)(1) ordering the listing of parties' candidates on the general election ballot as majority party, minority party and "recognized political party" violates the Equal Protection Clause as an impermissible voting cue. (Docket Entry No. 73). Plaintiff also filed copies of the election ballots for all Tennessee counties in the 2012 general election. (Docket Entry Nos. 88 through 96-1).

In response and in support of their cross motion for summary judgment, Defendants contend, in essence, that: (1) Plaintiffs lack standing to challenge Tennessee's ballot-access statutes given that Plaintiffs neither intend nor desire to nominate their candidates by primary election; (2) Tennessee's statutory requirements for "recognized minor party" status are supported by legitimate state interests and do not unduly burden Plaintiffs' First Amendment rights and; (3) that Tennessee's ballot placement statute is facially constitutional. (Docket Entry No. 80).

In response to Defendants' motion for summary judgment, Plaintiffs assert: (1) that the Court previously rejected Defendants' argument that the State's election preparation process justifies the

7

minor party filing deadlines; (2) that Tennessee's 2012 amendments creating the statutory alternative for a minor political party's recognition and ballot access for their candidates in the general election did not alter the unconstitutional effects of State's 2.5% signature requirement for such access; (3) that the Defendants ignore the Anderson v. Celebreeze, 460 U.S. 780 (1983) balancing test; (4) that Tenn. Code Ann. § 2-5-208(d)(1) is unconstitutional under Anderson and violates principles of legislative political neutrality; and (5) that the Plaintiffs have standing to challenge the constitutionality of Tenn. Code Ann. § 2-5-208(d)(1). (Docket Entry No. 85).

For the reasons stated below, the Court concludes that the Plaintiffs' renewed motion for summary judgment should be granted, and Defendants' motion for summary judgment should be denied. The Court respects the General Assembly in its efforts to reform the State's ballot access laws, but the 2012 amendments to Tennessee's ballot access statutes retain the 2.5% signature requirement to become a "recognized political party" with ballot access for that party's candidates. This 2.5% signature requirement is contrary to express Supreme Court precedents on the necessary showing of a modicum of voter support for ballot access. The historical and expert proof also establishes that the 2.5% signature requirement imposes a severe burden on Plaintiffs' First Amendment rights to organize a political party and the rights of Tennessee voters to competition in political choices. In addition, the proof and empirical studies relied upon by courts, including the Supreme Court, on the effects of ballot preference statutes, establish that Tennessee's ballot preference statute for the candidates of the majority political party violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

8

# 1. Findings of Fact[3]

## a. Tennessee's Current Ballot Access Process

Political parties seeking ballot listing for their candidates, can secure recognition as a "statewide political party" or a "recognized minor party." These two parties must satisfy distinct statutory requirements to have their nominees listed on an election ballot **with their party's name.**

**Statewide Political Party Nominee**

A "statewide political party" means:

A political party at least one (1) of whose candidates for an office to be elected by voters of the entire state in the past four (4) calendar years has received a number of votes equal to at least five percent (5%) of the total number of votes case for gubernatorial candidates in the most recent election of governor.

Tenn. Code Ann. § 2-1-104(a)(31).

**Recognized Minor Party Nominee**

"Recognized minor party" means any group or association that has successfully petitioned by filing with the coordinator of elections a petition which shall conform to requirements established by the coordinator of elections, but which **must at a minimum bear the signatures of registered voters equal to at least two and one-half percent (2.5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor, and on each page of the petition, state its purpose, states its name, and contain the names of registered voters from a single county.**

---

[3]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court concludes that there are not any material factual disputes. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(d) based upon the parties' factual submissions and the Court's prior findings of fact on the statutes at issue here.

Tenn. Code Ann. § 2-1-104(a)(24) (emphasis added).

Statewide political parties must nominate candidates for the offices of President, Governor, General Assembly members, United States Senate and United States House of Representatives by primary election. Tenn. Code Ann. § 2-13-202 and 205(a). Those parties may nominate their candidates for all other offices by any method authorized under the rules of the party or by primary election. Tenn. Code Ann. § 2-13-203. The "statewide political party" primaries are held the first Thursday in August every two years. Tenn. Code Ann. § 2-13-202 and § 2-1-104(a)(26). The deadline to qualify as a candidate for a statewide political party primary is the first Thursday in April. Tenn. Code Ann. § 2-5-101(a)(1). The latter statute creates the 119 day deadline cited by Plaintiffs in their earlier action.

For Presidential primary candidates, candidates may also appear on the ballot for Tennessee's Presidential Preference Primary upon certification by the Secretary of State who, in his sole discretion, determines that a candidate is recognized in the national news media as a Presidential candidate. Tenn. Code Ann. § 2-5-205(a)(1). Alternately, a Presidential primary candidate can obtain ballot access by submitting a petition signed by at least twenty-five hundred (2,500) registered voters no later than noon on the first Tuesday in December of the year before the year in which the election will be held. Tenn. Code Ann. § 2-5-205(a)(2).

For minor political parties' candidates to be listed on the general election ballot, such parties may nominate their candidates for any office by any method authorized under the rules of the party or by primary election. Tenn. Code Ann. § 2-13-203(a)(2). If a minor party chooses the non-primary method for nominating its candidates, then Tenn. Code Ann. § 2-13-107(a)(2) requires its qualifying petition to be filed ninety (90) days before the general election. Such a petition must conform to the

10

requirements of Tenn. Code Ann. § 2-1-104(a)(24). For the 2014 election year, this deadline is August 6, only one day prior to the August primary election. If, however, a minor party chooses to nominate its candidates by primary election, Tenn. Code Ann.§2-1-104(a)(24) requires its recognition petition to be filed by the same deadline for statewide party candidates to qualify, 119 days before the August primary election. Tenn. Code Ann. § 2-13-107(a)(1).

If the Coordinator of Elections determines that the petition submitted by a minor political party lacks valid signatures, any candidate seeking to represent such minor party in the August primary election who had timely filed nominating petitions, can be placed on the November general-election ballot, but as an independent candidate. Tenn. Code Ann. § 2-13-107(c). If a minor political party fails to submit sufficient number of signatures to meet the April filing deadline, Tenn. Code Ann. § 2-13-107(a)(1), allows the minor political party's candidates to be listed on the November general election ballot by meeting the deadline set forth in Tenn. Code Ann. § 2-13-107(a)(2), that is, 90 days before the general election and satisfying the requirements of Tenn. Code Ann.§ 2-1-104(a)(24).

Any Tennessee registered voter may sign any new party's petition for recognition and may sign a new party petition after voting in a party primary election. Additionally, Tennessee's election laws do not impose any temporal or geographic restrictions on gathering signatures for a new party's petition for recognition nor restrict who may gather petition signatures nor assess any fee for verifying signatures.

### b. Tennessee Ballot Preparation Process

Tennessee has approximately 4,030,861 registered voters in its 95 counties. (Docket Entry No. 80-1, Robertson Affidavit at ¶ 5). The Tennessee Secretary of State appoints the Tennessee

11

Coordinator of Elections who serves as the State's chief administrative election officer of Tennessee elections.[4] The State Coordinator's office has eight (8) full-time employees, whose duties include (1) to implement various federal and state election regulations, including the Help America Vote Act of 2002, 42 U.S.C. § 15301, et seq. and the National Voter Registration Act, 42 U.S.C. § 1973, et seq.; (2) to process candidate nominating petitions for statewide and multi-county candidacies;(3) to approve ballots for all ninety-five (95) Tennessee counties; and (4) to maintain and update the statewide voter-registration database and candidate database. (Docket Entry No. 80-1, Robertson Affidavit at ¶ 4). Local election officials must verify signatures on these petitions. (Docket Entry No. 36-8 and 36-7 at 5).

The State election officials have responsibilities for Tennessee' three major elections that are held every four years:

> (1) the Presidential Preference Primary and County Primary Elections held on the first Tuesday in March;

> (2) the County General Election, the State and Federal Primary Elections, and occasionally the State General Elections for judicial offices, held on the first Tuesday in August; and

> (3) the State and Federal General Election, held on the first Tuesday after the first Monday in November.

(Docket Entry No. 80-1, Robertson Affidavit at ¶ 6).

The August primary election ballot is the largest and most complex ballot that includes the County General Election, the State and Federal Primary Election, and any judicial candidates that may be included on the State General Election ballot. Id. In non-presidential years, a county primary election may be held on the first Tuesday in May. Id. In addition, every eight (8) years the ballot

---

[4] Tenn. Code Ann. § § 2-11-201(b) and 2-11-202.

includes the offices for all state Trial and Appellate Court Judges, the District Attorney Generals, and Public Defenders (the next one is scheduled in 2014). Id.

Each Tennessee county has a five (5) member election commission that appoints its chief administrative officer to conduct its elections. Id. at ¶ 5. Twelve (12) Tennessee counties employ only one full-time employee as its election official. Six (6) county election commissions operate less than five days a week. Id. at ¶ 5. Each county prepares its sample ballot for each primary election and for each type of voting system, such as paper absentee ballots and machine ballots. Id. at ¶ 7. For the August primary election, each county prepares at least five (5) different ballots:

    (1) Republican party paper ballot;

    (2) Democratic party paper ballot;

    (3) Republican party machine ballot;

    (4) Democratic party machine ballot; and

    (5) paper ballot for August General Election.

Id. For any political party that qualifies as a "recognized minor party" for the primary, the county election commission would have to prepare additional paper and machine ballots. Id. For the November General Election, the county election commissions must only prepare one paper ballot and one machine ballot. Id.

Upon completion of their ballots, the county election commissions submit their sample ballots to the Tennessee Coordinator of Elections' office for approval. Tenn. Code Ann. §§2-5-207(e) and 2-5-206(c). State Election Office employees review each ballot. (Docket Entry No. 80-1 at ¶ 8). Another employee must double check each initial review. Id. Each review takes approximately 20-30 minutes per ballot. Id. at ¶ 9. The State Election Office documents each

13

approval and notification to the counties for each ballot. Id. For the August primary election, the State Election Office reviews at least 475 sample ballots, at least 5 from each of the 95 counties. Id. Assuming the Defendants' estimated maximum time of 30 minutes for multiple reviews of each ballot, the eight State election employees would require eight (8) work days to complete that review. For the November election the State Election Office employees' review of 190 sample ballots would take 2-3 days to complete. Id.

After the approval of a ballot, the State election office officials scan and return each sample ballot to the county election offices for printing. Id. This process takes about 10-15 minutes per ballot. Id. The county election officials must print each ballot, program the voting machines, and test the voting machines before the election. Id. at ¶ 10. During this period, the county election offices also prepare ballots for military and overseas voters, provide absentee ballots to voters and process voter-registration applications. (Docket Entry Nos. 39-7, Koelman Affidavit at 11-12 and 39-8, Tiche Affidavit at 11). During non-presidential election years, the county election offices conduct County primary elections during May and municipal elections in presidential and non-presidential election years. Id.

In Davidson County, four and a half weeks are necessary to prepare the ballot layouts, print ballots and/or program the machines and prepare and mail the ballots to military voters. (Docket Entry No. 36 at 19-20; Exhibit 8, Tieche Affidavit at ¶ 17). According to Albert Tieche, the Davidson County Administrator of Elections, his staff needs approximately two weeks to prepare the ballots and one week to print them and thereafter ten days to two weeks to prepare the military ballots for mailing after the ballots have been printed. Id.; Exhibit 8, Tieche Affidavit at ¶¶ 19, 22. In Montgomery County, two weeks are required to prepare military ballots for mailing after the

14

ballots have been printed. (Docket Entry No. 36 at 20; Exhibit 7, Koelman Affidavit at ¶ 18).

Drew Rawlins, executive director of the Tennessee Bureau of Ethics and Campaign Finance, reports that in the 2010 gubernatorial election, 28 individuals filed as candidates for the office of Governor, and of these persons 18 filed appointment of political treasurer forms before the April qualifying deadline. (Docket Entry No. 36-13 at ¶ 4). Nine (9) ultimately did not qualify to appear on the ballot in the August primary election. Id. at ¶ 5. Michael McWherter, a Democratic candidate filed his appointment of political treasurer form on May 15, 2009, almost 11 months before the qualifying deadline. Id. at ¶ 6. One candidate, Basil Marceaus, filed his form on October 7, 2008, eighteen (18) months before the April deadline. Id. at ¶ 7. Two Republican candidates, then Congressman Zach Wamp and now Governor Bill Haslam, filed their forms in January 2009, over fifteen (15) months prior to the qualifying deadline. Id. at ¶ 7. A fourth candidate, Senator Ron Ramsey, a Republican, filed his form on March 4, 2009, thirteen (13) months prior to the qualifying deadline. Id. The fifth candidate, Joe Kirkpatrick, filed his form on May 19, 2009, eleven (11) months before the qualifying candidate. Id.

Robertson, Tennessee's assistant coordinator of elections, also cites compliance with federal and state laws on mailing ballots to absentee voters and military personnel as well as various training and other obligations of election officials to justify 119 day deadline for the August primary. (Docket Entry No. 36-6 at ¶ 7).

### c. History of Minor Political Parties in Tennessee Elections[5]

---

[5] Given Plaintiffs' continuing challenge to the 2.5% signature requirement for qualification as a "Recognized Minor Party"and ballot access for its candidates, the Court includes its earlier findings of fact based upon the parties' historical and expert proof that are also referred to in the parties pending motions for summary judgment. (Docket Entry Nos. 37 and 80). This section is also a modified version of the Court's findings in Goins that Defendants did

In 1889, when state governments started printing ballots, minor political parties appeared on the ballot in every presidential and congressional election year in virtually all states. From 1889 until 1961, any new or minor political parties seeking access to the general election ballot in Tennessee had to nominate candidates by convention and notify Tennessee election officials to have their nominees placed on the November election ballot. Prior to 1961, minor political parties appeared regularly on the Tennessee ballot. In 1960, the Tennessee ballot listed four political parties, Democratic, Republican, Constitution, and Prohibition.

In 1961, the Tennessee legislature amended the State's election laws to allow only political parties that had either polled 10 percent of the vote in the last election or that submitted a petition signed by 5% of the votes cast in the last election to appear on the Tennessee ballot. Since the 1961 amendments, minor political parties appeared on the Tennessee election ballot only during the elections of 1968 and 1972, when George Wallace's American Independent Party qualified. In 1972, the Tennessee legislature reduced the five percent petition requirement for ballot access for political parties to 2.5 percent of the total vote in the last gubernatorial election.

Since 1972, minor political parties attempted to qualify as statewide political parties in Tennessee without success. The Populist Party tried unsuccessfully to obtain political party recognition in Tennessee in 1989-1990. GPT sought political party recognition in Tennessee in 1993-1994, but also was unsuccessful. The Reform Party's efforts at political party recognition in Tennessee in 1995-1996, 1997-1998, and 1999-2000, were unsuccessful. GPT's efforts at political

---

not appeal. 793 F. Supp. 2d at 1069-70. The historical record of political parties' participation in elections is relevant in these actions as "[p]ast experience will be a helpful, if not always an unerring, guide." Storer v. Brown, 415 U.S. 724, 742 (1974).

16

party recognition in Tennessee in 1999-2000, 2001-2002, and 2003-2004 were each unsuccessful. In each attempt, the parties acquired several thousand voters' signatures, but these numbers were insufficient for party recognition under Tennessee law. Tennessee has a population of approximately 6.2 million people and purportedly has over 3,872,868 registered voters and 3,503,355 active voters. (Docket Entry No. 36, Defendants' Memorandum at 17).

In 2000 with the "Fair Ballot Access Act of 2000," the Tennessee legislature authorized ballot access for the 2000 presidential election for candidates who polled 5,000 votes for the presidential race in 1996. Qualifying candidates could have their political party's name printed next to their names on the November 2000 ballot. After the 2000 election, a non-statewide political party's name could be listed next to the name of its presidential candidate, only if that party's candidate received at least 5% of the votes in Tennessee's last presidential election. Tenn. Code Ann. § 2-5-208(d)(1). In the 2000 presidential election, presidential candidates of the Libertarian, Reform, and Green parties had their respective party name next to their candidate's name, but their candidates were still listed on the election ballot under an "Independent" heading. Since the 2000 general election, Tennessee and Oklahoma are the only states in which only the Democratic and Republican parties have appeared on the election ballots.[6]

For the 2012 election, the Green Party of the United States had two Presidential candidates, Kent Mesplay and Jill Stein, as of May 24, 2011 and November 2, 2011. (Docket Entry No. 36 at 8; Exhibit 4). One of these candidates filed a declaration of candidacy with the Federal Election Commission. (Docket Entry No. 36 at 8; Exhibit 5). "The Constitution Party website announces that

---

[6]Goins, 793 F. Supp.2d at 1070 (citing Docket Entry No. 36, Defendants' Response to Plaintiffs' Statement of Undisputed Facts at ¶ 15).

its national party convention to select its nominees for President and Vice President of the United States will be held in April of 2012 in Nashville." (Docket Entry No. 36-12 at 7). The American Elect party filed a petition under the then Tennessee laws seeking recognition as a political party. (Docket Entry No. 36 at 31; Exhibit-6, Henry-Robertson Affidavit at 14-15).

Todd Donovan, a defense expert who is a professor of political science at Western Washington University, stated that "[i]n 2010 there were 16 candidates listed on Tennessee's ballot for [] the gubernatorial contest. Many other states would have only 2 candidates (a Democrat and a Republican). Likewise, there were 8 candidates competing for the US Senate seat who were listed on the 2008 Tennessee ballot. This high number of candidates reflects that the state has multiple options for non-major party candidates to achieve ballot access." (Docket Entry No. 36-10 at 32). Bruce Oppenheimer, another defense expert and professor of political science and public policy and education at Vanderbilt University, observed: "As of a year before the 2012 election, there is already active competition with announced candidates in Tennessee's 3rd Congressional District. Only indecision about the drawing of congressional district and state legislative district lines following the 2010 census is slowing active contests elsewhere." (Docket Entry No. 36-12 at 7).

Other relevant historical facts are that in a March 27, 1984 letter, Tennessee elections officials acknowledged that Tennessee statutes did not provide a specific date for when the new party petition for recognition and ballot access is due. In addition, on September 17, 1984, the then Tennessee Attorney General issued his opinion that the statutory requirements for a "statewide

18

political party" under then Tenn. Code Ann. § 2-1-104(28)(b) was unconstitutional.[7]

### d. Parties' Expert Proof

### 1. Plaintiffs' Expert

In his report in the earlier action, Plaintiff's expert, Richard Winger, reviewed minor political parties' experiences in Tennessee and cited his study of state ballot access laws and minority political parties' participation in other states. Winger characterized minor political parties' prospects for success of obtaining recognition as a state-wide political party in Tennessee as "impossible, or virtually impossible." Goins, 793 F. Supp.2d at 1073 (quoting Docket Entry No. 25-3, Plaintiffs' Amended Expert Report at 7).

For this action, Winger opines that Tennessee's requirement for primaries for minor political parties's candidates for statewide and federal offices effectively impairs minor political parties' viability and intrudes upon their internal affairs in the selection of their nominees or spokesperson.

> **Minor parties in the United States almost never have contested primaries, so providing them with their own primaries is wasteful. Professor Joseph P. Harris of the University of California at Berkeley was recognized during his lifetime as the nation's leading expert on election administration. He wrote in A Model Direct Primary Law,** a booklet published by the National Municipal League in 1951, "Recommendation Number 6. The use of the direct primary should be mandatory for political parties which polled 10% or more of the vote cast at the preceding general election. **Smaller parties should not be permitted to demand state conduct of their internal nominating processes and do not need it."** He also wrote, **"Minority parties rarely have any contests for nominations and it is unnecessary to require their use of the direct primary. Very small parties, indeed, commonly have difficulty filling up the ticket.** The benefits of government operation of a primary should be restricted to parties which have cast a minimum vote, say 10%, in order to avoid the needless expense of printing separate ballots for

---

[7] The last page of this opinion and its reasoning were not provided by the parties, and the Attorney General's office was unable to provide a complete copy for the Court to cite the full rationale for that opinion. See Goins, 793 F. Supp.2d at 1070 n.4.

the very small parties in which contests are extremely rare."

> What Dr. Harris wrote in 1951 is still true. **Forty-two states have a procedure by which a newly qualifying party can appear on the general election ballot, even though that party did not participate in a government-administered primary.** States which once required newly-qualifying parties to nominate by convention, but which no longer do so, include Arkansas, Idaho, Kansas, Maine, Michigan, Montana, Nebraska, Nevada, and Wyoming. **Most states never have required newly-qualifying parties to nominate by primary.**
>
> **The rationale for requiring major parties to nominate by primary does not apply to minor and newly-qualifying parties. No nationally-organized party, other than the Democratic and Republican Parties, has elected one of its nominees to Congress since 1948. Although minor parties significantly influence the spread of new ideas, minor party nominees don't generally get elected to public office. Minor parties generally try to nominate their most effective spokesperson, but there is no general public expectation that the typical minor person will be elected in the general election. By contrast, when voters vote in Democratic or Republican primaries, these voters generally have some reasonable expectation that the primary winner may hold public office, so there is a more compelling reason to let major party nominees be chosen via the primary process.**

(Docket Entry No. 20, Winger Report at 28) (emphasis added). Winger further opined that "It is virtually unheard of for more than 3% of any state's primary voters to choose to participate in a minor party primary. In the overwhelming majority of instances at which states do provide primaries for minor parties, fewer than 1% of the primary voters choose a minor party primary ballot." Id. at 29.

Dr. Winger also cited the financial costs imposed on minor political parties' limited resources to collect the requisite voter signatures for petitions for state recognition as a barrier to recognition as a minor political party and to obtain ballot access for their candidates.

> **As a general rule candidates and parties must collect 1.5-1.75 times the number of signatures required by statute.**
>
> **The cost of signature collection by paid signature collection ranges from $1.50 to $2.00 per signature, whether valid or not. In states requiring more than 5,000 signatures, for a candidate or party, the cost of signature collection alone exceeds the revenue available to the party and effectively prevents that from**

20

obtaining ballot access. **Moreover, even where the party or candidate has sufficient resources to collect the requisite number of signatures to obtain ballot access, the cost of signature collection represents such a burden that they rarely have sufficient funds to conduct an effective campaign.** . . .

[M]y research has shown that if a state requires as many as 5,000 signatures, it will never have a crowded ballot, if "crowded ballot" is defined as a ballot with more than 9 candidates for a single office. . . .

**[A]s many as six or more candidates have appeared on the general election ballot as candidates for statewide or federal office on at least 50 occasions since the principle of "avoiding voter confusion" was first enunciated, and there is no evidence that there was any voter confusion in those elections.**

**Tennessee's new party petition signature requirement of 2.5% of the total votes case in the most recent gubernatorial election is the sixth most demanding in the nation . . . (and) no new party has been able to gain ballot access in Tennessee since 1968.**

Id. (emphasis added).

Winger also opined on the negative impact of the "Independent" label on a ballot for a candidate who is a nominee of a minority political party whose party affiliation on the ballot is "extremely" important.

Having a party affiliation designated on the ballot is essential to the candidacy of a minor party candidate. This is especially important in establishing that the candidate is affiliated with an organized party. **For candidates with limited name recognition, having a party affiliation designated on the ballot is an extremely important "voter cue" to the positions and political philosophy of the candidate, and denial of that voter cue severely burdens the candidate and his party. No candidate having an identity or affiliation with a minor party has ever been elected to state office when forced to be listed on the ballot as an Independent candidate.**

Id. at 30 (emphasis added).

## 2. Defendants' Experts

According to Donovan, one of the defense experts, Winger exaggerated the costs of signature collection given the use of volunteers. Donovan cited federal campaign laws and states accelerating

21

their primary and caucuses dates to earlier in the year as causing the early identity of major political parties' nominees and an increase in public awareness and interest in political issues. In addition, Donovan identified the "winner take all" election rules as causing the lack of minority party access to the ballot.

> [D]ata from public opinion polls show that voter attention to presidential contests begins to increase as early as January of the election year, with interest peaking from early February through March before it declines thorough early summer. This would suggest voters do pay attention to high profile elections at a rather early stage of the process.

* * *

Furthermore, **a published study reporting a statistical analysis the relationship between filing deadlines and the success of ballot access for minor party independent US Senate and gubernatorial candidates in 2000 and 2004 found that filing deadlines did not predict the number of non-majority party candidates on state ballots. Thus, it does not appear to matter how early the petitions are due; other factors related to petitioning may be more important, including how much time is actually allowed to collect signatures. As noted above, Tennessee does not limit when petitioning may being.**

**The third claim (above) proposes that a new party would have to "pay" $120,000 to qualify for ballot status in Tennessee.** This claim appears to be based on the assumption that the new party would have zero ability to mobilize volunteers, and/or on the assumption that the substance of the petition (granting a specific party ballot status) would be of such little interest to voters that volunteers would be unable to collect signatures. **The $120,000 figure assumes that every single signature would need to be collected by paid, professional petitioners. Again, minor party experiences in other states do demonstrate success in collecting signatures for ballot access. Furthermore, America's experience with direct democracy demonstrates that citizen groups have been successful using volunteers (rather than paid petitioners) to gather signatures in many instances. Research has found that outside of California and Ohio, over 80% of initiatives that reached state ballots had relied on volunteers to gather at least 90% of signatures.** This suggests that volunteer efforts are successful in places where the petitioning requirements are much more restrictive than in Tennessee.

The fourth claim (above) proposes that early filing deadlines are a burden on minor parties because the deadlines fall before major party candidates are known to voters. There was more support for this claim in previous decades than today. Several things

22

have changed the American political landscape in recent decades. Prior to the 1970s, the major parties nominated presidential candidate by conventions in the summer of presidential election years. Many convention delegates were chosen by state and local party officials and many were uncommitted. As a result, nominees were not known until after the summer nominating conventions. However, **beginning in the 1970s, the major parties moved to allocating convention delegates by public primaries and conventions. One consequence of this was a sharp increase in delegates pledged to specific candidates, with each candidates delegate share known months before the convention. In 1988 major party organizations in the states began "frontloading" the schedule of primaries and caucuses such that it was often became clear who a party's nominee would be, and the schedule compressed further over the next two decades.** By 2008, 70% of convention delegates were selected by March 2 (in 1976 only 10% were selected by that date). As a result, the parties presidential nominees are typically known to the public no later than March.

In addition, campaigns for statewide and congressional offices have grown increasingly expensive over the last few decades. As a result, serious major party candidates now begin soliciting campaign contributions earlier than in the past given the demands of contemporary election costs. Over the same period, states have adopted more rigorous campaign finance reporting requirements. These often require that candidates who have begun fundraising file disclosure reports before they file as candidate seeking ballot status. Candidates who are fundraising for federal (congressional) offices must also file with the Federal Election Commission prior to filing for ballot access if they are soliciting contributions. All of this provides interested observers with information about the major party candidate poll in advance of when candidates file for office, and in advance of when major party primaries are conducted.

(Docket Entry No. 36-10 at 15-16, 18-20) (footnotes omitted).

Donovan also described the justification and reasonableness of Tennessee's deadline and signature requirements for minor political parties' petitions for recognition for ballot access.

**Social scientists who study political parties and two party systems have determined that the most noteworthy barrier to the long-run success of smaller parties is winner-take-all (plurality) election rules.** Nearly every office contested in the United States is awarded to the candidate seeking the position who wins the most votes. In the winner-take-all elections that are the norm in the United States, votes cast for a third place or lower placing candidate have no effect on determining how much representation those candidates will receive.

Thus, **regardless of ballot access rules, candidates who are not affiliated with a**

23

**major party (a major party being a party that represents a broad electoral coalition having a history of electoral success) face the task of convincing voters to support them when they have a very limited (if any) history of electoral success, and little chance of gaining office. Many voters tend to act strategically, and attempt to affect the outcome of an election by supporting candidates from one of the two major parties. A vote for a non-major party candidate can have the effect of increasing the chances that a voter's least preferred major party candidate could win.** Given that many voters make such calculations when casting ballots in winner-take-all contests, their behavior seriously limits the short-term and long- term prospects for candidates who are not affiliated with a major party. Lacking an electoral system, such as proportional representation (PR), that is more favorable to candidates who capture smaller shares of the vote, non-major party candidates historically have had a difficult time maintaining themselves as viable political actors across time in places that use winner-take-all election rules. . . .

∗∗∗

**Successful minor parties are also absorbed by one of the American major parties. Non major party political movements, then, are typically short-lived in the United States.**

The US electoral system--more so than the state ballot access laws that are the subject of this analysis--means that popular support for these movements, and their potential pool of candidates, fade over time. Scholars note that the national decline in minor (third) party activity in the United States since the 1930s is due the fact that most minor party voting from the 1800s through 1930 was for left-wing parties that were absorbed by the Democrats. Candidates from these parties tended to migrate to the Democratic Party after it adopted many the of New Deal policies.

Id. at 5-6, 8-9 (footnotes omitted).

Donovan also justified the need to limit ballot access so as to avoid increasing the size of the ballot and to allow the voters to know the candidates "well before a general election." Id. at 12.

Crowded ballots create the potential for ballot design flaws such as Palm Beach County, Florida's infamous "butterfly ballot" that apparently failed to accurately translate voter intention into counted votes. The "butterfly ballot" failed because it listed candidates for the same office on two separate sheets of the ballot. If all candidates for an office are to be listed in a single column, on a single page, a crowded candidate field would require an increase in the physical size of the ballot (either the size of the paper or the number of pages), which may increase the likelihood that voters fail to complete their ballots. Crowded ballots may thus introduce voter fatigue, increase the potential for "position effects" in voting (where a non-trivial portion of a candidate's vote share is a function, in part, of how high the

24

candidates is listed on the ballot) and complicate the administration of elections (by requiring different sets of ballots to be printed with candidate name rotation to eliminate position effects).

Petition requirements are a common method that states use to allocate ballot access to non-major party candidates. Administrative necessity requires petitions be received well before a general election. As part of conducting multiple elections each year (for local districts, municipality, state, and federal offices), state and local election officials are required to design ballots, manage voter rolls, maintain and test voting equipment, certify elections, manage recounts, and conduct myriad additional tasks associated with the administration of elections. Many tasks are conducted at the county level in offices with small staffs. Evaluating and certifying signatures on petitions (for candidates and for ballot measures) required of election administrators.

Id. at 11-12, 15-16 (footnotes omitted).

As to absentee ballots, Donovan cites the need to mail such ballots to citizens and military personnel overseas in time for those voters to return their ballot.

More recently, a 2004 report by the U.S. Election Assistance Commission of the United States Government on the recommended best practices for facilitating voting by uniformed U.S. Citizens overseas recommends that states should mail ballots "at least 45 days prior to the deadline for receipt of voted absentee ballots" because the 30 day advance date may not provide enough time for ballots to be returned. The US Congress subsequently passed the Military and Overseas Voter Empowerment (MOVE) Act in 2009. MOVE established standards for ballots in federal elections, including that ballots be mailed at least 45 days prior to a federal election. This means that officials now have a narrower time window to design, print, assemble and mail ballots than before MOVE. The MOVE Act is associated with increased voting by military personnel.

Id. at 13 (footnotes omitted).

Donovan also cited States' acceleration of their primary caucus and election dates that heightens political interest among voters. Id. at 19-20. Donovan describes the political futility of minor political parties in Tennessee seeking ballot access for their candidates:

In 2000, Tennessee listed minor party presidential candidates with their party affiliation on the ballot. Thus, Ralph Nader was identified as the Green Party candidate on the Tennessee ballot that year. This was a year when the Greens achieved heightened media attention, and when the party posted it highest national

25

vote share ever.

* * *

[In Tennessee] [s]upport for the Green Party in 2000 in Tennessee and other neighboring states, as well as support for the Greens in the Pacific Northwest[,] [w]ith Nader identified as a Green candidate on the Tennessee ballot, the Green Party nonetheless polls a lower vote share than in neighboring states where Nader was also identified as the Green candidate. The Green Party ran even weaker in Tennessee (0.95% vs. 2.75% in the US) than it did in the neighboring region where the Green Party received its lowest electoral support in the nation. Conversely, the Green Party received much greater support in the west and in other regions, where state party systems have historically been more malleable and votes more supportive of minor parties.

The effect of muted public support for minor parties in Tennessee was not limited to the Green Party. Nationally the combined votes for all non-major party presidential candidates (independents plus the Green, Reform, Libertarian, and other minor party votes) was 3.75% in 2000. In Tennessee, with minor party labels listed on the ballot and with a very low threshold for qualifying presidential candidates, the combined non-major party vote total was only 1.56% in 2000. Again, this was the lowest for the region, and the region had lower support for minor parties than the national average.

Table 4 (below) illustrates that this effect was not limited to 2000. In 2008, a year with substantially lowered voting for minor parties nationally and for the Green Party and for the former Green candidate Nader, Tennessee continued to have lower support for the Green candidate (McKinney) and for all non-major party candidates in the presidential election than the national average. Western states, in contrast, again posted higher than average levels of support for minor parties. Table 3 and Table 4 can be considered in light of a state's signature petition requirement. These patterns suggests that even if every Green Party voter signed a ballot qualification petition in 2000, the party would have difficulty qualifying if signatures equal to 1% of votes cast were required for ballot status. Put differently, any regulation on minor party ballot access may be relatively more difficult for a minor party in Tennessee in part because of limited public interest in minor parties. These election results suggest there is simply less market demand for minor parties in Tennessee than in many other states. To put this in further perspective, the Green candidate for president (Nader) could receive 2.45% support in Idaho as a write in 2000, but only 0.95% in Tennessee as when listed as a Green candidate on the Tennessee ballot.

Id. at 26-28.

As to Tennessee's signature requirement and Plaintiffs' expert's comparative analysis with

26

other states, Donovan challenged the correlation with other states and notes that Tennessee imposes lesser restrictions than other states on new political parties' petition efforts on gathering signatures, e.g. no geographical restrictions. Id. at 29. Donovan identified as a viable option for Plaintiffs and their candidates in Tennessee, ballot access as an independent candidate.

> By providing easy qualifying for as independent candidates, Tennessee's election regulations provide opportunities for non-major party candidates to appear on general election ballots.

> \* \* \*

> **In 2010 there were 16 candidates listed on Tennessee's ballot for in the gubernatorial contest. Many other states would have only 2 candidates (a Democrat and a Republican). Likewise, there were 8 candidates competing for the US Senate seat who were listed on the 2008 Tennessee ballot. This high number of candidates reflects that the state has multiple options for non-major party candidates to achieve ballot access.**

Id. at 31-32 (emphasis added).

Oppenheimer, the other defense expert, opined that minor political parties' lack of ballot access is caused by the political futility of minor political parties. Oppenheimer cites the "winner take all" election rules and the absorption of minor political parties' views by major political parties. In Oppenheimer's opinion, members of minor political parties should participate in a major political party as a political strategy in lieu of seeking ballot access as a political party.

> In an election system that features single member constituencies and plurality elections, there is a general disincentive for minor parties to invest in general elections as a means of achieving political influence. Unlike electoral systems in countries with proportional representation and multi-member constituencies (in which minor parties may win seats with very modest percentages of the vote and thus will invest a great deal in achieving ballot access), minor parties in the United States know that it is highly unlikely for them to win office in a system where only the candidate receiving the most votes gets elected, and losing party candidates get nothing. It is clearly the biggest hurdle that minor parties and their candidates face in Tennessee and elsewhere, regardless of variation in costs of getting on ballots in different states. **There is no rationale for minor parties to incur the cost of party**

27

ballot access because there exist other vehicles for minor parties and their candidates to influence elections that are less costly and as, if not more, effective than party ballot access.

\* \* \*

The other part is that minor party candidates fare just as well when listed as independents on the ballot as they do when listed with a minor party label. Contrary to the plaintiffs' assertion, there is no empirical evidence of an additional benefit in terms of winning votes for candidates running with a minor party label as opposed to running as independents. **The plaintiffs' claim that voters use a party label as a cue in selecting among candidates on the ballot is based on research about voting for major party candidates, not for minor party candidates. In fact, the success of minor parties and their candidates rests not on the party label but instead on the visibility of the candidates. The cue works in the reverse of the way it operates for major parties candidates.** Some examples provide appropriate illustration. In 1968, George Wallace ran as the candidate of the American Independent Party for president. As a highly visible individual, Wallace won 13.55% of the national popular vote. Four years later, the party nominee, John Schmitz, an obscure former California congressman, won 1.4% of the vote. It was Wallace rather than the party label that provided the cue for voters. More recently, Ross Perot fared better in 1992 running as an independent than he did in 1996 running as the nominee of the Reform Party. Again, success was linked to the varying popularity of the candidate not to the party label. **If having the party label on the ballot were worth more in terms of electoral performance of their candidates, minor parties in Tennessee would undertake the effort of getting ballot access.** In 2008 presidential election, for example, it made little difference in the percentage of vote minor party presidential candidates received in southern states whether they were running with a party label or as independents. **Green, Constitution, and other minor party candidates in states received similar percentages of the vote regardless if the party label was present with the candidate name or the candidate was listed as an independent.** Only when they were Write-in candidates, and their names not on the ballot at all, did minor party candidates receive noticeably fewer votes. In some states minor party candidates for president in 2008 had to run write-in campaigns. That was not the case in Tennessee because of the minimal requirement for listing as an independent candidate.

**Ballot Structure**

If Tennessee elections used party ballots rather than office ballots, the plaintiffs might have a marginal argument about the importance of party label. But **Tennessee has an "office" ballot, not a party ballot.** Voters view candidates grouped by office on the ballot, not in party lists. There is no single party lever, punch, or spot on the touch screen that allows voters to cast their vote for all the candidates of one

28

party with a single action.

**Voters must vote for each office separately. This ballot structure greatly reduces the role of party label in voting and leads votes to focus more on candidates. It results in lower levels of straight party voting and greater frequency of split tickets**. Campaigns in states with office ballots are more likely to be candidate driven rather than party driven.

* * *

**With the growing use of direct primaries for candidate selection purposes, and especially in states with relatively open primary laws such as Tennessee, there is a strong incentive for potential minor party candidates to pursue major party nominations rather than to run as a minor party or independent candidates. In doing so, they can often change major party positions on issues, either by influencing other candidates in the major party primaries to alter their positions or by winning major party nominations.** The major parties have very little protection against these minor party or other insurgents.

In 2010 Tea Party supporters decided to influence the issue positions of the Republican Party. By entering candidates Republican primaries, rather than running as minor party candidates, Tea Party supporters forced mainstream Republicans to adopt Tea Party issue positions and in other cases won Republican nominations with Tea Party backed candidates. The effect on Republicans in state legislatures and the U.S. Congress and on the field of candidates seeking the 2012 Republican presidential nomination has been marked. Some would argue that the Tea Party movement has captured the Republican Party.

The major parties have become so permeable that it is not unheard of for someone who holds positions that are so extreme as to be an embarrassment to the major party to win a major party nomination. In 2004 James L. Hart, a proponent of eugenics and other racist ideas, won the Republican nomination for the U.S. House of Representatives in Tennessee's 8th C.D. despite late efforts of Republicans disavowing him and running a write-in candidate in the primary. Republicans had to expend resources to prevent Hart from getting on the primary ballot in subsequent years. He won over 25% of the vote in the general election in 2004. Unlike a minor party candidate, a label is very helpful to a major party candidate. That is why running for major party nominations rather than running as minor party candidates is a more effective way of influencing American elections.

Even candidates who have been relatively successful competing as minor party candidates come to understand that seeking a major party nomination is a better alternative. In 1972, George Wallace chose to run for the Democratic presidential nomination rather than to run as a third party candidate as he did in 1968. . . . More

29

recently, Ron Paul, a former Libertarian Party candidate for president, has contested for both the 2008 and 2012 Republican presidential nominations, minimally exposing a larger audience to his policy positions.

**In sum, other factors, not Tennessee's requirement ballot access law, explain the absence of minor parties on the ballot. Tennessee law makes it nearly costless for candidates of any party or no party to get on the ballot. Minor party candidates do not perform better when listed with a party label than as independents, and those disagreeing with the major parties' positions can be more effective competing for major party nominations in primaries than investing in minor parties.**

(Docket Entry No. 36-12 at 2, 3-5) (emphasis added).

Oppenheimer also opined that Tennessee's 119 day deadline prior to the primary may actually assist minor political parties to meet the signature requirements for party recognition and that Tennessee's primary requirement serves the public interest against party bosses' selection of candidates. Oppenheimer also discounts as baseless, concerns that major or other party members would vote in Plaintiffs' primary election for Plaintiffs' nominee.

**The Filing Deadline**

\* \* \*

Before 1972 no presidential candidate had announced candidacy prior to a year before the general election. Now that would be considered too late to have a reasonable chance at a nomination. Candidates for the 2012 Republican presidential nomination had their first televised debate on May 5, 2011, a full eighteen months prior to the general election.

The change is not restricted to presidential nominations. The Tennessee Republican gubernatorial field was already well-established more than a year prior to the general election. Three of the four major candidates announced in early January of 2009, and the eventual Democratic nominee announced in April 2009. **As of a year before the 2012 election, there is already active competition with announced candidates in Tennessee's 3rd Congressional District. Only indecision about the drawing of congressional district and state legislative district lines following the 2010 census is slowing active contests elsewhere.**

Even one of the plaintiffs in this case recognizes that the calendar for campaign

30

activity starts far earlier now. **The Constitution Party website announces that it national party convention to select its nominees for President and Vice President of the United States will be held in April of 2012 in Nashville. How can April be enough to nominate its candidates but too early for sufficient public interest to stimulate the gathering of names on a filing petition?**

In fact, the requirement **the April filing deadline may assist minor parties in their efforts to build support by getting them to contact voters sooner when major parties and their candidates are also actively engaged in organizing, raising money, getting media attention, and meeting with voters.**

* * *

Most of the arguments in favor of using primary elections rather than conventions or other means for the selection of candidates are as applicable to minor parties as they are to major parties. The progressive reformers who pushed for the direct primary a little over a century ago argued that democratic principles are best served when participation in the selection of party candidates is open to the largest number of citizens rather than just party insiders. **Conventions and caucuses involve only a relatively small number of people whom party bosses too frequently control. Thus, they end up selecting candidates that insiders favor and are not necessarily "popular" choices.**

**For individual citizens participation in conventions and caucuses is a far more costly undertaking than voting in primaries in terms of time commitment and transportation. . . .**

* * *

**The concern that major parties would undermine the candidate selection processes of minor parties if minor parties were required to have primary elections to select their candidates is lacking foundation in logic or fact.** It is a classic "the monster is under the bed" fear. **There is no incentive for a major party to urge some of its members vote in a minor party primary and choose nominees who adhere to the positions of the major party rather than those of the minor party.** That would only make the minor party candidates more attractive to voters who might otherwise support the candidates of the major party. In addition, such a scheme, if per chance it were successful, would expose the major party to extensive negative publicity. In fact, the plaintiffs' provide no evidence of major parties actually undermining the primary election of a minor party. Even if there were merit in this concern, it would be just as easy for a major party to undermine the nomination process of a minor party that used a convention to select its candidates.

Id. at 6-7, 8 (emphasis added).

31

### e. Tennessee's Preferential Ballot Statute

For Tennessee's general election ballot, Tenn. Code Ann. § 2-5-208, as amended in 2012, mandates that the political parties' candidates are to be listed in the following order:

> (d)(1) Notwithstanding any other provision of this chapter or this title, **on general election ballots, the name of each political party having nominees on the ballot shall be listed in the following order: majority party, minority party, and recognized minor party, if any.** The names of the political party candidates shall be alphabetically listed underneath the appropriate column for the candidate's party. **A column for independent candidates shall follow the recognized minor party, or if there is not a recognized minor party on the ballot, shall follow the minority party, with the listing of the candidates' names alphabetically underneath.**

Tenn. Code Ann. § 2-5-208(d)(1) (emphasis added). Prior to the 2012 amendments, the Tennessee general election ballot named each political party at the top of the ballot with the candidates' names underneath. Tenn. Code Ann. § 2-5-208(d)(1) (2011).

In its earlier ruling on this statute, the Court relied upon three empirical studies that from the Court's research, other courts cited in ruling on the effects of and constitutionality of ballot preference statutes. The three studies are: H. Bain & D. Hecock, Ballot Position and Voter's Choice: The Arrangement of Names on the Ballot and its Effect on the Voter (1957); Joanne M. Miller & Jon A. Krosnick, "The Impact of Candidate Name Order on Election Outcomes", 62 Pub. Opinion Q., Vol. 62 No.3, 291, 293-94, 308-09 (1998) and Laura Miller, "Election by Lottery: Ballot Order, Equal Protection, and the Irrational Voter", 13 N. Y. U. J. Legis. & Pub. Pol'y 373, 405 (2010) (collecting empirical social science studies). (Docket Entry No. 45, Memorandum at 82 and Docket Entry No.59 Memorandum at 9).

The Defendants challenged only the Miller study on grounds that Tennessee law required a "party block ballot" and Miller's study involved "block ballots". In its earlier findings of fact, the

32

Court cited Defendants' expert who described Tennessee's "Ballot Structure" as a "Block or Office ballot": "If Tennessee elections used party ballots rather than office ballots, the plaintiffs might have a marginal argument about the importance of party label. "But **Tennessee has an 'office' ballot, not a party ballot.**" Green Party of Tennessee v. Hargett, 882 F. Supp.2d 959, 984 (M.D. Tenn 2012) (emphasis in original). In fact, the Defendants cited as one cause for the lack of minor political parties' success in Tennessee was: "(3) Tennessee's 'office' ballot." (Docket Entry No. 36, Defendants' Memorandum at 25). In its Memorandum denying the Defendants' motion for a partial stay, the Court attached general election ballots for two major metropolitan cities in Tennessee for the 2008 Presidential election and 2010 Gubernatorial election, both were "block or office ballots." Id. at 8, 18-23. Since remand, Plaintiffs filed general election ballots for all Tennessee counties that utilized only the "block or office ballot" for all offices in that election.(Docket Entry Nos. 88 through 96-1).

To be sure, on remand, the Defendants cite competing empirical studies in support of their motion for summary judgment:

> See Ho & Imai, Estimating Causal Effects of Ballot Order from a Randomized Natural Experiment: The California Alphabet Lottery, 1978-2002, 72 Pub. Opinion Q 216, 227 (2008) (finding little systematic evidence that major party candidates in general elections are favored by being first on the ballot); R. Michael Alvarez, Betsy Sinclair, and Richard L Hasen, How Much is Enough? The "Ballot Order Effect" and the Use of Social Science Research in Election Law Disputes, 5 Election L.J. 40, 41 (2006) (finding that empirical evidence of ballot order effect is "muddled and it is unclear if the effect exists at all in general elections); Robert Darcy, Positional Effects with Party Column Ballots, 39 W. Pol Q. 648, 661 (1986) (determining that position effect does not occur at all in American general elections in which party listing serve as a cue on the ballot and where voters were asked to pick only one candidate among those running in a contested election).

Case 3:11-cv-00692   Document 97   Filed 06/18/13   Page 33 of 67 PageID #: 1415

(Docket Entry No. 80 at 37-38).[8]

In its prior ruling, the Court recognized the different and competing empirical studies (Docket Entry No. 59, Memorandum at 8), but relied upon the Eighth Circuit's ruling that despite differences in the studies, "many studies report a finding of some ballot advantage in the top position" Id. at 9 (quoting McClain v. Meier, 637 F.2d 1159, 1166 n.15 (8th Cir. 1980)). These electoral advantages are referred to as "primacy effects."[9]

Among the other "many studies"[10] are the following recent empirical studies: Jonathan G. S. Koppell and Jennifer A. Steen," The Effects of Ballot Position on Election Outcomes, 66 J. Pol. 267, 269 (2004) and Ned Augenblick and Scott Nicholson, "Choice Fatigue: the Effect of Making Previous Choices on Decision Making" at 23 (Apr. 2009), *available at* <http://www.stanford.edu/~ned789/Choice_Fatigue.pdf> ("We find that voters are more likely to abstain and more likely to rely on decision shortcuts, such as voting for the status quo or the first candidate listed in a contest, as the ballot position of a contest falls."). Augenblick and Nicholson also found that the lower the ballot position of a contest, the higher the number of undervotes or

---

[8]Although not cited by the Defendants, their expert earlier observed that "Voters must vote for each office separately. This ballot structure greatly reduces the role of party label in voting and leads votes to focus more on candidates. It results in lower levels of straight party voting and greater frequency of split tickets campaigns in states with office ballots are more likely to be candidate driven rather than party driven.(Docket Entry No. 36-12 at 3). With the 2012 amendments, party affiliation determines the order of candidates on the ballot.

[9]Miller and Krosnick explain about these empirical studies that: "One psychological theory of order effects predicts 'primacy effects,' which are biases toward selecting the first object considered in a set. ... **This theory is consistent with dozens of experiments that presented objects visually and nearly always found bias toward selecting initially offered options.**"*The Impact of Candidate Name Order on Election Outcomes*, 62 Pub. Opinion Q. at 293-94) (citations omitted and emphasis added)

[10]These studies are cited in the Miller article.

34

primacy effect votes. Id.; see also Jon A. Krosnick, Joanne M. Miller, and Michael P. Tichy, An

Unrecognized Need for Ballot Reform: The Effects of Candidate Name Order on Election Outcomes,

in Rethinking the Vote: The Politics and Prospects of American Election Reform 51, 66 (A.N.

Crigler, M. R. Just, and E. J. McCaffery eds., Oxford University Press, 2004) (studied  2000

elections in Ohio and North Dakota and found primacy effects in two-candidate contests ranging

from 1.41% to 6.32%, with an average of 2.88%). Paul S. Herrnson et al."Voting Technology: The

Not-So-Simple Act of Casting a Vote" at 195 n.16 (Brooking Institute Press 2008) (finding that

candidates in the middle of a ballot lose more votes to proximity mistakes than candidates at the top

and bottom of the ballot); Kamin, Ethnic and Party Affiliations of Candidates as Determinants of

Voting, 12 Canadian J. Psych. 205 (1969); Coombs, Peters & Strom, Bandwagon, Ballot Position

and Party Effects: An Experiment in Voting Choice, 3 Experimental Stud. Pol. 31 (1974); Taebel,

The Effect of Ballot Position on Electoral Success, 19 Am. J. Pol. Sci. 519 (1975); Brooks, Voters'

Vagaries: The Value of Position on a Ballot, 10 Nat'l. Municipal Rev. 161 (1921); White, Voters

Plump for First on List, 39 Nat'l. Municipal Rev. 110 (1950); Mueller, Voting on the Propositions:

Ballot Patterns and Historical Trends in California, 68 Am. Pol. Sci. Rev. 1197 (1969); W. Durley,

Secretary of State's Unpublished Statistical Table of 1970 and 1974 Primary Elections (1975); Note,

California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents, 45 So. Cal. L.

Rev. 365 (1972).[11]

### C. Conclusions of Law[12]

[11] These studies are cited  in New Alliance Party v. New York State Bd. of Elections, 861
F. Supp. 282, 287-9, n. 7 (S. D. N. Y.  1994).

[12] The Court incorporates by reference the standards for evaluating motions for summary
judgment in its earlier decision. Green Party of Tenn. v. Hargett, 882 F. Supp.2d 959, 986-91.

## 1. Standing

As a threshold issue, Defendants contend that "given . . . the petition and filing-deadline requirements set forth in Tenn. Code Ann. §§ 2-1-104(a)(24) and 2-13-107(a)(1) apply only to those minor parties that choose to nominate their candidates by primary, initially there is an issue of whether Plaintiffs continue to have the requisite standing to challenge the constitutionality of these provisions. . . . There is no evidence in the record that Plaintiffs intend or even desire to nominate their candidates by primary election. . . . Accordingly, Plaintiffs have not suffered any 'injury in fact' as a result of these statutory provisions." (Docket Entry No. 80 at 12, 14). Defendants also contend that Plaintiffs lack standing because "Plaintiffs have not met the statutory requirements for placement on the November 2014 general election ballot as a recognized minority party." Id. at 32.

Under Article III of the Constitution, a threshold requirement for any civil action is a "case or controversy" that exists when the named plaintiff has alleged a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 41 (1991) (quoting Allen v. Wright, 468 U.S. 737 (1984)). The Supreme Court has held that:

> [A] plaintiff . . . must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of 'a real need to exercise the power of judicial review' or that relief can be framed 'no broader than required by the precise facts to which the court's ruling would be applied.'
>
> * * *
>
> The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the

36

court's remedial powers.

Warth v. Seldin, 422 U.S. 490, 508, 517-18 (1975). Plaintiff's "threat of injury" must be both "real and immediate" not "conjectural" or "hypothetical." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983).

Although the Defendants cite several decisions on standing, the Court concludes that the standing issue must be determined by decisions on standing in ballot access controversies. In Williams v. Rhodes, 393 U.S. 23, 28 (1968), the Supreme Court held that the Socialist Labor Party had standing to challenge Ohio's restrictions on minor party ballot access, including the petition signature requirement, although that party had not filed any petition with signatures. In Storer v. Brown, 415 U.S. 724, 738 n.9 (1974), the Supreme Court found that independent presidential and vice-presidential candidates had standing to challenge California's ballot access notwithstanding their failure to file any petition with signatures seeking ballot recognition. See also Stevenson v. State Board of Elections, 794 F.2d 1176 (7th Cir. 1986) (independent candidate in general election to state and county offices had standing to challenge Illinois' early filing deadline without showing submissions of petition with signatures); Rainbow Coalition of Oklahoma v. Oklahoma State Election Board, 844 F.2d 740 (10th Cir. 1988) (minority parties who contested Oklahoma's petition requirements and filing deadline for third parties had standing despite their lack of compliance with statutes). In this Circuit, an affiliate of minor political party that presented evidence that a state's ballot access requirements were impossible to meet, was held to possess standing to challenge the state statutes at issue. Libertarian Party of Kentucky v. Ehrler, 776 F. Supp. 1200, 1203 (E.D. Ky. 1991).

Moreover, under Blackwell, the constitutional "inquiry is not whether each law individually

37

creates an impermissible burden **but rather whether the combined effect of the applicable election regulations** creates an unconstitutional burden on First Amendment rights." 462 F.3d at 586 (citing <u>Williams</u>, 393 U.S. at 34) (emphasis added). Moreover, in light of the Sixth Circuit's remand to consider the two remaining claims, the Court concludes that Plaintiffs have standing to challenge these statutes.

Defendants contend that Plaintiffs lack an injury in fact because Plaintiffs do not intend or desire to nominate their candidates by primary election. (Docket Entry No. 80 at 14). As to ballot access challenges, the Supreme Court has held that minority parties have standing to a petition signature requirement even when the party had not filed any petitions with signatures. <u>See Williams v. Rhodes</u>, 393 U.S. 23, 28 (1968); <u>Storer v. Brown</u>, 415 U.S. 724, 738 n. 9 (1974). Moreover, the Court concludes that Plaintiffs have standing to challenge the Tennessee ballot-access statute given the Sixth Circuit's remand and the continuing statutory requirement of the 2.5% signature requirement for a recognition as a political party for the August primary or the November general election.

As to Plaintiffs' standing to challenge the party-order provision, in earlier proceedings, the Court determined that "the Plaintiffs are deemed to have acquired the requisite number of signatures required for recognition as political parties and to have their parties' names next to their candidates on the general election ballot." (Docket Entry No. 46 Order at 2). As such, the Plaintiffs' candidates were named on the 2012 general election ballot that Plaintiffs challenge in this action. Thus, the Court concludes that Plaintiffs possess the requisite injury in fact for standing to challenge the party-order provision, as a claim remanded by the Sixth Circuit.

### 2. Facial or As Applied Challenge

38

Prior to a merits discussion, the Court addresses the Defendant's characterization of Plaintiffs' challenges as "facial" challenges.[13] The statutory 2.5% signature requirement remains at issue with the 2012 amendments. In earlier proceedings, Plaintiffs and Defendants presented

_____

[13] (Docket Entry No. 80, Defendants' Response at 1). In <u>Washington State Grange v. Washington State Republican Party</u>, 552 U.S. 442, 450-51 (2008), the Supreme Court described the policy considerations against facial challenges:

> Facial challenges are disfavored for several reasons. **Claims of facial invalidity often rest on speculation.** As a consequence, they raise **the risk of "premature interpretation of statutes on the basis of factually barebones records."** Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither " **'anticipate a question of constitutional law in advance of the necessity of deciding it'** " nor " 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' " Finally, facial challenges **threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.** We must keep in mind that " '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'"

<u>Id</u>. (internal quotation marks and brackets omitted with emphasis added).

The Court considers Plaintiffs' challenges to be as applied challenges. First, the record here is not a "barebones record" as the parties present historical facts, expert proof, and evidence of Tennessee's actual general election ballots. As the Supreme Court observed in an election controversy, the historical record of political parties' participation in elections is relevant as "[p]ast experience will be a helpful, if not always an unerring, guide." <u>Storer v. Brown</u>, 415 U.S. 724, 742 (1974). Second, reliance on recognized empirical studies relied upon by courts and expert opinions on issues eliminates speculation. The adverse impact on democracy is on the recognized right of Tennessee voters to have a choice among candidates of different parties with differing positions. <u>Williams v. Rhodes</u>, 393 U.S. 23, 30 (1968)("the right of qualified voters, regardless of their political persuasion, to cast their votes effectively"). Remedies after additional elections under these statutes lack meaningfulness and causes additional injuries to First Amendment rights. Moreover, as the Supreme Court observed in a First Amendment controversy, "we do not read our case law to require that empirical data come to us accompanied by a surfeit of background information. Indeed, in other First Amendment contexts, we have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether or eve, in a case applying strict scrutiny, to justify restrictions based upon history, consensus and 'simple common sense'". <u>Florida Bar v. Went for It. Inc.</u>, 515 U.S. 618, 628 (1995) .

39

expert proof on the effects of Tennessee's ballot access laws on minor political parties. The parties

submitted proof of historical facts and electoral outcomes for minor political parties in other States

and Tennessee's electoral outcomes for minor political parties. With the "Winner take All" electoral

rule, Defendants' experts opined that Plaintiffs face political futility in gathering the voter support

to meet Tennessee's 2.5% or 40,000 plus signature requirement. Plaintiffs' expert opinion was that

based upon Tennessee's historical record, minor political parties' prospect for success of obtaining

recognition as a state-wide political party in Tennessee is " 'impossible, or virtually impossible.' "

Goins, 793 F. Supp.2d at 1073 (quoting Docket Entry No. 25–3, Plaintiffs' Amended Expert Report

at 7).

To be sure, in its opinion, the Sixth Circuit directed that on remand, the Court must consider

the facial challenge to the 2.5% signature statute.

> **As part of its reconsideration, however, the district court must take into account
> that the 2.5% signature requirement, standing alone, is not unconstitutional on
> its face.** See, e.g., Am. Party of Texas v. White, 415 U.S. 767, 789 (1974)
> ("Demanding signatures equal in number to 3% or 5% of the vote in the last election
> is not invalid on its face."); Jenness v. Fortson, 403 U.S. 431 (1971) (upholding a
> Georgia law requiring independent and minor-party candidates to secure supporting
> signatures amounting to at least 5% of the total voters from the last election).

700 F.3d at 823 (emphasis added). In its earlier decision, this Court stated:

> [A]s the Court observed in Goins, **multiple decisions of the Supreme Court and
> Circuit courts upholding as high as five percent (5%) of the total vote for
> political party recognition and ballot access as constitutional. See e.g., American
> Party of Texas**, 415 U.S. at 789, 94 S.Ct. 1296 ("Demanding signatures equal in
> number to 3% or 5% of the vote in the last election is not invalid on its face");
> Storer, 415 U.S. at 739–40, 94 S.Ct. 1274 (5% requirement not facially
> unconstitutional); **Jenness v. Fortson, 403 U.S. 431, 438–39, 91 S.Ct. 1970, 29
> L.Ed.2d 554 (1971) (upholding Georgia statute requiring signatures of 5% of
> registered voters before independent candidates could be placed on ballot). To
> be sure, other circuits have upheld higher percentage requirements. Cartwright
> v. Barnes**, 304 F.3d 1138, 1141–42 (11th Cir.2002) (reaffirming constitutionality of
> Georgia 5% signature requirement); Rainbow Coalition of Okla. v. Oklahoma State

Election Bd., 844 F.2d 740, 741–42, 744 (10th Cir.1988) (upholding Oklahoma statute requiring signatures of 5% of the number of votes cast in the most recent election)

Other Circuits have upheld state laws requiring 2% to 3% of the total vote for ballot access as a recognized political party. Swanson v. Worley, 490 F.3d 894, 905 (11th Cir.2007) (upholding Alabama statute requiring independent candidates obtain signatures of 3% of vote in last gubernatorial election); Rogers v. Corbett, 468 F.3d 188, 195 (3rd Cir.2006) (uphold Pennsylvania statutes requiring candidate of minor political party obtain signatures of 2% of vote in last election); Libertarian Party of Florida v. Florida, 710 F.2d 790, 792–95 (11th Cir.1983) (upholding Florida statute requiring minor party candidate obtain signatures of 3% of all registered voters to appear on general election ballot). **The Court agrees that for a facial challenge, the 2.5% requirement alone is a reasonable state regulation for the reasons set forth by the esteemed late jurist William M. Leech, sitting as Special Justice in Tennessee Libertarian Party v. Democratic Party, 555 S.W.2d 102, 103–05 (Tenn. 1977).**

882 F. Supp.2d at 1006 (emphasis added). Yet, given the parties' historical and expert proof, the Court addressed this 2.5% statute as an "as applied" challenge.

In remanding Plaintiffs' claim challenging Tennessee's ballot preference statute, the Sixth Circuit also cited the lack of a factual record for the Court's ruling and the submission of new evidence on appeal:

> While the State's appeal was pending, however, the plaintiffs received our permission to file an exhibit of a sample general-election ballot from Washington County that uses the office-block format. But this exhibit is not sufficient to alter our conclusion that the district court wrongly held that the party-order provision is facially unconstitutional. The significance, if any, of Washington County's general-election ballot format or any other Tennessee ballots that might use the office-block format is not for us to decide in the first instance, especially because such a format appears to conflict with the presumptive "party block" ballot specified in Tenn.Code Ann. § 2–5–206(b)(2). See Taft Broad. Co. v. United States, 929 F.2d 240, 243–44 (6th Cir.1991) (listing cases stating the general rule that issues not litigated in the trial court are not appropriate for appellate consideration). Rather, the district court is the best forum in which to further develop the factual record as necessary.

700 F.3d at 827.

In ordering Plaintiffs' recognition as a political party and placement of their candidates'

41

names with each candidate's party on the November 2012 election ballot, the Court made factual findings. Those factual findings were based upon Plaintiffs' historical proof about minor political parties in Tennessee and the parties' expert proof. The Court concluded that Supreme Court precedent on the limit on the number of actual voters signatures, established that Plaintiffs had made the requisite showing of "a modicum of support among potential voters" for ballot access. (Docket Entry No. 45 Memorandum at 65-72). This conclusion necessitated an analysis of Tennessee's preferential ballot statute. On the latter question, the Court considered the three cited empirical studies actual as well as the 2008 and 2010 general election ballots in ruling on Tennessee's ballot preference statute. (Docket Entry No. 59 Memorandum at 8, 18-23). Those ballots confirmed the appropriateness of the Court's reliance on the Miller and other empirical studies.

Based upon the Court's legal research, courts faced with this constitutional issue cited or had experts who presented summaries of empirical studies on the effects of preferential ballot placement. As to reliance on empirical studies, Justice Powell observed in a ballot access controversy that "a court may properly look to available evidence or to matters subject to judicial notice." McCarthy v. Briscoe, 429 U.S. 1317, 1323 (1976) (citations omitted). Courts deemed those statistical studies reliable and despite differences among studies, courts, including the Supreme Court, identified the Bain and Hecock study and its conclusions to represent the majority view among scholars on the adverse effects of ballot preference statutes. Thus, the Court deemed these recognized empirical studies, the parties' historical proof on minor political parties' ballot access in Tennessee and expert proof, to provide an adequate factual basis to evaluate the effects of these statutes on Plaintiffs' First Amendment rights. As noted earlier, the Supreme Court observed in a First Amendment controversy,

> we do not read our case law to require that empirical data come to us accompanied by a surfeit of background information. Indeed, in other First Amendment contexts,

42

we have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether or even, in a case applying strict scrutiny, to justify restrictions based upon history, consensus and simple common sense.

Florida Bar, 515 U.S. at 628.

For these collective reasons, the Court considers Plaintiffs' challenges to Tennessee's ballot preference statute to be an "as applied" challenge.

### 3. Plaintiffs' Party Recognition and Ballot Access Claims

In sum, Plaintiffs argue that Tennessee's 2012 amendments did not affect the costly and burdensome 2.5% signature requirement for a new minor political party's recognition petition to secure ballot access for their candidates. In a word, the 2012 amendment, creating the alternative of submitting such a petition 90 days before the general election, retains the 2.5% signature requirement. Thus, Plaintiffs assert that the 2012 amendment has the same effect as the 119 day deadline for recognition as a political party and ballot access for their candidates in Tennessee primary elections. Plaintiffs contend that the State lacks a legitimate justification for this 2.5% signature requirement due to its lack of proof of any voter confusion and the State's de minimis 2,500-person signature requirement for Presidential candidate. Plaintiffs contend there is not any validity to the 2.5% or 40,000 plus voter signature requirement for minor political parties.

Defendants contend, in essence, that Plaintiffs have not met their burden that the 2.5% petition signature requirement alone or in combination with the other cited state election laws is facially unconstitutional; that the State has a legitimate interest in requiring a new-party to demonstrate significant support; that the applicable law does not require the State to prove actual voter confusion or ballot overcrowding, or frivolous candidacies to restrict ballot access; that the

43

State does not impose a fee for circulation of party recognition petitions; that the State does not restrict voters signing such petitions; and that the filing deadlines are necessary to assure ballot accuracy and timely distribution of absentee ballots.

Of these issues, the initial question is whether Tennessee's 2012 amendments provide an effective alternative for Plaintiffs to obtain recognition and ballot access for their candidates ninety (90) days before the November general election. If so, does that alternative render unnecessary consideration of the 2.5% signature requirement for the April or 119 day filing deadline for such petitions for ballot access in a primary election?

In its decision remanding this issue, the Sixth Circuit remarked about the effect of Tennessee's 2012 amendments to its ballot access statutes: "That framework has fundamentally changed since the district court decided the case because the party-primary requirement is no longer mandatory, the petition-filing deadline has moved from seven months before the general election to only three months before, **and minor-party candidates are no longer required to submit nominating petitions meeting the 2.5% signature provision and 119–day filing deadline unless their party chooses to hold a primary election**" Hargett, 700 F.3d at 824 (emphasis added).

Effective May 2012, the Tennessee General Assembly amended the Tennessee ballot access statutes to provide that to become a "recognized political party," Plaintiffs must file its signature petition for recognition and ballot access for its candidates as late as 90 days before the general election. Tenn. Code Ann. §§ 2-13-107(a) and (c)(amended 2012). For such recognition and access, Tenn. Code. Ann. § 2-13-107 provides as follows:

> (a)(1) To be recognized as a minor party for purposes of a primary election, a petition as required in § 2-1-104 must be filed no later than twelve o'clock (12:00) noon, prevailing time, on the appropriate qualifying deadline as established in § 2-5-101(a) in the office of the coordinator of elections. The petition shall be accompanied by the

44

name and address of the person or the names and addresses of the members of the group or association filing the petition to form the recognized minor political party.

**(2) To be recognized as a minor party for purposes of a general election, a petition as required in § 2-1-104 must be filed in the office of the coordinator of elections no later than twelve o'clock (12:00) noon, prevailing time, ninety (90) days prior to the date on which the general election is to be held.** The petition shall be accompanied by the name and address of the person or the names and addresses of the members of the group or association filing the petition to form the recognized minor political party.

(b) Within thirty (30) days after receipt of such petition, the coordinator of elections shall determine the sufficiency of the petition, and if the petition is found sufficient, the minor party shall be recognized with all rights and obligations declared in this section.

(c) Upon filing the required petition, candidates seeking to represent the minor party in a primary election must file nominating petitions as any other candidate for the desired office no later than twelve o'clock (12:00) noon, prevailing time, on the appropriate qualifying deadline as established in § 2-5-101(a). If the coordinator of elections determines the petition meets the statutory requirements to be declared a recognized minor party, the candidates seeking to represent such minor party shall be placed on the appropriate primary ballot for such minor party. If the coordinator of elections determines the petition fails to meet the statutory requirements to be declared a recognized minor party, the candidates seeking to represent such minor party shall be placed on the appropriate general election ballot as independent candidates.

Tenn. Code. Ann. § 2-13-107 (a) through (c) (emphasis added).

For this 90 day deadline, Section 2-13-107(a)(2) refers to "a petition as required in § 2-1-104" and the latter statute provides for a minor political party, in pertinent part, as follows:

A "recognized minor party" is defined as any group or association that has successfully petitioned by **filing with the coordinator of elections a petition which** shall conform to requirements established by the coordinator of elections, but which **must at a minimum bear the signatures of registered voters equal to at least two and one-half percent (2.5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor, and on each page of the petition, state its purpose, states its name, and contain the names of registered voters from a single county.**

Tenn. Code. Ann. § 2-1-104 (24) (emphasis added)

45

To be sure, the statutory requirement to gather such a petition for a primary is now optional. Yet, a comparison of Tennessee's 2012 amendments and the 2011 statute reveals little substantive change. The substantive change is the time deadline for a minor political party's recognition petition, namely 90 days prior to the general election. The Defendants present this 90 day deadline as an alternative to the 119 day deadline for the primary deadline. To be sure, the courts have upheld deadlines of 90-91 days prior to the general election for the filing of independent candidates' petition for ballot access. See Dr. John Hagelin for President Committee of Kansas v. Graves, 804 F. Supp. 1377, 1380-81 (D. Kan. 1992) (collecting decisions). For minor political party petitions, courts have upheld various deadlines shorter and longer than 90 days. See Libertarian Party of Maine v. Dunlap, 659 F. Supp.2d 215, 221 n. 7 (D. Me. 2009) (collecting decisions).

Tennessee's 90 day deadline is measured from the general election, but in effect, the deadline is shortly before the August primary, the first Thursday in August. This 90 day deadline under the 2012 amendments operates to require collection of signatures during the same time period preceding the August primary that caused the 120 day deadline to be held unconstitutional in Blackwell, 462 F.3d at 586, 591, and led this Court to hold Tennessee's prior 119 day deadline unconstitutional. (Docket Entry No. 45 at 72-79). The rationale is that this time period is well before the major parties' August primaries and by tradition, before those parties' nominating conventions. Id. at 74-76. Significantly, Tennessee's 2012 amendments with this 90 day deadline still impose the statutory requirement of 2.5% of the total number of votes in the last gubernatorial candidates. This reading of the 2012 amendment is reflected in the Plaintiffs' continuing burdensomeness argument, (Docket Entry No.73 Plaintiffs' Renewed Motion for Summary Judgment at 4-5), and the Defendant's argument that requiring Plaintiffs to demonstrate a modicum of voter support is a permissible State

46

interest.  (Docket Entry No. 80, Defendants' Response in Opposition at 18-20).

Plaintiffs assert violations of their First Amendment rights by the effective denial of ballot access for their parties' candidates in elections in Tennessee. "The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." Williams v. Rhodes, 393 U.S. 23, 31 (1968). This right of the minor political party to ballot access also impacts "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively" Id. at 30.  "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." Id. at 32. "In our political life, third parties are often important channels through which political dissent is aired." Id. at 39 (Douglas, J., concurring). In another decision, the Supreme Court stated:

> Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. All political ideas cannot be channeled into the programs of our two major political parties. History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. . . . The absence of such voices would be a symptom of grave illness in our society.

Sweezy v. New Hampshire, 354 U.S. 234, 250-51 (1957).

To be sure, "[t]he States possess a 'broad power to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices.'" Washington. State Grange, 552 U.S. at 451 (quoting Clingman v. Beaver, 544 U.S. 581, 586 (2005)). As a general rule, a State has the authority

47

to organize its election ballot. United States v. Classic, 313 U.S. 299 (1941). Moreover, a State may enact laws that "favor the traditional two party system." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 362 (1997). State ballot restrictions can prevent "the clogging of [a state's] election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections. . . . Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." Bullock v. Carter, 405 U.S. 134, 145 (1972). As the Sixth Circuit observed, "[t]his does not mean . . . that all state restrictions on political parties and elections violate the Constitution" and "states 'may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign related disorder.'" Libertarian Party of Ohio v. Blackwell, 462 F.3d 579, 585 (6th Cir. 2006) (quoting Timmons, 520 U.S. at 358). Yet, "the primary values protected by the First Amendment . . . are served when election campaigns are not monopolized by the existing political parties.'" Id. at 589 (quoting Anderson, 460 U.S. 780, 794 (1983)).

As to the standards for evaluating Plaintiffs' constitutional challenges to State ballot access laws, the Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies **prior to the imposition of reasonable restrictions on ballot access**." Munro v. Socialist Workers Party, 479 U.S. 189, 194-95 (1986) (emphasis added). With a constitutional challenge, the issue is whether Tennessee "affords minority political parties a real and essentially equal opportunity for ballot qualification" American Party of Texas v. White, 415 U.S. 767, 787-88 (1974). Once Plaintiffs demonstrate that Tennessee ballot access statutes impose a significant burden upon their First

48

Amendment right to ballot access, "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group." Anderson, 460 U.S. at 793. Strict scrutiny applies if the state law "burdens the rights of political parties and their members." Eu v. San Francisco County Democratic Cent. Committee, 489 U.S. 214, 222 (1989). "Election regulations that impose a severe burden on associational rights are subject to strict scrutiny," and will be upheld "only if they are 'narrowly tailored to serve a compelling state interest.'" Washington Grange, 552 U.S. at 451 (quoting Clingman v. Beaver, 544 U.S. 581, 586 (2005)). "If a statute imposes only modest burdens, however, then 'the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures." Id. at 452 (quoting Anderson, 460 U.S. at 788). "[M]inor barriers between voter and party do not compel strict scrutiny." Blackwell, 462 F.3d at 604 (citing Bullock v. Carter, 405 U.S. 134, 143 (1972)).

The Supreme Court summarized the analytical framework for assessing constitutional challenges to these ballot access laws:

> [Courts] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

Anderson, 460 U.S. at 789.

The Sixth Circuit restated the standard of judicial review as corresponding to the extent of the injuries caused by the cited state law:

> First, the court looks at the "character and magnitude of the asserted injury" to petitioner's constitutional rights. Anderson, 460 U.S. at 789. The court must then "identify and evaluate the precise interests put forward by the State as justifications

49

for the burden imposed by its rule. Id. If petitioner's rights are subjected to "severe" restrictions, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" Burdick v. Takushi, 504 U.S. 428, 434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)). But if the state law imposes only "reasonable, nondiscriminatory restrictions" upon the protected rights, then the interests of the state in regulating elections are "generally sufficient to justify" the restrictions. Id. (quoting Anderson, 460 U.S. at 788). The first step under the Anderson/Burdick framework is to determine whether this burden on the associational rights of political parties is "severe." . . . [T]o accurately apply this test, we must first determine the exact nature of the burden placed upon minor political parties and their voter-supporters.

* * *

Thus, though the court's role in reviewing election regulations is limited, it is also vital in that it protects interests that may not be adequately represented in the political process.

* * *

The key factor in determining the level of scrutiny to apply is the importance of the associational right burdened. Restrictions that do not affect a political party's ability to perform its primary functions-organizing and developing, recruiting supporters, choosing a candidate, and voting for that candidate in a general election-have not been held to impose a severe burden.

* * *

[T]he Supreme Court focus[es] on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity. Anderson, 460 U.S. at 793 (quoting Clements v. Fashing, 457 U.S. 957, 964 (1982) (plurality opinion)).

Id. at 585-86, 587, 588, (footnotes omitted).

Although state voting regulations "are not automatically subjected to heightened scrutiny, Blackwell,. 462 F.3d at 585, the Sixth Circuit cited decisions of district courts in this Circuit and other Circuits that applied the "strict scrutiny" standard to similar ballot access laws setting percentages and deadlines for recognition of minor political parties. Id. at 590-91. The constitutional

50

"inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights." Id. at 586 (citing Williams, 393 U.S. at 34) (emphasis added). Thus, because the proof clearly establishes the undue burden of the 2.5% signature requirement upon minor political parties' ballot access in Tennessee, the Court applies the "strict scrutiny" standard to Tennessee's statutory 2.5% signature requirement for ballot access for minor political parties.

"The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." Anderson, 460 U.S. at 788-89. "To the degree that a State would thwart this interest by limiting the access of new parties to the ballot, [the Court has] called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation." Norman v. Reed, 502 U.S. 279, 288-89 (1992) (emphasis added). In American Party of Texas, 415 U.S. 767 (1974), where minority candidates had to obtain 1% of the vote for governor at last general election, the Court stated: "what is demanded may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot," Id. at 783.

In evaluating Tennessee's 2.5% signature requirement, this Court looked beyond the mere percentages in the state statutes[14] cited in the Supreme Court decisions[15] on this issue. The Court again deems probative that in American Party of Texas, the Supreme Court ruled: "The District

---

[14] See Libertarian Party of North Dakota v. Jaeger, 659 F.3d 687, 695-96 (8th Cir. 2011) ("In Storer, the Supreme Court looked beyond the plain language of the statute.").

[15] For example in Jenness v. Fortson, 403 U.S. 431 (1971), the Supreme Court observed that "Georgia's election laws . . . do not operate to freeze the status quo." Id. at 438. Here, the proof established that historically, Tennessee laws do.

51

Court recognized that any fixed percentage requirement is necessarily arbitrary, but **we agree with it that the required measure of support –1% of the vote for governor in the last general election and in this instance 22,000 signatures-falls within the outer boundaries of support the State may require before according political parties ballot position.**" Id. at 783 (emphasis added). As in American Party of Texas, this Court focused on the 22,000 signatures of registered voters as the outer boundaries of the modicum of support required under the Constitution. See New York State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 204 (2008) (stating the signature requirement here for a primary election "is far from excessive." See, e.g. Norman v. Reed, 502 U.S. 279, 295 (1992) (approving requirement of 25,000 signatures, or approximately two percent of the electorate); White, 415 U.S. at 783 (approving requirement of one percent of the vote cast for Governor in the preceding general election, which was about 22,000 signatures)"). See also MacDougall v. Green, 335 U.S. 281, 283-84 (1948) (upholding a state law requiring 25,000 signatures for a new political party's ballot access).

Whether for the primary or the general election, Tennessee law still requires 40,000 plus signatures of registered voters on Plaintiffs' recognition petition for Plaintiffs' candidates to be listed on the ballot with their party names. Tennessee's voter signature requirement for party recognition far exceeds the outer limit of 22,000 signatures set in American Party of Texas and the 25,000 signature limits in Norman and McDougall. Given the significantly higher 2 million voters in Texas, the Court again concludes that Tennessee's outer limit should be significantly less than 22,000. Moreover, Tennessee ballot access laws require only 2,500 signatures of eligible voters for ballot access for a candidate for President of the United States, creating a form of discrimination. Anderson, 460 U.S. at 793 ("**A burden that falls unequally on new or small political parties or**

52

on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. **It discriminates against those candidates and–of particular importance–against those voters whose political preferences lie outside the existing political parties**") (citation omitted and emphasis added).

Here, citing empirical evidence, Defendants' experts opine, in essence, that for Plaintiffs, as minor political parties, to obtain significant voter support in Tennessee for recognition as a political party, is an act of political futility. Yet, "the primary values protected by the First Amendment . . . are served when election campaigns are not monopolized by the existing political parties." Blackwell, 452 F.3d at 589 (quoting Anderson, 460 U.S. at 794). Given Tennessee's historical record on minor political parties, the Court concludes that the 2.5% signature requirement for party recognition unduly burdens Plaintiffs' First Amendment rights to associate as a political party.

Although not at issue in Blackwell, Ohio's signature requirement for recognition and ballot access for a political party recognition was one percent of the total vote cast in the previous election or 30,000 signatures. 462 F.3d at 583. In Libertarian Party of Ohio v. Brunner, 567 F. Supp.2d 1006, 1013 (S. D. Ohio 2008), the district court noted that Ohio changed its signature requirement to .5% of the votes in the last gubernatorial election. Several other states require fewer signatures for recognition of a political party. See N.D. Cent. Code Ann. § 16.1-11-30 (West 2011) (minor parties) (7,000 signatures); see also S.C. Code Ann. § 7-9-10 (West 2012) (minor parties) (10,000 signatures); 2013 Kentucky Laws Ch. 66 (HB 427) (5,000 signatures); Green Party of Arkansas v. Daniels, 649 F.3d 675 (8th Cir. 2011) (sustaining Arkansas statute requiring a political party to win 3% of the state vote in the presidential or gubernatorial election or to obtain 10,000 signatures from registered voters during a three month period of their choice). According to a law review article

53

observed in Michigan, "[t]he qualifying certificate of a political party or independent candidate seeking ballot access in either 1972 or 1974 therefore had to have signatures of 14,238 eligible voters." Note, "Access to the General Election Ballot for Political Parties and Independent Candidates" 88 Harv. L. Rev.1121, 1127 n.17 (1975).

The State's justifications for this 2.5 % requirement remain speculative. As to assertions of voter confusion with multiple candidates, in fact, Tennessee had seven (7) Presidential candidates and sixteen (16) Gubernatorial candidates on the ballot without any evidence of voter confusion. The 90 day deadline for minor party petitions for the general election undermines the Defendants' administrative justifications for the 119 day deadline for such petitions for the primary. The administrative costs for ballot review by the Defendants' state election officials' proof taken at their highest estimate, is an eight-workday window to review ballots for distribution. For the reasons stated earlier,[16] the Court declines the Defendants' expert views that minor political parties should

---

[16]"As to the defense expert's opinions on the minor political party's futility in Tennessee, the First Amendment is the cornerstone for other constitutional rights in the Bill of Rights and the Constitution. Without the First Amendment's right of access to the courts, enforcement of constitutional rights and provisions could be rendered meaningless. The First Amendment rights of free speech, of petition for redress and to associate are critical to our democratic principles. These fundamental rights and their enforcement cannot be conditioned upon political expediency nor limited by contemporary political outcomes. "A candidate who wishes to be a party candidate should not be compelled to adopt an independent status in order to participate in the electoral process." McClain v. Meier, 637 F.2d 1159, 1165 (8th Cir. 1980) (citing Storer, 415 U.S. at 745, "[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."). "All political ideas cannot and should not be channeled into programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups which innumerable times have been at the vanguard of democratic thought and whose programs were ultimately accepted. ... The absence of such voices would be a symptom of grave illness in our society." Sweezy. 354 U.S. at 250-51. The Court concludes that its decision on the First Amendment must be based upon constitutional values, not political values or political expediency." (Docket Entry No. 45 Memorandum at 72).

54

give up and join the major parties. As to the 2012 statutory amendments for minor political parties' recognition petitions, the Court concludes that with the same 2.5% signature requirement, the 90 day deadline for a general election petition is also an unconstitutional and severe burden on Plaintiffs' First Amendment rights as it were with the 119 day deadline for minor parties' petitions for their ballot access for primary elections. (Docket Entry No. Memorandum at 72-79). As stated in the Court's prior decision, other courts have found 90 day deadlines burdensome for minor political parties and voters.[17] The concerns cited by the State do not outweigh the Plaintiffs' First Amendment rights. Here, as in Blackwell, "the State has put forth no evidence that [its] interests are compelling or that they are advanced by" this signature requirement. 462 F.3d at 594.

As to the 90 day deadline for general elections, the Defendants explain that this deadline is one day before the August primary. (Docket Entry No. 80 at 4). For state elections, Tennessee statutes set a deadline of the first Thursday in April for nominating petitions for independent candidates in a November election, Tenn. Code Ann. § 2-5-101(a)(1), and the third Thursday in February for independent or primary candidates for an August election. Tenn. Code Ann.§ 2-5-101(a)(2). Tennessee also has a "sore loser statute", Tenn. Code Ann.§2-5-101(f)(1) and (4), that would expressly disqualify a losing candidate in a party primary from running as a candidate for

---

[17] Hargett, 882 F. Supp.2d at 1010 ("As stated in Blackwell the Sixth Circuit cited and relied upon decisions in other Circuits and district courts holding State deadlines of 60 days and 90 days prior to a primary as creating burdens for minor political parties and voters. 462 F.3d at 586 (citing Council of Alternative Parties v. Hooks, 121 F.3d 876, 880 (3d Cir.1997) (60 day deadline before primary an undue burden because "the election is remote and voters are generally uninterested in the campaign")); McLain v. Meier, 851 F.2d 1045, 1050–51 (8th Cir.1988) (Nebraska's February deadline 90 days prior to the primary unconstitutional). Significantly, Blackwell and Goins cited other district courts in this Circuit that have stricken state deadlines for lesser periods of time than Tennessee's 120 day deadline. Cripps v. Seneca County Bd. of Elections, 629 F. Supp. 1335, 1342 (N. D. Ohio 1985) (deadline of 75 days before the primary for independent candidates violates the First Amendment").

another political party and bars a candidate from running as a candidate of more than one party.

To be sure, "sore loser" laws are constitutional, <u>Storer</u>, 415 U.S. at 736, but alone or in combination with the other state ballot access statutes, the 90 day deadline in the 2012 amendment reinforces the effects of a "sore loser statute" on minor political parties as recent studies have documented the effects of such disqualification laws as entrenching the "duopoly" of the major political parties and "deny[ing] minor parties the most crucial element for their potential electoral success–quality candidates." Michael S. Kang, "Sore Loser Laws and Democratic Contestation", 99 Geo. L. J. 1013, 1049 nns.145-147 (2011).[18]

---

[18] The Kang article also chronicles other effects of Sore Loser laws: "Sore loser laws, however, impose an enforceable precommitment among party candidates by power of state law. Under a sore loser law, a primary winner need not worry as much about effective exit by primary losers from the party coalition, particularly in the short term. Primary losers are prohibited by law from challenging the party's nominees in the general election, even if they stand a better chance of winning it in the end than any other candidates. Informal loyalty to the party, reinforced by some perception of mutual self-advantage, is no longer necessary to block them from challenging the party's nominees. Candidates must satisfy the party bases, regardless of their own policy preferences or other electoral considerations, for a viable candidacy. As one political handicapper explains: "'[I]n a primary, shrillness matters. It's a race to the fringe.'" Candidates who are more ideologically extreme are advantaged, while centrist candidates are badly handicapped and forced to adapt to party orthodoxy. ..

Sore loser laws limit the supply of candidates eligible for the general election by disqualifying losing candidates from party primaries. Sore loser laws, therefore, remove routes for candidates to reach the general election outside the auspices of the parties, and they reinforce the major parties' control over ballot access. As a practical matter, this concentration of ballot access in the hands of the major parties entrenches the dominance of more ideological elements in the major parties over more moderate dissenters. Sore loser laws, by removing the leverage of moderate dissenters from exiting the party through sore loser candidacies, disrupt the natural incentives to compromise with more moderate elements within the party. Repealing sore loser laws might reverse this effect and increase the leverage of moderate dissenters to move the major parties toward the political center from within. " <u>Id.</u> at 1058, 1074-75 (footnotes omitted).

56

Thus, for Plaintiffs' as applied challenge, the Court concludes that although the 2012 amendments create an alternative for a minority party's recognition petition within 90 days of the general election, Tennessee retains the 2.5% signature requirement based upon the most recent gubernatorial election. The effect of this retention imposes an unjustified and unduly burdensome requirement that violates Plaintiffs' First Amendment right to associate as a political party and Tennessee voters' rights of the opportunity to vote for such parties. For the same reasons, the Court again concludes that the same signature requirement for the 2012 amendment's 90 day filing deadline before a general election violates Plaintiffs' First Amendment rights and Tennessee voters' rights of the opportunity to vote for such parties.

### 4. Tennessee Ballot Preference Statute

Plaintiffs contend that "TCA § 2-5-208(d)(1) is unconstitutional because it improperly and unjustifiably gives a ballot placement benefit to the candidates of a specific party and denies all other candidates of any opportunity to gain priority position at the top of the candidate listing on the ballot." (Docket Entry No. 73 at 19). Defendants, however, assert "[t]here is no constitutional right under the equal protection clause to a favorable ballot position." (Docket Entry No. 80 at 32). Moreover, Defendants assert that "the majority of the empirical studies concerning the prejudicial effects of ballot order have consistently found that there is little if any ballot order effect in general elections." Id. at 37. Defendants assert that "courts have recognized that a candidate's party affiliation is the single most important factor influencing a voter." Id. at 38. Defendants also assert that even if Plaintiffs incur a minor injury from ballot placement, the state interests in organizing a clear and intelligible ballot outweigh any injury. Id. at 39.

On appeal, the Defendants "point[ed] out, "[t]he effect of ballot placement on voting is a

matter of fact, and virtually every court that has found prejudice resulting from preferential ballot placement has done so based upon significant evidence demonstrating such prejudice in[]elections in that state.'"[19] <u>Green Party of Tennessee</u>, 700 F.3d at 826. As the Sixth Circuit explained:

---

[19]The Court notes that the cases cited by the Defendants for this proposition on remand, and presumably in their appeal, and referred to by the Sixth Circuit, actually rely on the empirical studies cited by this Court in its earlier ruling. In <u>Sangmeister v. Woodard</u>, 565 F. 2d 460 (7th Cir. 1977), cited by the Defendants, the expert testimony was only presentation of empirical studies, including studies cited by the Court: "The plaintiffs' expert, Dr. Samuel A. Kirkpatrick testified **based on previous empirical studies done by other scholars** and his own research . . . 'that on the average first place garners 3.3 percent more votes than second place.'" <u>Id.</u> at 463 (footnotes omitted) (emphasis added).

"Academic studies and articles, as well as case law, have often adopted the view that position bias exists on an election ballot. The **authoritative study on the subject is a report that analyzed the effects of ballot placement in Michigan city and county elections from 1951 to 1952. Henry M. Bain & Donald S. Hecock, Ballot Position and Voter's Choice: The Arrangement of Names on the Ballot and its Effect on the Voter (1957)."** <u>New Alliance Party v. New York State Bd. of Elections</u>, 861 F.Supp 282, 288 (S.D.N.Y 1994) (emphasis added).

In <u>Democratic-Republican Organization of New Jersey v. Guadagno</u>, 2012 WL 4863045 at *8 (D.N.J. 2012), also cited by the Defendants, that court approvingly cited this Court that "in virtually all of these cases, courts have required evidence demonstrating that ballot placement confers a benefit prior to determining whether the plaintiffs have been burdened, let alone harmed"; <u>see also</u> <u>Green Party of Tennessee v. Hargett</u>, No. 3:11–0692, 2012 WL 913259, at *5-8 (M.D. Tenn. Mar. 16, 2012) (collecting cases requiring empirical evidence of positional bias to determine burden imposed on plaintiffs.). In <u>Clough v. Guzzi</u>, 416 F. Supp. 1057, 1063, 1064, n.11 (Mass. Dist. Ct. 1976) the factual basis there was "Dr. Just [who] cited as her principal authority a study by Henry M. Bain and Donald S. Hecock, Ballot Position and the Voter's Choice (1957)"). In <u>Gould v. Grubb</u>, 14 Cal. 3d 661, 667, n.6 (Cal. 1975) the experts there were Henry M. Bain and William James Scott, Jr., whom the Court characterized as preeminent authorities on the question of ballot placement preference. There, "several of the experts testified that a significant advantage as to ballot placement accrued to the beneficiaries in virtually all elections with the possible exception of President of the United States or perhaps a state governor." <u>Id.</u> at 688.

As to Defendants' contention that prejudice due to preferential ballot placement must be tied to the particular state, the Eighth Circuit expressly rejected that contention: "as the Seventh Circuit has noted, the probative value of the cited studies is not completely dissipated merely because the studies are not perfectly suited to the facts of this case." <u>McLain</u>, 637 F.2d at 1166, n. 14, 15 (citing <u>Sangmeister</u>, 565 F.2d at 466). In another decision cited by the Defendants, the court ruled that proof of prejudice in local elections was not required to find ballot bias due to preferential placement in

58

Because the plaintiffs brought this case as a facial challenge, "we have no evidentiary record against which to assess their assertions that voters will be confused" or influenced by the position of the names on the ballot. . . . So we are left to speculate about the form of the ballot, upon which the claim of positional bias hinges. And "[a]s long as we are speculating," we must, our of deference to the principle of federalism, "ask whether the ballot could conceivably be printed in such a way as to eliminate the possibility of widespread" positional bias "and with it the perceived threat to the First Amendment." . . . We need not strain to conceive of such a ballot. If one of the studies cited by the district court is to be believed, Tennessee might in fact already use a ballot free of any widespread positional bias. The State presumptively uses what is known as a "party block" ballot form for general elections, meaning that "all of the candidates for a party are listed in a single column." Miller, 13 N.Y.U. J. Legis. & Pub. Pol'y at 388 & n. 77; see Tenn.Code Ann. § 2–5–206(b)(2) (mandating the "party block" ballot form for general elections, subject to certain exceptions). This form is distinct from an "office block" ballot form, "in which candidates are listed vertically under the heading of the office they seek." Miller, 13 N.Y.U. J. Legis. & Pub. Pol'y at 388. The study cited by the district court analyzed elections "in states that use the 'office block' ballot form in general elections," but not elections in states that use the "party block" form. Id. As for the "party block" states, the study's author hypothesized that, "[g]iven the salience of the party label with this type of ballot, one should expect that positional effects would be minimal." Id.

Id. at 827 (citations omitted).

Tennessee's preferential ballot placement statute defines the order of the parties' candidates on the State's general election ballots:

> **Notwithstanding any other provision of this chapter or this title, on general election ballots, the name of each political party having nominees on the ballot shall be listed in the following order: majority party, minority party, and recognized minor party, if any.** The names of the political party candidates shall be alphabetically listed underneath the appropriate column for the candidate's party. A column for independent candidates shall follow the recognized minor party, or if there is not a recognized minor party on the ballot, shall follow the minority party,

---

local elections. Gould, 14 Cal.3d at 667-78 ("Neither of the City's objections can prevail. In the first place, although none of the petitioner's witnesses conducted political studies in past Santa Monica elections noting in the record suggests that the Santa Monica voters differ significantly from voters whop participated in the numerous elections that were studied.").

59

with the listing of the candidates' names alphabetically underneath.

Tenn. Code. Ann. § 2-5-208(d)(1) (emphasis added).

In addition to the proof cited in the Court's earlier findings, <u>supra</u> at 32-33, after remand, Plaintiffs submitted proof that in the 2012 elections, the Defendants utilized "office block" ballots for all 95 Tennessee counties. The Defendants did not present any proof on the use of "party block" ballots except for election officials' references to different party ballots for the August primaries.

Denial of equal access to the ballot falls with the protective scope of the Equal Protection Clause of the Fourteenth Amendment. <u>Munro</u>, 479 U.S. at 193-94 (1986); <u>Williams</u>, 393 U.S. at 30-31. A state ballot practice that provides a voting cue violates the Equal Protection Clause. <u>Rosen v. Brown</u>, 970 F.2d 169, 175-77 (6th Cir. 1992). In its earlier ruling, the Court cited <u>Rosen</u> and other Circuit decisions to conclude that "Tenn. Code Ann. § 2-5-208(d)(1)'s preferential placement of the majority party candidates on election ballots provides an impermissible 'voting cue' that violates Plaintiff's First Amendment rights as well as the First Amendment rights of Tennessee voters." (Docket Entry No. 45 Memorandum at 81-82). The Court cited three empirical studies, including the "authoritative study" on this issue, finding that preferential ballot placement prejudicially effects the outcomes of elections for minor political parties. <u>Id.</u> and Docket Entry No. 59 Memorandum at 9.The Court also relied on the inference that by its enactment, the majority party in the General Assembly recognized or perceived a political advantage of such a preferential ballot placement. <u>Id.</u> at 11. This inference is a reasonable one. <u>Blackwell</u>, 492 F.3d at 587 (where a "State . . . is controlled by the political parties in power, [those parties] . . . 'presumably

60

have an incentive to shape the rules of the electoral game to their own benefit.'") (quoting
Clingman v. Beaver, 544 U.S. 581, 603 (2005) (O'Conner, J., concurring)). See also
Weisberg v. Powell, 417 F.2d 388, 393 (7th Cir. 1969) (per curiam) (discussing candidates
and their representatives who camped out overnight for a chance to be first on the ballot).
The Court's Memorandum denying the Defendants' motion to stay attached ballots from the
2008 Presidential election and the 2010 Gubernatorial election from two of the State's largest
two cities in which "office block" ballots were used. (Docket Entry No. 59, Memorandum
at 18-23).

Among the three empirical studies that the Court cited was the Bain and Hecock
study. In New Alliance Party v. New York State Bd. Of Elections, 861 F. Supp. 282,
(S.D.N.Y 1994), that is relied upon by the Defendants, the District Court described the
Bain and Hecock study as the "authoritative study" on the effects of ballot preference
statutes. Id. at 288. As to the empirical studies cited by the Defendants' pending motion
for summary judgment, the Court earlier recognized the different and competing
empirical studies on the effects of such laws, (Docket Entry No. 59, Memorandum at 8),
but relied upon the Eighth Circuit's finding that despite differences among these studies,
"many studies report a finding of some ballot advantage in the top position." Id. at 9
(quoting McClain, 637 F.2d at1166 n.15).

As to the appropriateness of this Court's finding based upon these published
empirical studies, in Morse v. Republican Party of Virginia, 517 U.S. 186, 197 n.13
(1996), the Supreme Court noted that:

> **Research has shown that placement at the top of a ballot often confers
> an advantage to candidates so positioned. The classic study of the**

61

> phenomenon is H. Bain & D. Hecock, **Ballot Position and Voter's Choice: The Arrangement of Names on the Ballot and its Effect on the Voter (1957).** See also Note, California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents, 45 S. Cal. L.Rev. 365 (1972) (listing other studies); Note, Constitutional Problems with Statutes Regulating Ballot Position, 23 Tulsa L.J. 123 (1987). **Some studies have suggested that the effect of favorable placement varies by type of election, visibility of the race, and even the use of voting machines.** See id. **at 127. While the research is not conclusive, it is reasonable to assume that candidates would prefer positions at the top of the ballot if given a choice.**

517 U.S. at 197 n. 13 (emphasis added).

As stated earlier, federal and state courts have held preferential ballot placement statutes and practices to be prejudicial and unconstitutional under various circumstances. See Sangmeister v. Woodard, 565 F.2d 460, 467 (7th Cir. 1977) ("We, therefore, hold that the practice of Illinois County Clerks of excluding plaintiffs from top ballot positions was intentional and worked a substantial disadvantage to them in violation of the Fourteenth Amendment to the United States Constitution."); McLain v. Meier, 637 F.2d at 1169 ("In the present case, we find that North Dakota's "incumbent first" statute does not withstand even this minimal standard of review, because the justification offered for North Dakota's ballot arrangement is unsound."); Graves v. McElderry, 946 F. Supp. 1569, 1574 (W.D. Okla. 1996) ("Based upon these facts, the Court concludes the greater weight of the evidence suggests that while its effect may be slight, position bias is present in partisan elections where candidates for office are listed vertically on the election ballot within office blocks. The Court therefore finds that Plaintiffs have met their burden to prove some measure of position bias exists in Oklahoma's General Elections, and that Democratic party candidates for public office receive a number of windfall votes in such Elections because of the configuration of

62

election ballots prescribed by section 6–106 of the Election Code.") (footnote omitted); Culliton v. Board of Election Comm'rs, 419 F. Supp. 126, 129 (N.D. Ill. 1976) ("Indeed in Republican leaning DuPage County, that party has enjoyed the favored position continuously since the days of Abraham Lincoln. Further testimony indicated that it is the general practice throughout the state for county clerks to favor their own party with the top position."), aff'd and remanded sub nom. on other grounds by, Sangmeister v. Woodard, 565 F.2d 460, 464 (7th Cir. 1977) (footnote omitted); Mann v. Powell 333 F. Supp. 1260,1261 (N.D. Ill.1969) (three-judge court) ("Secretary of State . . . has repeatedly stated that Public Act 76-1964 permits him to engage in practices utilized in the past. More recently he has argued that favoring certain candidates on the basis of "incumbency" or "seniority" is constitutionally permissible and permitted by Public Act 76-1964. We disagree. The Fourteenth Amendment requires all candidates, newcomers and incumbents alike, to be treated equally. The Weisberg case expressly condemned Secretary of State Powell's attempt to favor personal acquaintances and party regulars by awarding them top positions on the ballot. We will not permit him to achieve the same result by the transparent device of favoring incumbents or those with 'seniority.' Therefore, we have decided to make permanent the temporary injunction issued by this court on December 5, 1969."); Netsch v. Lewis, 344 F. Supp. 1280, 1281 (N.D. Ill.1972) ("The defendant, his agents and employees and all persons acting in concert and participation with him, are hereby restrained in certification of election ballots from granting priority to candidates by reason of incumbency and seniority, as purported directed by Illinois House Bill 2485 (page 2 of the Amendment), subject to further order of this Court.").

State courts have also held such laws unconstitutional and similarly expressed concerns about the fairness of elections with such preferences that are contrary to democratic principles. In <u>Gould v. Grubb</u>, 14 Cal.3d 661, 536 P.2d 1337, 1345-46 (Cal. 1975), the California Supreme Court stated.

> In light of the trial court's finding that candidates in the top ballot position receive a substantial number of votes simply by virtue of their ballot position, a statute, ordinance or election practice which reserves such an advantage for a particular class of candidates inevitably dilutes the weight of the vote of all those electors who cast their ballots for a candidate who is not included within the favored class. (See Scott, California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents (1972) 45 So.Cal.L.Rev. 365, 383—386.) Indeed, in a close race it is quite possible that a candidate with fewer 'conscious' supporters than an opponent will actually win an election simply because his high position on the ballot affords him the advantage of receiving the vote of unconcerned or uninformed voters. (Id. at p. 376.) In such an instance, the challenged provision effectively undermines the fundamental democratic electoral tenet of majority rule.
>
> * * *
>
> We thus conclude that an election procedure which grants positional preference to incumbents violates the equal protection clause of both our state and federal Constitutions. We note that every other court which has definitively ruled on the constitutionality of similar 'incumbent first' ballot procedures has reached the same conclusion."

536 P.2d 1343, 1345-46 (citing other state court decisions); <u>see also</u> <u>Matter of Holtzman v. Power,</u> 62 Misc.2d 1020, 1023, 313 N.Y.S.2d 904, 907 (1970) ("It was found herein as a matter of fact that there is a distinct advantage to the candidate whose name appears first on a ballot. Aside from the factual determination, such a belief appears to be so widespread and so universally accepted as to make it almost a matter of public knowledge."); <u>Arvan v. Wayne County Clerk</u> 381 Mich. 761, 160 N.W.2d 345 (1968) (citing <u>Elliott v. Secretary of State,</u> 294 N.W. 171, 173 (Mich. 1940) ("It is a commonly known and accepted fact that in

64

an election, either primary or general, where a number of candidates or nominees for the same office are before the electorate, those whose names appear at the head of the list have a distinct advantage. Groesbeck v. Board of State Canvassers, 251 Mich. 286, 232 N. W. 387. It is not consistent with fairness or purity of elections or the avoidance of misuse of elective franchise for election officials to prepare ballots in such a condition as will afford one candidate or nominee an unfair advantage over rival candidates or nominees."); Akins v. Secretary of State, 157 N. H. 67, 72-73, 904 A.2d 702, 706 (2006) ("By establishing a system that grants the primacy effect to the party that received the most votes in the prior election, RSA 656:5 denies candidates of minority parties an equal opportunity to enjoy the advantages of the primacy effect, and, thus, an equal right to be elected"). One state court found the effect of positional bias, but noted that this effect is much less pronounced in partisan elections. Ulland v. Grove, 262 N.W.2d 412, 414-6, n.5 (Minn. 1978).

To be sure, other federal and state courts have reached contrary results. After Sangmeister, the Seventh Circuit held that a two-tiered fixed-position ballot system was constitutional, even though the system essentially guaranteed the top two spots on the ballot to the two major political parties. Bd. of Election Com'rs v. Libertarian Party, 591 F.2d 22, 27 (7th Cir. 1979). In a dissent, Judge Swygert argued that the procedure invidiously discriminated against minor parties, noting that "[b]y approving a procedure which prevents a minor or 'non-established' party [a]s such from ever attaining the top ballot position, the majority has effectively negated the order of this court in Sangmeister." Id. at 28 (Swygert, J., dissenting). See also New Alliance Party, 861 F. Supp. at 295–97 ("access to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not

65

a constitutional concern."); Libertarian Party of Colorado v. Buckley, 938 F. Supp. 687, 693 (D. Colo.1996) (placement of less popular parties lower on the ballot held to be minimal, and did not outweigh the state's "recognized interest in regulating elections is sufficient to outweigh any 'position bias' claimed by Plaintiffs.").

One state court upheld the preferential ballot position, but did so because the top spot was rotated. Sonneman v. State, 969 P.2d 632, 638, 639 n.7 (Alaska 1998) (finding that fixed-position ballot "allocates the benefit of positional bias" through its random selection of one candidate for the top position, and any primacy effect poses a "lesser burden" on the right to vote, even though it accepted as true allegation that primacy effect affects 5-7% of votes cast, and that elections in Alaska are "often decided by margins less than 5%.").

As to prejudice arising from Tennessee's ballot preference statute, the empirical studies refer to these electoral advantages of the preferential ballot position as "primacy effects."[20] In its prior rulings, the Court recognized the different and competing empirical studies on these "primacy effects," (Docket Entry No. 59, Memorandum at 8), but relied upon the Eighth Circuit's ruling in McClain that despite differences in the studies, "many studies report a finding of some ballot advantage in the top position" Id. at 9 (quoting McClain, 637 F.2d at 1166 n.15). Based upon decades of precedents in the state and federal courts and the empirical studies since the 1940s on this issue that retain their viability, the Court again concludes that Tennessee's ballot preference statute deprives Plaintiffs'

_____

[20]Miller and Krosnick explain that: "One psychological theory of order effects predicts 'primacy effects,' which are biases toward selecting the first object considered in a set. . . . This theory is consistent with dozens of experiments that presented objects visually and nearly always found bias toward selecting initially offered options."*The Impact of Candidate Name Order on Election Outcomes*, 62 Pub. Opinion Q. at 293-94) (citations omitted)

66

candidates and Tennessee voters of their rights to equal and equitable treatment in listing of candidates on ballots for general elections in violation of the Equal Protection Clause of the Fourteenth Amendment.

As to an appropriate remedy, requiring alphabetical listing of candidates has been held sufficient. Schaefer v. Lamone, 2006 U.S. Dist. Lexis 96855 at *14 (D. Md. Nov. 30, 2006) aff'd, 248 Fed. App'x. 484 (4th Cir. 2007) (finding no equal protection violation in statute that requires alphabetical ordering of candidates).

### D. Conclusion

The Court concludes that the Plaintiffs' renewed motion for summary judgment (Docket Entry No. 73) should be granted and Defendants' motion for summary judgment (Docket Entry No. 82) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of June, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court

67