UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **GREEN PARTY OF TENNESSEE and** | ) | |
| **CONSTITUTION PARTY OF** | ) | |
| **TENNESSEE,** | ) | |
| | ) | **NOS. 3:11-cv-692** |
| **Plaintiffs,** | ) | **JUDGE CRENSHAW** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TRE HARGETT, in his official capacity** | ) | |
| **as Tennessee Secretary of State and** | ) | |
| **MARK GOINS, in his official capacity** | ) | |
| **as Coordinator of Elections,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

The Green Party of Tennessee ("Green Party") and the Constitution Party of Tennessee

("Constitution Party") bring claims under 42 U.S.C. § 1983 against Tre Hargett, in his official

capacity as Tennessee Secretary of State, and Mark Goins, in his official capacity as Coordinator

of Elections for the State of Tennessee (collectively, "the State"). Plaintiffs are political parties

seeking recognition and ballot access in federal and state elections. They bring facial and as-

applied constitutional challenges to election statutes that they claim have impaired their access to

the ballot. Previously, the Honorable William J. Haynes, Jr., twice granted summary judgment to

Plaintiffs, and the United States Court of Appeals for the Sixth Circuit twice reversed those

judgments. In its most recent remand, the Sixth Circuit admonished the Court not to resolve this

case on summary judgment again without substantial development of the record. Green Party of

Tennessee v. Hargett, 767 F.3d 533, 554 (6th Cir. 2014).

The parties had the opportunity to fully develop the record during a two-day bench trial.

After consideration of the entire record, the Court holds on the as-applied challenges that Plaintiffs

1

have not carried their burden of proving by a preponderance of the evidence that their constitutional rights were violated. With respect to the Plaintiffs' facial challenges, the Court concludes that Plaintiffs have not carried their burden of proving by a preponderance of the evidence that no set of circumstances exists under which the challenged statutes would be valid. Accordingly, the Court will enter judgment for the State on all claims. The Court had consolidated the trial on the merits with Plaintiffs' motion for preliminary injunction (Doc. Nos. 204, 218), which is DENIED.

## I. Background

### A. Ballot Access in Tennessee[1]

In Tennessee, it is easy for a candidate to get on the ballot. To be listed on the ballot for any office besides president, a candidate with no party affiliation need only submit a petition signed by 25 registered voters. TENN. CODE. ANN. § 2-5-101(b)(1). To be listed on the ballot as an independent candidate for president, only a petition with the signatures of 275 registered voters is required. Id.

Tennessee has two avenues for political parties to appear on the state's ballot: they can qualify as a "statewide political party" or a "recognized minor party."

> "Statewide political party" means a political party at least one (1) of whose candidates for an office to be elected by voters of the entire state has received a number of votes equal to at least five percent (5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor.

TENN. CODE ANN. § 2-1-104(a)(30).

> "Recognized minor party" means any group or association that has successfully petitioned by filing with the coordinator of elections a petition which shall conform to requirements established by the coordinator of elections, but which must at a minimum bear the signatures of registered voters equal to at least two and one-half percent (2.5%) of the total number of votes cast for gubernatorial candidates in the

---

[1] See Libertarian Party of Tenn. v. Goins, 793 F. Supp. 2d 1064, 1069–70 (M.D. Tenn. 2010) (summarizing the history of Tennessee's ballot-access statutory scheme).

most recent election of governor, and on each page of the petition, state its purpose, state its name, and contain the names of registered voters from a single county. . . .

TENN. CODE. ANN. § 2-1-104(a)(23) (the "ballot-access statute"). For the 2012 and 2014 elections 40,039 petition signatures were required for a political party to become a "recognized minor party." (Stipulations of Fact, Doc. No. 242 at ¶ 48.) For the 2016 and 2018 elections, 33,844 petition signatures will be required. (Id. at ¶ 49.) The State will include any candidate who is not a member of a statewide political party or a recognized minor party as an "Independent" on the ballot. TENN. CODE ANN. § 2-13-107(c).

The timeline for a party to file the 2.5% signature petition described in the ballot-access statute depends on how the party nominates its candidates. When Judge Haynes first granted summary judgment to Plaintiffs, Tennessee required that for certain offices, *every* party had to select their candidates by primary election. A party selecting their candidates by primary election must file its 2.5% signature petition on the first Thursday in April—119 days before the State's August primary election. TENN. CODE ANN. § 2-13-107(a)(1). The April filing deadline for the 2.5% signature petition is the same as (and tied to) to the statutory deadline for Independent and primary candidates to file their nominating petitions to appear on the August primary ballot:

> Independent and primary candidates for any office to be filled at the regular November election for which a primary is required to be held at the regular August election shall qualify by filing such candidates' nominating petitions no later than twelve o'clock (12:00) noon, prevailing time, on the first Thursday in April.

TENN. CODE ANN. § 2-5-101(a)(1).

However, in the spring of 2012, while this case was on appeal the first time, Tennessee amended its ballot-access statutes to allow an alternative for minor parties to select their candidates. Green Party of Tenn. v. Hargett, 767 F.3d 533, 541 (6th Cir. 2014). The 2012 Amendment allows political parties to "nominate their candidates for any office by *any method*

3

*authorized under the rules o§f the party* or by primary election." TENN. CODE ANN. § 2-13-203(a)(2) (emphasis added). If a party chooses to nominate its candidate by primary election, the deadline for filing the 2.5% signature petition is still the first Thursday in April. However, the 2012 amendment provided that if a party chooses to nominate by its own party rules, rather than by primary election, then the 2.5% signature petition is to be filed in August—90 days prior to the November general election. TENN. CODE. ANN. at § 2-13-107(a)(2).

Once a party has qualified as a recognized minor party by meeting the 2.5% signature requirement, it must then satisfy the requirements of a statewide political party contained in Tennessee Code Annotated § 2-1-104(a)(30) (by receiving "a number of votes equal to at least five percent (5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor") in order to maintain ballot access beyond the current election year.

> To maintain recognition beyond the current election year, a minor party must meet the requirements of a statewide political party as defined in § 2-1-104. A recognized minor party who fails to meet such requirements shall cease to be a recognized minor party. Such party may regain recognition only by following the procedures for formation of a recognized minor party. The coordinator of elections shall advise each county election commission of a recognized minor party's failure to receive a sufficient number of votes and shall order that said party cease to be recognized.

TENN. CODE. ANN. § 2-13-107(f) ("the ballot-retention statute").

Tennessee statutes also proscribe the order in which parties' candidates are to appear on the ballot.

> Notwithstanding any other provision of this chapter or this title, on general election ballots, the name of each political party having nominees on the ballot shall be listed in the following order: majority party, minority party, and recognized minor party, if any. The names of the political party candidates shall be alphabetically listed underneath the appropriate column for the candidate's party. A column for independent candidates shall follow the recognized minor party, or if there is not a recognized minor party on the ballot, shall follow the minority party, with the listing of the candidates' names alphabetically underneath.

TENN. CODE ANN. § 2-5-208(d)(1) ("the ballot-order statute"). "Majority party" is defined as the

4

political party whose members hold the largest number of seats in the combined houses of the General Assembly. TENN. CODE. ANN. § 2-1-104(a)(11). "Minority party" is defined as the political party whose members hold the second largest number of seats in the combined houses of the General Assembly. TENN. CODE. ANN. § 2-1-104(a)(12).

### B. Procedural History

The procedural history of Plaintiffs' challenges to the State's election laws can be found in four opinions in this 2011 case (two opinions from the district court and two Sixth Circuit opinions) and two opinions in a related 2013 case (one opinion from the district court and one Sixth Circuit opinion). See Green Party of Tenn. v. Hargett, 791 F.3d 684, 688–89 (6th Cir. 2015) (Green Party VI); Green Party of Tenn. v. Hargett, 767 F.3d 533 (6th Cir. 2014) (Green Party V); Green Party of Tenn. v. Hargett, 700 F.3d 816 (6th Cir. 2012) (Green Party IV ); Green Party of Tenn. v. Hargett, 7 F.Supp.3d 772 (M.D. Tenn. 2014) (Green Party III); Green Party of Tenn. v. Hargett, 953 F. Supp. 2d 816 (M.D. Tenn. 2013) (Green Party II ), vacated by, Green Party V, 767 F.3d 533; Green Party of Tenn. v. Hargett, 882 F. Supp. 2d 959 (M.D. Tenn. 2012) (Green Party I), reversed by Green Party IV, 700 F.3d at 816.[2]

### 1. This Case (2011 Case)

The legal issues presented in this case overlap somewhat with those at issue in a parallel case filed by Plaintiffs in this Court in 2013. Plaintiffs filed *this* case in July 2011, challenging Tennessee's ballot-access and ballot-order statutes. Judge Haynes granted summary judgment to Plaintiffs in Green Party I, which the Sixth Circuit reversed and remanded in Green Party IV, in part because Tennessee had amended the statutes at issue. Green Party IV, 700 F.3d at 816. In Green Party IV, the Sixth Circuit: (1) instructed this Court "to evaluate the various components of

---

[2] The Court has adopted the numbering of these prior court decisions created by the Sixth Circuit in Green Party VI, 791 F.3d at 688-89.

Tennessee's election laws as part of the larger framework for providing ballot access to minor political parties;" (2) concluded "that the 2.5% signature requirement, standing alone, is not unconstitutional on its face;" (3) instructed the Court to allow further factual development on the question of whether, and to what degree, ballot order affects voter behavior. Green Party V, 767 F.3d at 541-42 (quoting Green Party IV, 700 F.3d at 824).

On remand, the parties filed cross-motions for summary judgment, and Judge Haynes again granted summary judgment to Plaintiffs in Green Party II, which the Sixth Circuit vacated and again remanded in Green Party V. The Sixth Circuit's opinion in Green Party V addressed the constitutionality of the ballot-access and ballot-order statutes, the two claims on which Judge Haynes had granted judgment to the Plaintiffs. Green Party V, 767 F.3d at 538. The Sixth Circuit found that Plaintiffs have standing to bring these claims, but reversed this Court's order granting summary judgment, holding as follows:

> This case is accordingly remanded to the district court for further development. On remand, the parties should supplement the existing record with further evidence demonstrating the effects of Tennessee's ballot-access and ballot-ordering provisions on the plaintiff minor parties, and with any other evidence that they and the district court deem relevant. Furthermore, this evidence should account for the recent changes to Tennessee's ballot-access scheme. We caution the district court and the parties that this court will not look favorably upon any effort to dispose of this case at the summary judgment stage without substantial development of the record.

Green Party V, 767 F.3d at 554.

After this second remand, Judge Haynes granted Plaintiffs' motion for leave to file an Amended Complaint, in which Plaintiffs raised four new claims. (Doc. No. 116, 119.) Plaintiffs later voluntarily dismissed Count III and VII of their Amended Complaint. (Doc. Nos. 220, 244.) The Pretrial Order identifies the remaining claims that were tried before the Court without a jury as follows:

Count I: The 2.5% signature petition required by Tennessee's ballot-access statute (Tennessee Code Annotated § 2-1-104(a)(23)) for a party to qualify as a "recognized minor party" is unconstitutionally burdensome to Plaintiffs. (Pretrial Order, Doc No. 248 at 2.)

Count II: The combination of the 2.5% signature petition required by Tennessee's ballot-access statute (Tennessee Code Annotated § 2-1-104(a)(23)) for a party to qualify as a "recognized minor party" and the April deadline for minor parties selecting their candidates by primary election to file the petition required by Tennessee Code Annotated § 2-13-107(a)(1) (which incorporates the candidate filing deadline contained in § 2-5-101(a)(1)) imposes unconstitutional burdens on Plaintiffs and other minor parties wanting to nominate their candidates by primary elections. (Pretrial Order, Doc No. 248 at 2.)

Count IV: Tennessee's election laws unconstitutionally deny access to the November general election ballot to candidates of minor parties selected by their parties' rules (as opposed to being selected by primary election) if their party fails to satisfy the requirements to become a "recognized minor party." (Pretrial Order, Doc No. 248 at 2-3.)

Count V: Tennessee denies the candidates of minor parties the benefit of including their party affiliation on the ballot unless their party qualifies as a recognized minor party, which unconstitutionally burdens both the candidate and their party. (Pretrial Order, Doc. No. 248 at 3.)

Count VI: Tennessee's ballot-order statute (Tennessee Code Annotated § 2-5-208(d)(1)) violates the Equal Protection Clause. (Pretrial Order, Doc. No. 248 at 3.)

Thus, the statutes at issue here are: (1) the ballot-access statute, which requires a minor party to file a 2.5% signature petition to become a recognized minor party (TENN. CODE. ANN. § 2-1-104(a)(23)); (2) the statute setting an April deadline for the filing of the 2.5% signature petition for a minor party selecting its candidate by primary election (TENN. CODE. ANN. § 2-13-107(a)(1),

7

which incorporates TENN. CODE. ANN. § 2-5-101(a)(1)); and (3) the ballot-order statute (TENN. CODE ANN. § 2-5-208(d)(1)). To be clear, Plaintiffs do *not* challenge Tennessee's statute governing when a particular *candidate* may appear on the ballot, but instead challenge the requirements for a candidate to have his or her party name on the ballot. (Pretrial Order, Doc. No. 248.) Plaintiffs also do not challenge the ballot-retention statute,[3] which was addressed in the 2013 case, as described below. (Id.)

### 2. Related Case (2013 Case)

The 2013 case arose because in the 2011 case, Judge Haynes ordered the State to list Plaintiffs' candidates on the 2012 ballot (a non-gubernatorial election year) with their parties' respective names. Green Party I, 882 F. Supp. 2d 959, 1019 (M.D. Tenn. 2012). However, Plaintiffs' candidates did not receive 5% of the votes cast in the 2012 election, which would have allowed Plaintiffs to maintain their recognized minor party status under the ballot-retention statute. Plaintiffs again had to satisfy the 2.5% signature requirement in order for their names to appear on the next ballot.

As a result of losing their recognized minor party status, Plaintiffs filed a new lawsuit on October 10, 2013, Green Party et al. v. Hargett et al., No. 3:13-cv-1128 (M.D. Tenn.), bringing the following claims: (1) the ballot-access statute and the ballot-retention statute jointly imposed an unconstitutional burden on minor parties seeking status as recognized minor parties in violation of the First Amendment; (2) the ballot-retention statute violated the Equal Protection Clause of the Fourteenth Amendment because it required recognized minor parties to meet the 5% requirement in one year, but allowed statewide political parties four years to meet the same requirement; and (3) Tennessee Code Annotated § 2-1-114 violated their rights under the First and Fourteenth

---

[3] The Pretrial Order (Doc. No. 248) that supplants the pleadings makes no reference to this statutory section. The Court has considered the ballot-retention statute only as it is part of Tennessee's ballot election statutes.

8

Amendments because it required a minor or new political party to file an affidavit stating that the party does not advocate the overthrow of local, state, or national government by force or violence (a "loyalty oath") before its nominees could be placed on the ballot. Green Party VI, 791 F.3d 684, 690-91 (6th Cir. 2015). Judge Haynes granted Plaintiffs' motion for summary judgment on each of Plaintiffs' claims. Green Party II, 953 F. Supp. 2d 816 (M.D. Tenn. 2013).

On appeal of the 2013 case, the Sixth Circuit affirmed in part and vacated in part Judge Haynes's order. Green Party VI, 791 F.3d at 698. The Sixth Circuit vacated Judge Haynes's decision on the First Amendment challenge to the ballot-access statute, as that question was already pending in this Court following the remand in Green Party V. Green Party VI, 791 F.3d at 695. As to the second claim, the Sixth Circuit affirmed Judge Haynes's holding that the ballot-retention statute, which at the time allowed major parties four years to meet the 5% vote threshold but only allowed minor parties one year to meet the same vote threshold, was facially invalid under the Equal Protection Clause. The Court explained that the statute "clearly impose[d] a greater burden on minor parties without a sufficient rationale put forth by the state." Id. At the time of the appeal, the State had already amended the ballot-retention statute to give both recognized minor parties and statewide political parties one year to meet the 5% requirement. TENN. CODE ANN. § 2-13-107(f); see also Green Party VI, 791 F.3d at 694 ("Supporting the restrictive nature of this law is the fact that Tennessee amended the ballot-retention statute immediately after the district court ordered it to include plaintiffs' candidates on the 2012 general-election ballot."). Having determined that the ballot-retention statute violated the Equal Protection Clause, the Sixth Circuit declined to decide whether it also violated the First Amendment. Id. As to the third claim, the Sixth Circuit held that the loyalty oath violated Plaintiffs' First Amendment right to free speech. Id. at 696. The 2013 case is now closed.

## II. Findings of Fact

### A. Tennessee's Election Process

1. Tennessee has 95 counties. Each county has a five-member county election commission. (Stipulations of Fact, Doc. No. 242 at ¶ 53.) Each county election commission appoints an Administrator of Elections, who serves as the chief administrative officer and is responsible for conducting elections in that county. (Id. at ¶ 54.)

2. There are three major elections held every four years in each of the 95 counties in Tennessee: (1) the Presidential Preference Primary and County Primary Elections, which are held on the first Tuesday in March; (2) the county General Election, the State and Federal Primary Elections, and possibly the State General Elections for judicial offices, which are held on the first Thursday in August; and, (3) the State and Federal General Election which is held on the first Tuesday after the first Monday in November. (Id. at ¶ 55.)

3. In non-presidential election years, the County Primary Election (if held) is held on the first Tuesday in May. (Id. at ¶ 56.)

4. County election offices may also conduct municipal elections in both presidential and non-presidential election years.

5. Every eight years, the offices for all trial court and appellate court judges, District Attorneys General, and Public Defenders are included on the August ballot. (Stipulations of Fact, Doc. No. 242 at ¶ 57.)

6. Each county prepares the ballots for that county, which must then be approved by the State Election Office.

7. The counties must prepare a ballot for each primary or general election and for each type of system they use, *e.g.*, paper ballots for absentee voting and machine ballots for Election Day

and early voting.

8. The State Election Office must review and approve all ballots.

9. Once a ballot has been approved, the State Election Office sends each approved ballot to the appropriate county. The county then have the paper ballots printed and program their voting machines. (Stipulations of Fact, Doc. No. 242 at ¶ 60.)

10. Tennessee's election process is also impacted by federal statutes. In 2009, Congress passed the Military and Overseas Voter Empowerment Act ("MOVE Act"), Pub. L. 111–84, 123 Stat. 2190 (2009), which amended the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 42 U.S.C. § 1973ff, *et seq*. UOCAVA, as amended by the MOVE Act, requires states to take certain measures to prevent the disenfranchisement of absent uniformed services and overseas voters. In particular, "[t]o account for inconsistencies and delays in foreign mail systems, UOCAVA, as amended by the MOVE Act, requires states to provide absentee ballots to absent military and overseas voters at least 45 days prior to an election. 42 U.S.C. § 1973ff–1(a)(8)." Obama for Am. v. Husted, 697 F.3d 423, 434 (6th Cir. 2012).

**B. Green Party**

**1. Stipulated Facts**

11. The Green Party is a political organization in Tennessee desiring to be a "qualified" party for purposes of nominating candidates for political office. (Stipulations of Fact, Doc. No. 242 at ¶ 1.)

12. Kathleen Culver and Howard Switzer formed the Green Party in 2001. (Id at ¶ 2.)

13. The Green Party has never filed with the IRS a Form 8871, Form 8872, or Form 1120-POL and has never registered with the Registry of Election Finance in Tennessee either as a political action committee, a multi-candidate political campaign committee, or otherwise. (Id at ¶ 3.)

14. The Green Party has no office space, does not maintain a post office box, and does not have a phone. (Id at ¶ 6.) It operates out of the personal homes of its officers. (Id. at ¶ 7.)

15. The Green Party currently has approximately 200 members, which is the highest its membership has ever been. (Id. at ¶ 8.) It does not maintain a consolidated list of all of its members and cannot determine its actual membership. (Id. at ¶ 9.) The party does not conduct any regular procedure or examination of its membership lists to remove individuals who have moved, died, or no longer affiliate with the party. (Id. at ¶ 10.)

16. The Green Party currently has representatives from three counties on its State Coordinating Committee (Knox, Davidson, and Perry), and has never had representatives from more than six local communities. (Id. at ¶ 13.)

17. The Green Party often does not have all of the representatives on the State Coordinating Committee permitted by its by-laws. For example, it currently only has two at-large members, while the by-laws allow for four, and it has no college or high school student representatives, although the by-laws allow for both. (Id. at ¶ ¶ 14-15.) The Party has never had a high school student representative. (Id. at ¶ 15.)

18. Prior to 2014, the Green Party did not have a Secretary, and members of the Coordinating Committee took individual notes. (Id. at ¶ 17.)

19. The by-laws call for an executive committee, but the party has never had one. (Id. at ¶ 18.) The party currently has no working or standing committees. (Id. at ¶ 19.)

20. The Green Party has never organized any kind of event or speaking engagements for its candidates nominated for political office. (Id. at ¶ 22.)

21. The Green Party has never attempted to organize its members, either at a local or statewide level, to get people to collect signatures to gain access to the ballot. (Id. at ¶ 23-24, 26.)

12

22. The Green Party has made no efforts beyond informal communication to acquire information or documentation of other states' efforts to obtain ballot access through signature petitions or otherwise, even though such information is available from the ballot-access committee of the national Green Party. (Id. at 25.)

### 2. Kate Culver's Testimony

23. Kate Culver has been involved with the Green Party since its inception and has been the chair for most of those years.

24. The Green Party is a state affiliate of the Green Party of the United States, which has been in existence since 1982, and received recognition from the Federal Election Commission in 2001.

25. Some members of the Green Party are also involved in the Green Party of the United States.

26. The Green Party is on the ballot, with its name listed, in 24 states.

27. The Green Party has had a presidential candidate on the ballot in Tennessee for every presidential election since 1996.

28. In 2015, the Green Party produced a membership list of 120 voting members in discovery. Culver does not know how many voting members there are currently.

29. The Green Party has about $2,100 in bank account, and that amount has not been significantly higher or lower in recent times.

30. The Green Party receives no funds from the Green Party of the United States. Its funds come from individual donations. It has never charged membership dues.

31. The Green Party provides no monetary support for its candidates nominated for political office. It has no affiliated political action committee, gives no financial assistance to candidates, and provides no advertising for candidates other than by emails and on its website. It also provides no expenditures to assist with candidates' campaigns, such as yard signs or bumper stickers.

13

The Green Party allows its candidates to put information in its newsletter that goes out to members and to access the party's membership list.

32. The Green Party has never selected its candidates by primary, and doing so is not "a priority" for it. The members may wish to nominate by primary at some point in the future, but they would have to amend the party's by-laws to do so.

33. The Green Party has never tried to collect the 2.5% signature petition required to become recognized minor party in Tennessee. Culver assumes that the party would need to pay signature collectors, and it does not have sufficient money for that.

34. The only reason the party members have not pursued obtaining recognition as a minor party is the number of signatures required to do so. They assume that they would need to collect many more signatures than the statute requires because of the number that the State will reject as unverifiable. She thinks the party members would need to collect around 88,000 signatures to reach the number required.

35. The Green Party has about a dozen signature collectors for nominating petitions for <u>candidates</u> each election cycle. It also has had two signature collectors who have worked for pay to gather signatures for other political parties who volunteered to collect signatures for the Green Party's candidate nominating petitions.

**C. Constitution Party**

**1. Stipulated Facts**

36. The Constitution Party is a political organization desiring to be a "qualified" party for purposes of nominating candidates for political office. (Stipulations of Fact, Doc. No. 242 at ¶ 28.)

37. Joan Castle and her husband, Darrell Castle, formed the Constitution Party in 1992 after attending the national startup for what was then the U.S. Taxpayers Party in New Orleans as

14

Tennessee delegates. (Id. at ¶ 29.)

38. The Constitution Party has never filed with the IRS a Form 8871, Form 8872, or Form 1120-POL and has never registered with the Registry of Election Finance in Tennessee either as a political action committee, a multi-candidate political campaign committee, or otherwise. (Id. at ¶ 30.)

39. Joan Castle has served in some official capacity for the Constitution Party since it was founded, as Secretary from 1992 to 2000, as Chair from 2000 to 2014, and as a member of the executive committee since 2014. (Id. at ¶ 31.)

40. The Constitution Party's membership is currently the highest it has ever been at 203. (Id. at ¶ 32.)

41. The Constitution Party currently has one county that has an operational Constitution Party organization. (Id. at ¶ 27.)

42. The Constitution Party always has operated out of its executive members' homes and has never had its own separate office space. (Id. at ¶ 33.)

43. The Constitution Party's executive committee met three or four times per year between 2000 and 2014. (Id. at ¶ 35.)

44. Although the Constitution Party's by-laws establish five elected state party officers, including a chairman, vice-chairman, secretary, treasurer, and assistant treasurer, the positions of secretary and assistant treasurer are currently vacant. (Id. at ¶ 36.)

45. The Constitution Party provides no financial assistance to the candidates it nominates for political office. (Id. at ¶ 37.)

46. The only promotion or advertisement the Constitution Party provides for the candidates it nominates for political office is through its website. (Id. at ¶ 38.)

15

47. In 2001, Joan Castle was the Chair of the Constitution Party and was responsible for leading the party's efforts to gain ballot access in Tennessee. (Id. at ¶ 39.)

48. The Constitution Party's effort to collect signatures to gain ballot access began in late August of 2001. When it ceased its efforts, it had collected 16,000 out of the 24,406 signatures then required. (Id. at ¶ 41.)

49. In its 2001 petition drive, the Constitution Party did not pay for any subscribers' or mailing lists to solicit signatures and did not hire professional signature collectors. (Id. at ¶ 42-43.) About 18 members gathered signatures at various events, and most of their efforts were focused in West Tennessee. (Id. at ¶¶ 44-45.) Little effort was made to gather signatures in Middle Tennessee. (Id. at ¶ 45.)

50. The Constitution Party does not believe that there is anything about the actual voters in Tennessee, the actual individuals who would be signing the petitions to get the Constitution Party on the ballot, or Tennessee's geography, population demographics, or otherwise, that would prevent it from asking individuals to collect and to sign petitions. (Id. at ¶ 46.)

51. The Constitution Party has made no attempt to contact party organizations in other states to obtain information and/or documentation describing the difficulties that they encounter complying with petition signature requirements similar to Tennessee's. (Id. at ¶ 47.)

### 2. Joan Castle's Testimony

52. Joan Castle has served as an officer of the Constitution Party since its inception in 1992, which was the same year the party began at national level.

53. The national Constitution Party now has 36 accredited state affiliates.

54. The national Constitution Party is on the ballot in 18 states, either with a party label, an independent label, or as a write in.

16

55. The Constitution Party has had a candidate for president in every election since 2000.

56. The Constitution Party candidate (both at the national and the Tennessee levels) for president in 2016. Darrell Castle. Joan Castle serves as his campaign manager.

57. The Constitution Party's members have never discussed nominating by primary as a viable option. Although they have no current intent to select a candidate by primary election, Joan Castle cannot say that they "would never have an intent to do that." (Doc. No. 261 at 70.) However, the party would have to amend its by-laws to nominate a candidate by primary election.

58. Joan Castle's assumption is that the party would need paid collectors to get the necessary signatures for the 2.5% signature petition, which the members believe would be cost prohibitive.

59. The Constitution Party attempted to gather signatures in 2001, and Joan Castle was the head of that effort. Volunteers gathered 15,000-to-16,000 signatures of the 24,406 required, with the help of one national field coordinator paid for by the national party and about 18 or 19 volunteers. She believes this happened between August and either November or December of 2001. She cannot remember why they stopped trying to collect the signatures.

60. The Constitution Party has not tried to collect signatures to become a recognized minor party since 2001. Joan Castle testified that the party's members were "demoralized" by the failure to collect the necessary signatures in 2001. She thinks the party would be motivated to try again if the number of signatures required was 5,000 or less.

61. To Joan Castle's knowledge, the Constitution Party's candidates have never failed to qualify to appear on the Tennessee ballot.

**D. Administration of the Election Processes**

    **1. Testimony of Beth Henry Robertson, Assistant Coordinator for Division of Elections**

62. Beth Henry Robertson has worked for the Division of Elections for 21 years, beginning as the Deputy Coordinator of Elections in 1995. She received her law degree from Tulane University.

63. State statutes (Tennessee Code Annotated §§ 2-1-107 and 2-5-101) provide county election officials with the specific standards that are required for verifying petition signatures. The statutes require that the state and counties complete the verification of signatures within 30 days.

64. Robertson's office trains the election officials on what the statutes require.

65. Among other things, the state statutes require that county election officials match each signature on the 2.5% signature petition with the signature on that individual's voter registration card, which are kept in the county election offices.

66. To verify signatures on the 2.5% signature petition, the party can either submit the signatures to the State, which will then send them to the county to be verified, or send them to the county first, and the county will send the petition to the State once they have verified the signatures.

67. County election officials are required to verify signatures for all petitions filed, including candidates for all local, state, national offices, referenda, and recall petitions. That means that the county election officials verify petitions often and have expertise in doing so.

68. Parties can start collecting signatures at any time.

69. There are various situations that cause the county to reject a petition signature. For example, the county will reject the signature if the voter has moved to different county or precinct than the one in which they are registered to vote. The county may reject a signature if the voter's name has changed because of marriage or divorce. However, if enough of the name remains

18

the same as the name on the voter registration card to allow the county to compare a portion of the signature, the county will approve the signature even if the name has changed. The county also may reject the signature if the voter signed the petition using a nickname rather than the name on the voter registration card.

70. Parties can minimize the rate of signature rejections by submitting the signatures to the county for verification soon after they have collected them, which will reduce the problems of petition signers having moved or changed names. The county will provide the minor party with a running tally of the number of valid signatures it has collected.

71. For example, when Americans Elect made an effort to collect the signatures to become a recognized minor party, the party members submitted their signatures as they collected them rather than waiting until all signatures were collected. The State introduced an e-mail that Robertson sent to Americans Elect on April 24, 2012, informing Americans Elect that it had collected 37,354 valid signatures and needed 2,685 more. (Pl.'s Ex. 9) The party had about 3 months to obtain about 2,700 signatures. Her understanding is that Americans Elect did not continue with its petition drive because it did not find a candidate that it wanted to nominate.

72. An individual or party that believes a county improperly rejected a signature can request that the State or county review the signature.

### 2. Testimony of Mark Goins, Coordinator of Elections

#### a. Operation of State Election Commission

73. Mark Goins has been the Coordinator of Elections since he was appointed by the Secretary of State in February 2009. He previously served on the State Election Commission from 2005-2009. He has a law degree and is licensed to practice law in Tennessee.

74. The State Election Commission has eight full-time employees, a shared intern, and a part-time

employee during presidential elections. Each county has a five member election commission and a hired administrator. About fourteen counties have only one full-time employee. At least three counties are open less than five days per week.

75. The State Election Commission's responsibilities include: implementing various federal and state election regulations, such as the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 21081, *et seq.*; and the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg *et seq.*; processing candidate nominating petitions; processing petitions collected by parties seeking recognized minor party status; approving the ballots for all 95 Tennessee counties; training local election officials on election procedures; and handling voter registration applications. The State Election Commission receives about 1,000 pieces of mail daily to register to vote, which it must process and send to the counties.

### b. Ballot Creation and Approval

76. The ballot for the August election is usually the largest and most complicated ballot because it includes offices for the County General election, the State and Federal Primary election, and the State General election for any judicial vacancies that may be on the ballot.

77. The counties prepare at least five different ballots—a paper ballot for the August general election, a Democratic primary ballot in paper and machine form, and a Republican primary ballot in paper and machine form. If a political party qualifies as a recognized minor party for the August election, each county would need to prepare a paper and machine ballot for that recognized minor party's primary as well.

78. For the August election, the State Election Commission must review at least 475 ballots—five ballots for each of ninety-five counties. Each ballot takes twenty to twenty-five minutes to review, and two individuals review every ballot.

20

79. Ballots must be compliant with the Americans with Disabilities Act, which includes having an audio ballot for every ballot for those who are hearing impaired.

80. Once the Election Commission has reviewed and approved a county's ballot, it documents the approval and sends the ballot back to the county, often copying the county's vendor for the electronic voting machines and, if different, the vendor for the paper ballots.

### c. Timing Pressures on the Election Commission

81. The process of programming a voting machine is time consuming. The county must create the ballot and then invite the public to view the loaded ballot on the machine. Each machine must be inspected to be sure the ballot is correct. Representatives from the parties and the candidates must have an opportunity to inspect the ballot on the machines and to test to ensure the machine is accurately recording votes. Every machine is tested.

82. The process of programming a voting machine for early voting is more difficult, because voters are not tied to their precinct and can vote anywhere in the county. As a result, every machine must have all of the ballot styles loaded so that the ballot is accurate for all precincts in the county.

83. It takes two-to-three weeks to program voting machines to have them ready for early voting. Early voting begins twenty days before the election. The machines must be programmed far enough in advance of the early voting to allow time to correct any problems.

84. The MOVE Act, which specifies the process for military and overseas ballots, also creates timing requirements for the State Election Commission. Once an individual in the military or living outside the country requests a ballot, the State sends the ballot over the internet, but it must first verify that the ballot is sent to the correct person by comparing the signature on the request with the voter registration card of the requestor. The State must send the ballot no later

than the forty-fifth day before each of the three major elections.

85. The MOVE Act also requires that the individual be able to track his ballot, which is administratively time consuming because it requires people on the local level to manually enter information that allows individuals overseas to track their ballots.

86. The MOVE Act applies to any election with a federal office on the ballot, and the federal government has indicated that if a state fails to conform strictly to the MOVE Act's requirements, it will initiate enforcement efforts.

87. The deadlines for filing the 2.5% petition are tied to other timelines created by the election statutes. For example, candidates for president have until the third Thursday in August to qualify to be on the ballot, and then have seven days after qualifying to withdraw. Thus, the State cannot prepare the ballot until a week after the third Thursday in August, as that is the earliest that the final list of candidates for president is available. Additionally, the counties have to certify results of the August primary election to the State Election Commission by the third Monday after the election. Thus, the State does not know who won the August primary election until the third Monday after the election. Thus, ballot preparations for the November general election cannot begin until the end of August. The November general election requires fewer ballots than the August election because it does not include the primary election.

### d. The 2.5% Signature Petition

88. Tennessee law allows voters to sign multiple petitions for minor party recognition; does not preclude voters who voted in a primary party from also signing a petition to form a new minor party; does not require the individual signatures on the petition or the petition itself to be notarized; and does not require signature collectors to be residents of Tennessee. It also places no geographic restrictions on where the signatures can be collected, such that all signatures

could be collected in one county or in the major cities in Tennessee. A party that does not nominate its candidate by primary election can begin collecting signatures as soon as a governor's race has ended, at which time the State is able to calculate how many signatures will be required. This gives the party three years and six months to collect the required number of signatures.

89. A party can avoid the problem of rejected signatures by submitting the signatures on a rolling basis to the counties for verification. That also would ease the administrative burden on the State, which is required to verify signatures within thirty days, because verifying a large number of signatures presented at the same time can be difficult. Submitting signatures on a rolling basis would presumably be helpful to the parties as it would keep them apprised about whether they are on track to collect the necessary signatures.

90. A party could also gather signatures outside of the voting place in larger cities during early voting and on Election Day, which would help ensure that the petition signer is a registered voter in that county. The party could then submit those signatures to the county for verification.

91. Goins is also aware of a 2014 signature drive in Tennessee to allow wine to be sold in grocery stores, which required signatures equal to at least ten percent of the votes cast in the last governor's race *in each county*. The organizers of that referendum gathered 200,000 signatures in 2014. He does not know if the organizers of the wine referendum petition drive used paid signature collectors.

92. If a minor party nominating its candidate by primary is unable to collect the number of signatures required to become a recognized political party by the April deadline, the candidate would need to file a candidate petition in order to appear on the ballot as an independent candidate. The Libertarian Party candidate for president, Gary Johnson, has already filed his

petition to appear as an independent, even though the Libertarian Party is currently undertaking a petition drive to try to obtain recognition as a recognized minor party in this election. If the party obtains the necessary signatures, Johnson will be listed as the Libertarian Party candidate.

93. Goins is not aware of any minor party that has expressed interest in having an August primary in 2016.

94. There are functional differences between a statewide political party and a recognized minor party. Aside from the different requirements to obtain access and remain on the ballot, a recognized minor party is not required to have a primary, as are statewide political parties. Also, statewide political parties are required to have state and local (county) primary boards and to perform the functions associated with those boards. A recognized minor party is exempted from those statutory requirements.

95. Goins believes that the 2.5% signature petition requirement safeguards the integrity of the election process by ensuring that a new political party is an actual political party and not just a few people who support a candidate. There is also a mechanism for recognized minor parties to give political action committee funds to their candidate, which allows a party to give more contributions than would be permitted otherwise.

96. Goins experienced firsthand one reason that the 2.5% signature requirement is important. In the March 2016 election, after the state had reduced the number of signatures required to be a convention delegate, there were so many more delegates than there had been previously that the dials on some voting machines in the state stopped functioning.

97. The 2.5% signature requirement helps reduce administrative costs by avoiding the situation where the ballot is so long that a county needs both a machine and paper ballot because the entire ballot will not all fit on the machine. Tabulating votes collected in different ways (by

24

paper and machine) would be time consuming and, potentially, less accurate. The State might need to obtain new machines to handle longer ballots, which would require more resources. If the State printed the entire ballot on paper, that also would cost more. Publishing the ballots in newspapers, as required by state statute, would also cost more if the ballot was longer.

98. The 2.5% signature requirement keeps the ballot from becoming confusing to voters. The State wants to ensure that the ballot is not confusing so that a voter's intention can be carried out.

99. The Court ordered the Green Party and Constitution to be included on the ballot in 2012 and 2014. Goins does not know if that caused voter confusion.

### e. Ballot-Order Statute

100. In 2011, the Tennessee General Assembly passed the ballot-order statute, which codified the earlier practice. In 2008, the Democrats were in the majority in the state legislature, and so were listed first on the ballot, and Republicans were listed second. In that election, the Republican Party surpassed the Democratic Party in terms of representation in the state legislature, and the order of the parties was accordingly switched for the next election. The ballot order remains that way currently.

101. The ballot-order statute helps avoid voter confusion because people are accustomed to the order the State uses and, as a result, are able to quickly find the major candidates that they are most likely looking for. Avoiding voter confusion is important because that slows down voters, which causes lines to potentially be longer, and longer wait times can dissuade people from voting.

### E. Expert Witnesses at Trial

#### 1. The Green Party's Expert Witness, Richard Winger

102. Richard Winger has a bachelor's degree. He has been the editor of a publication called Ballot

25

Access News since 1985, which is his full-time job. He is the only employee of that publication.

103. The parties stipulated that Winger is qualified to serve as an expert witness in this case.

104. At trial, the State raised an objection about Winger's February 9, 2015 expert report, which the parties had previously agreed would be used as his direct testimony. Specifically, the State objected to the report because Plaintiffs had not provided the data upon which many of the opinions in his report relied. At the June 30, 2016 pretrial conference in this matter, the Court had addressed the State's concern that Plaintiffs had not provided the data upon which many of Winger's opinions were based. As a result, the Court ordered both parties to "provide each other with the direct testimony of all experts as well as all data relied upon by an expert witness in reaching an expert conclusion by July 8, 2016." (Doc. No. 246 at 1.) The Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Middle District of Tennessee clearly require the disclosure of the facts and data considered by an expert witness in forming his or her expert opinion. Fed. R. Civ. P. 26(a)(2)(B)(ii); LR 39.01(c)(6)(c). Responding to the State's objection at trial, Plaintiffs conceded that much of the underlying data had not been provided to the State. Counsel for the parties, by agreement, redacted those portions of Winger's report (the "Winger Report"). The parties had already stipulated to the admissibility of the Winger Report and agreed that the redacted Winger Report would be substituted for the original Winger Report. (Transcript, Doc. No. 261-1 at 27; Plaintiffs' Post-Trial Brief, Doc. No. 262 at 60 n. ii.) By agreement of the parties, the redacted Winger Report served as Winger's direct trial testimony. (Redacted Winger Report, Pl.'s Ex. 3.)

105. Winger offered nine opinions.

26

### a. Opinion One

106. In Opinion One, Winger states, "Requiring a minor party candidate (whose party has not qualified as a 'recognized minor party') to be listed on the ballot as an Independent imposes severe burdens on the candidate, on the candidate's party and on voters." (Redacted Winger Report, Pl.'s Ex. 3 at 1.) Winger testified at trial that this opinion is based on his fifty years of experience monitoring ballot-access issues, but he offers no underlying data supporting his opinion nor is it based on any analysis specific to Tennessee.

107. On cross-examination, Winger testified that Tennessee is one of the "weakest" states for third-party presidential candidates. (Transcript, Doc. No. 261-1 at 41.) For example, Ralph Nader, the Green Party candidate for president in 2000, received a lower percentage of the vote in Tennessee with the Green Party label than he did in Alabama, Kansas, North Dakota, or Ohio with an "Independent" label. In fact, Nader received a lower percent of votes in Tennessee with the Green Party label in 2000 than he received in each of the other states in which he ran with the Green Party label.

108. Winger also conceded that Cynthia McKinney, the Green Party candidate for president in 2008, did worse with the Green Party label in Tennessee than Nader, who ran with an Independent label in Tennessee in 2008.

109. Winger admitted that there are numerous examples in which candidates performed better with an "Independent" label in Tennessee than they did with a Green Party label in other states.

110. Winger concedes that comparing elections in different years with different candidates is flawed because it does not control for name recognition of different candidates. He failed to take into account the impact of name recognition.

111. Given the lack of data to support Opinion One, Winger's concession that this Opinion does not

account for the effects of name recognition of particular candidates, and the lack of any meaningful analysis of Tennessee specifically, the Court finds this Opinion to be of limited persuasiveness and relevance to the determination of the adverse effect Tennessee's ballot-access statute (TENN. CODE. ANN. § 2-1-104(a)(23)) imposes on Plaintiffs.

### b. Opinion Two

112. In Opinion Two, Winger states, "High petition signature requirement [sic] to qualify a new minor party impose severe burdens of [sic] new parties and make it virtually impossible for all but the most well-funded parties to achieve ballot recognition and qualification." (Redacted Winger Report, Pl.'s Ex. 3 at 1.) Again, he provides no authority to support this opinion.

113. He further explains that, "As a general rule candidates and parties must collect 1.5-1.75 times the number of signatures required by statute." (Id.) He provides no authority to support his opinion. County election officials will reject signatures that cannot be verified, but Winger provides no factual support for his opinion that a minor must collect 1.5-1.75 times the number of signatures required by statute.

114. Winger also asserts, "The cost of signature collection by paid signature collection [sic] ranges from $1.50 to $3.50 per signature, whether valid or not." (Redacted Winger Report, Pl.'s Ex. 3 at 1.) Winger conceded that he has not solicited bids for Tennessee signature collectors but testified that the cost of signature collectors tends to be similar around the country. He further testified that he is aware of the cost of signature collectors based on his membership on the Libertarian Party's ballot-access committee, as well as his conversations with other minor parties and paid petition circulators. The Court accepts that paid signature collectors charge $1.50 to $3.50 per signature, but notes that this is a large range.

115. Next, Winger opines that when signature requirements exceed 5,000 signatures, "it is virtually

impossible for a party to satisfy such requirements without engaging the services of paid petition signature collectors." (Redacted Winger Report, Pl.'s Ex. 3 at 1.) Again, he offers nothing in terms of objective authority for this conclusion. Winger believes that volunteers are not effective at obtaining many signatures because "[i]t is psychologically difficult for most people to ask strangers to sign a petition to put a new party on the ballot." (Id. at 6.) His opinion contradicts the testimony offered by Castle, who testified that the Constitution Party was able to collect 16,000 signatures using approximately 18 volunteers in just a few months. The Court does not find his opinion persuasive.

### c. Opinion Three

116. In Opinion Three, Winger states, "High party qualification petition signature requirements cannot be justified on the grounds that they reduce voter confusion." (Redacted Winger Report, Pl.'s Ex. 3 at 2.) Winger concedes that, although the report references his research, that research was not attached to the report or provided to the State.

117. The Court finds Opinion Three conclusory and unhelpful, based on the lack of objective support. Furthermore, his opinion is a legal conclusion that the Court does not find helpful.

### d. Opinion Four

118. In Opinion Four, Winger states that high petition signature requirements do not show a "modicum of support" for the party collecting the petitions because a number of court cases have largely stopped states from requiring petition signers to affirm that they are members of the party or are committed to supporting the party. (Redacted Winger Report, Pl.'s Ex. 3 at 2.)

119. Winger's primary point in this Opinion is that "[a]s a result of limitations on the language that may be required, signatures on party qualifying petitions represent little more than support for the general proposition that the party should be allowed to participate in elections, not that the

signers have decided to vote for that party or candidate." (Redacted Winger Report, Pl.'s Ex. 3 at 2.) If true, this proposition supports the State's stated interest in requiring a minor party to demonstrate that some proportion of the voters agree, at a minimum, that the party should be allowed on the ballot.

### e. Opinion Five

120. In Opinion Five, Winger details the requirements to obtain ballot access in other states, which he asserts demonstrate that requiring a large number of signatures on a petition is not "necessary" to establish support for new parties. (Redacted Winger Report, Pl.'s Ex. 3 at 3.)

121. The Court accepts Winger's assertion that there are states that have easier requirements for a party wishing to gain access to the ballot than Tennessee. Whether Tennessee's signature requirement is "necessary" is a legal conclusion which the Court finds unhelpful.

122. During cross examination on Opinion Five, Winger conceded that Tennessee's filing deadlines for the 2.5% signature petition are "quite good." (Transcript, Doc. No 261-1 at 83.) He later clarified that he believes Tennessee's August filing deadline for the November general election is "a very good deadline," but has no opinion about the April deadline for parties selecting their candidates by primary election. (Id. at 88; see also id. at 85-86, 103.) He also conceded that he approves of Tennessee's lack of restrictions on signature collectors. (Id. at 83.)

### f. Opinion Six

123. In Opinion Six, Winger argues that there "is no rational justification for Tennessee's ballot access schema when it is considered as a whole," because although Tennessee has "one of the nation's highest party qualifying requirements, its independent candidate qualifying requirement—25 signatures for any candidate, except that 275 are needed for President—is the lowest in the country." (Redacted Winger Report, Pl.'s Ex. 3 at 3-4.) Winger takes issue with

the State's failure to require more for candidates for statewide office to qualify to be included on the ballot. (Id. at 4.) For reasons discussed below, the Court does not find this Opinion persuasive.

### g.  Opinion Seven

124.  In Opinion Seven, Winger opines that the Green Party and the Constitution Party "have demonstrated sufficient voter support to be recognized in Tennessee," based on its performance in other states. (Redacted Winger Report, Pl.'s Ex. 3 at 4.)  At trial, Winger conceded that minor parties' experiences in other states do not necessarily apply in Tennessee because Tennessee is a particularly difficult state for minor parties. The Court does not find this Opinion persuasive.

### h.  Opinion Eight

125.  In Opinion Eight, Winger states that the "inclusion of a party affiliation designation of candidates on the ballot in an election contributes materially to the success of that party's candidates in future elections." (Redacted Winger Report, Pl.'s Ex. 3 at 4.)  He gives some anecdotal examples to support that contention. In particular, he argues that the Green Party and Constitution Party candidates for the United States Senate were identified by their respective party affiliations for the first time in 2012, and that the parties' candidates for governor polled better in 2014 because voters had become more familiar with the parties from seeing them on the ballot in 2012.

126.  Winger conceded that he had not run any statistical analyses to prove causation between a candidate having a party label on the ballot and the success of that candidate. For example, Winger did not disagree with the State's proposition to him that issues in the 2014 election unrelated to the Green and Constitution Parties' having their party labels on the ballot could

Case 3:11-cv-00692   Document 265   Filed 08/17/16   Page 31 of 77 PageID #: 4691

have increased their share of the votes in that election. In particular, the State suggested that the Republican candidate for governor in 2014 was the incumbent and viewed as a strong candidate and that the Democratic Party had a weak candidate might have contributed to a stronger showing for minor parties that election year.

127. Winger did not take issue with the State's assertion that in 2014, the late John Jay Hooker, an individual who was identified on the ballot as an Independent and had great historical and political name recognition in Tennessee, came in third in the 2014 gubernatorial election, ahead of all but the Republican and Democratic candidates, and polled more than three times higher than the Constitution or Green Party candidates.

128. Winger's Opinion Eight fails to control for multiple variables that can impact the election performance of any particular candidate or party in any particular election, the Court concludes that this opinion is not supported by sufficient data and scientific analysis to be helpful to the Court's analysis.

### i. Opinion Nine

129. In Opinion Nine, Winger states that "Tennessee's statute denying minor parties the opportunity to have the first position on the ballot imposes significant burdens on their candidates and the parties." (Redacted Winger Report, Pl.'s Ex. 3 at 4.) He explains that "'[p]ositional bias'—the benefit that accrues to candidates listed first on the ballot—is legislatively acknowledged to be real," and that twenty-nine states "have enacted legislation specifically intended to minimize it." (Id.) He then identifies ballot-ordering methods used by some other states to reduce positional bias. According to Winger, twenty-two states determine ballot order alphabetically or by lottery, and fourteen of those states further require that ballot order be rotated or randomized from one electoral district to another and even from one precinct to another. (Id.

at 5.) Winger acknowledged on cross-examination that this is the first time he has ever testified about the effects of ballot order and voting behavior, and that it is not his "strong area." Winger cites no data to support his opinion that Tennessee's ballot-order statute imposes a burden on Plaintiffs. The Court finds this opinion to be lacking in the data and scientific analysis necessary to be helpful or persuasive.

### j. Winger's Interview with FairVote

130. Winger participated in an interview with an organization called FairVote in January 2015, (Defendant's Exhibit 18), for which he identified the nineteen states with the "worst" ballot-access laws. He did not include Tennessee on that list. On re-direct examination, Winger testified that he was considering the most "irrational" and "silly" laws, and those that "are most difficult to justify," not the most restrictive laws. The Court notes that Winger did not consider Tennessee's ballot-access laws as among the nineteen states whose laws are most difficult to justify.

### 2. The State's Expert Witnesses on the 2.5% Signature Requirement- Dr. Hood

131. M.V. Hood III, Ph.D., is a tenured professor at the University of Georgia with an appointment in the Department of Political Science. He serves as the Director of Graduate Studies for the Department and has been on faculty since 1999. He is an expert in American politics, specifically in the areas of electoral politics, racial politics, election administration and Southern politics. He receives national research grants, has published many peer-reviewed journal articles about election administration, serves on the editorial boards of election-related journals, and has offered expert testimony in eight cases in the past four years. The parties have stipulated that he is qualified to serve as an expert in this case. (Doc. No. 249-2.) His written expert report served as his direct trial testimony. (Def.'s Ex. 19.)

33

132. The Court finds persuasive the explanation in Hood's report related to the weakness of Winger's conclusions in Opinions One (that a candidate's being listed as an Independent imposes a severe burden) and Eight (inclusion of a party affiliation designation of candidates contributions materially to the success of that party's candidates in future elections). Winger's opinions are not substantiated by empirical verification, but instead rely only on anecdotal evidence that do not show causation. (Id. at 5-6.) For example, as the State pointed out in its cross examination of Winger, in the 2014 gubernatorial election, John Jay Hooker, running as an Independent and listed on the ballot without a label, obtained 2.26% of the total vote, which is more than the combined vote percentage received by the Green Party and Constitution Party candidates running with their party labels. (Id. at 5.) Also, in the 2012 presidential election, Gary Johnson, running as an independent, obtained 0.76% of the total vote, which was three times more than the Green Party candidate (0.26%) and the Constitution Party candidate (0.24%) who were running with their party label. (Id.)

133. The Court also finds persuasive Hood's analysis that Winger's claim regarding the increase in Plaintiffs' support in 2014 because they were on the 2000 or 2012 ballot is not scientifically supported. (Id. at 8.) First, as Winger conceded, he does not control for other variables that could have contributed to that increase. Second, the mean share of the vote for third-party candidates increased only 1% in 2014 over the mean share in 2012, which is not statistically significant. (Id.)

134. Hood conducted a comprehensive analysis of all third-party candidates across multiple election cycles and various office levels to determine if party labels benefit third-party candidates. (Id. at 6.) The Court refers to Hood's expert report for a detailed explanation of his methodology, but is persuaded by his analysis, which led to the conclusion that a third party candidate's vote

34

share would be expected to be the same whether the candidate was identified on the ballot with a party label. (Id. at 6-8.) To reach this conclusion, Hood conducted a regression analysis, which is a statistical technique that allows the researcher to control for the effects of other factors. (Id. at 7.) Hood controlled for effects related to the particular political office, the election cycle year, and whether the race in question featured two major-party candidates or just one. (Id.) Hood concluded is that the "largest single effect related to explaining the vote share of third party candidates concerns the composition of the race," *i.e.*, whether the race contains one or two major party candidates. In election contests that feature only a single major party candidates, third-party candidates can be expected to obtain almost fifteen points higher than a race with both a Republican and Democratic candidate, which is highly significant from a statistical standpoint, unlike that for the effects of party labels. (Id. at 8.)

135. Hood considers three case studies to reach his conclusion that the 2.5% signature requirement should not present an insurmountable obstacle for third parties to gain statewide recognition in Tennessee. First, in 2011, the Constitution Party collected approximately 16,000 signatures of the 24,406 required (66%) in less than ninety days at no financial cost. The party accomplished this even under the more restrictive statutory scheme that existed in 2011, which required that an individual signing a 2.5% signature petition for a third party actually be a *member* of that party. The current statute does not have such a requirement. (Id. at 9.) The second example is the effort by Americans Elect, which in 2012 gathered 37,354 signatures of the required 40,039 (93%). That amount would have satisfied the current number of signatures required (based on the 2014 gubernatorial contest), which is 33,843 signatures. The Court notes that the testimony at trial suggests that these signatures were obtained using paid signature collectors, although the amount spent to collect these signatures was not presented at trial. The third case study is

a 2014 effort to place the sale of wine in grocery stores on the general election ballot as a set of local referenda. (Id.) That effort required signatures equivalent to ten percent of the vote in the 2010 gubernatorial election for the county at issue, and the correct percentage of signatures had to be collected in each county that wanted the referenda on its ballot, a more restrictive requirement than minor parties who can collect the required signatures from anywhere in the state. The groups organizing the effort collected the necessary signatures in eighty jurisdictions in a little over three months. (Id. at 9-10.)

### 3. The State's Expert Witness on Ballot Order Effects- Dr. Ho

136. Daniel Ho, J.D., Ph.D., has a doctorate in political science from Harvard University, a juris doctorate from Yale Law School, and is a tenured professor at Stanford Law School. (Doc. No. 249-3 at 3.) His scholarship centers on quantitative empirical legal studies. His dissertation work focused on quantitative methodology, particularly on causal inference, including a chapter on ballot order effects. The parties have stipulated that he is qualified to serve as an expert in this case. (Doc. No. 249-3.) As with the other expert witnesses, his written expert report served as his direct trial testimony. (Def.'s Ex. 20.)

137. Ho refutes Winger's Opinion Nine (Tennessee's denial of the opportunity to have first position on the ballot imposes significant burdens), which draws two broad conclusions about ballot order effects: (1) many states have enacted statutes to reduce ballot order effects; and (2) ballot order has a significant effect on voting behavior. Ho concludes that Winger's two conclusions as to ballot order effects are incomplete, inaccurate, and misleading.

138. Ho critiques Winger's citation to four state statutes that require rotation of ballot order. First, Ho notes that Arizona's rotation statute, one of the four state statutes cited by Winger, only applies to primary elections in Arizona, not general elections. Only general elections are at

36

issue in this case. Arizona does not rotate parties in *general* elections, but instead places the parties in order of the share of the vote the party received in the last gubernatorial election. (Id. at 4.) Second, the four states cited by Winger are not representative of the country as a whole. (Id. at 5.) Ballot rotation is the minority rule, as only twelve of fifty states employ rotation. (Id.) Of the remaining states, seven list candidates alphabetically, ten by lottery, and twenty-one by an alternative system, such as listing candidates by decreasing vote share of their party in the last election. (Id.) Third, neither rotation nor randomization by lottery alone is sufficient to fully eliminate the potential for ballot order effects. (Id.) Both are required, but very few states both randomize the order and also rotate across precincts or districts, which is necessary to fully eliminate the potential for ballot order effects. (Id.)

139. To the extent that other states' methods of determining ballot order are relevant to the Court's analysis, the Court credits Ho's testimony that ballot rotation is the minority rule and that a state would need to both randomize the order and rotate across precincts or districts to fully eliminate the potential for ballot order effects.

140. Ho offers a number of criticisms of Winger's opinion that ballot order imposes significant burdens on minor party candidates. Winger cites a total of four published studies and one unpublished study conducted for the Vermont legislature in support of his opinion. The four cited studies were published in 1957, 1972, 1987, and 1998. (Id. at 7.) Ho states that relying on studies that are so few in number and so outdated is scientifically problematic. (Id. at 7-8.) Over the last two decades, there has been considerable scholarly investigation of the extent of ballot order effects, with substantial disagreements remaining about the scope of such effects. (Id. at 7.) More recent scholarly research, some of which is Ho's own published research, has found serious methodological flaws in earlier research on this issue. (Id. at 8.)

37

141. The Court is persuaded by Ho's assertion that Winger's omission of the last seventeen years of research on ballot order effects undermines the credibility of his conclusions. Research during that period of time, some of which was conducted and published by Ho, showed that the claims in earlier studies "of dramatic effects on major candidates in general elections suffer from serious methodological flaws and are hence unwarranted." (Id. at 9.) Ho's report summarizes these methodological flaws, citing to articles he has published on his research. (Id. at 9-11.)

142. Ho also summarizes several other studies of ballot order effects published since 1998, which show varied effects of ballot order on election outcomes, some showing no evidence of ballot order effects and others showing a small increase in ballot share for the candidate holding the first position. (Id. at 11-13.) Of these more recent studies that show an effect on ballot order, four found an increase in the vote share of the candidate appearing first on the ballot of between 0.5% and one-to-two percent. (Id. at 11-12.) One showed a four-to-five percent increase. (Id. at 12.) These results suggest that ballot order has far less impact than in some of the older research, including the studies cited by Winger. (Id. at 11-14.)

143. Ho summarized the importance of recent research on ballot order effects on the question before this Court as follows:

> These more recent studies have several implications for Tennessee. First, there remains considerable variability in the research findings, each deploying different methods and examining different types of elections. Because more sophisticated statistical methods have only been deployed recently, one scholar noted, "Not surprisingly, scholars have found significant variation in the impact that ballot order has on the outcomes of elections." Second ballot order effects appear to be much less likely in general elections, which are disputed here. Third, even though minor party candidates appear to be more susceptible to ballot order effects, that effect is most pronounced in primary elections. When the baseline vote share of minor party candidates in general elections is low, the effect on the probability of a minor party winning office is likely to be quite low. . . . We can see these implications of these findings for Tennessee using the Green Party and Constitution Party candidates

38

who ran for office in a general election over the past twenty-five years. . . . On average, the winner beat the Green Party candidate by a margin of 62% and the Constitution Party candidate by a margin of 60%. . . . In no single election would ballot order have changed whether Green or Constitution Party candidates were elected, even using the highest (and surely biased) estimate of ballot order effects. Put differently, because the baseline vote share by these candidates is so low, ballot order has no likely effect on their actual prospects of winning office.

(Id. at 13.)

144. The Court refers to Ho's expert report, which served as his direct testimony, for further details on the methodology, analysis, and conclusions of recent research on ballot order effects.

### F. Summary of the Court's Findings of Fact

145. Plaintiffs offered three witnesses in their case in chief—Culver, Castle, and Robertson—and one expert witness—Winger.

146. Culver and Castle offered little testimony about any adverse effect Tennessee's ballot-access scheme has on the Green Party or Constitution Party. Castle's testimony about the number of signatures the Constitution Party collected using eighteen to nineteen volunteers over a four-month period strikes the Court as a successful effort that seemed to be on pace to meet the signature requirement or, at a minimum, as encouragement that the required signatures could be collected before the next election if the Party allowed a little more time for its effort.

147. At trial, Robertson demonstrated that she is very capable and knowledgeable about the statutory requirements and actual implementation of Tennessee's election laws and credits her testimony. However, her testimony offered no factual support for Plaintiffs' claims. The Court finds that the state election statutes (TENN. CODE ANN. §§ 2-1-107 and 2-5-101) provide county election officials with specific standards for verifying petition signatures and that the State Election Commission ensures compliance with the statutes. There is no evidence that the county election officials reject signatures improperly, and individuals and parties can appeal

39

signature rejections they believe were improper.

148. Winger has extensive knowledge about ballot-access issues across the country. However, his testimony was of limited value to the Court. The majority of his expert report, even after the redactions agreed to by the parties, and his trial testimony consist of legal conclusions and conclusory assertions that in most cases were not sufficiently grounded in objective data or scientific analysis.

149. The Court found Goins to be very capable and knowledgeable about the statutory requirements and actual implementation of Tennessee's election laws and credits his testimony. The Court is persuaded that the responsibilities of the Division of Elections are as he described and require the amounts of time by his staff that he detailed. The Court also finds that Tennessee law has few impediments on the collection of signatures for the 2.5% petition requirement, as he described, including the State's willingness to verify signatures on a rolling basis and the ability to appeal any signature rejections believed to be improper. The Court also credits his testimony as to the implementation of the election statutes, including his testimony that a minor party not choosing its candidate by primary election whose candidate timely filed a candidate nominating petition would be listed on the November general election ballot as an Independent if his or her party failed to satisfy the 2.5% signature requirement, despite the fact that there is no statutory provision explicitly so stating.

150. The State presented Hood to address the feasibility of a minor party meeting the 2.5% signature requirement and the impact of a candidate's having a party label on the ballot. The Court credits Hood's expert trial testimony based on the intellectual rigor he applied to support his opinions.

151. As to the effect of third-party labels on third-party electoral performance, Hood analyzed data in a scientifically rigorous manner, and the Court accepts his conclusion that a third-party

candidate's being listed on the ballot with a party affiliation does not increase the share of votes that candidate can be expected to obtain.

152. As to Hood's extrapolation from three recent petition drives that the signature requirement is an achievable goal for third parties, the Court agrees that the 2.5% signature requirement is an achievable goal. However, the Court hesitates to put much weight on the wine-in-grocery-stores signature collection effort, as the Court is not persuaded that voter support for that referendum effort can fairly be extrapolated to the ease with which minor political parties might be able to collect the requisite number of signatures. As the parties presented no evidence about the amount of money expended by Americans Elect to gather their signatures, the Court is also hesitant to rely heavily on that petition drive, as it could have been enormously expensive. However, the Court finds very persuasive that based on the Constitution Party's 2001 signature petition drive that the 2.5% signature requirement is achievable for a minor party seeking access to Tennessee's ballot. The Court finds the Constitution Party's signature petition drive was very successful in that: (1) it resulted in the collection of a large number of signatures; (2) over a relatively short period of time; (3) primarily from just one division of Tennessee; (4) at no cost; (5) with only 18 or 19 volunteers; and (6) under the more difficult statutory requirement that petition signers indicate membership in the party.

153. The State presented Ho to address the effects of ballot order on voters' behavior. The Court credits his expert trial testimony based on the intellectual rigor of his analysis and that of the other researchers he details in his report. The Court finds that the strongest and most persuasive evidence suggests that any effect ballot order has on minor party candidates is more pronounced in primary elections than in general elections. General elections are the only elections at issue in this case. Most fundamentally, because the Green and Constitution Party

41

candidates' baseline vote share is so low, ballot order has no likely effect on their actual prospects of winning office. (Ho Report, Def.'s Ex. 20 at 13.)

## III.    Conclusions of Law

Plaintiffs have five remaining claims, two of which are as-applied challenges, and three of which are both as-applied and facial challenges. (Doc. No. 248.) The Court reviews the standards that apply to each type of challenge and then turns to consideration of Plaintiffs' claims.

### A.  Facial vs. As-Applied Challenge

Counts I and VI (challenges to the ballot-access and ballot-order statutes) are as-applied challenges, and Counts II, IV, and V are both as-applied and facial challenges. The Sixth Circuit has explained the different standards for these two types of challenges as follows:

> A plaintiff can challenge the constitutionality of a statute in two ways. "A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications, to take the law off the books completely." Speet v. Schuette, 726 F.3d 867, 871 (6th Cir. 2013) (internal quotation marks omitted). The plaintiff must establish "'that no set of circumstances exist under which [the statute] would be valid.'" Id. at 872 (quoting United States v. Stevens, 559 U.S. 460, 472 (2010)). In contrast, an as-applied challenge "argues that a law is unconstitutional as enforced against the plaintiffs before the court." Speet, 726 F.3d at 872. "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010). In fact, a claim can have characteristics of as-applied and facial challenges: it can challenge more than just the plaintiff's particular case without seeking to strike the law in all its applications. John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010). In constitutional challenges reaching beyond the plaintiff's circumstances, the plaintiff must satisfy the "standards for a facial challenge to the extent of that reach." Id.

Green Party VI, 791 F.3d at 691–92.

### B.  Count I (2.5% Signature Petition Requirement)

In Count I, Plaintiffs assert an as-applied challenge to the constitutionality of Tennessee's ballot-access statute (TENN. CODE ANN. § 2-1-104(a)(23)) that requires them to submit a petition

bearing the signatures "of registered voters equal to at least two and one-half percent (2.5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor" in order to become a "recognized minor party." (Doc No. 248 at 2.) Benefits of becoming a recognized minor party include having the party label appear alongside its candidates' names on the ballot and the ability to give political action committee funds to its candidates, which allows a party to give its candidates more contributions than would be permitted otherwise.

Restrictions on access to the ballot implicate "two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30 (1968). Freedom of association is protected by the First Amendment, and "this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States." Id. at 30-31.

The Supreme Court has articulated the role of states in regulating their elections as follows:

> It is beyond cavil that "voting is of the most fundamental significance under our constitutional structure." Illinois Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979). It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute. Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986). The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. Sugarman v. Dougall, 413 U.S. 634, 647 (1973); Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217 (1986). Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Storer v. Brown, 415 U.S. 724, 730 (1974).

Burdick v. Takushi, 504 U.S. 428, 433 (1992). The power of states to regulate their own elections

43

includes the right to regulate how minor party and independent candidates gain access to the general election ballot, as long as that authority does not violate specific provisions of the Constitution. <u>Washington State Grange v. Washington State Republican Party</u>, 552 U.S. 442, 451 (2008); <u>Munro v. Socialist Workers Party</u>, 479 U.S. 189, 193 (1986) ("These associational rights, however, are not absolute and are necessarily subject to qualification if elections are to be run fairly and effectively.").

To determine whether Tennessee's election statutes violate Plaintiffs' constitutional rights, the Court applies the Supreme Court's <u>Anderson-Burdick</u> framework. <u>See</u> <u>Green Party VI</u>, 791 F.3d 684, 692-95 (6th Cir. 2015) (analyzing ballot-retention statute under <u>Anderson-Burdick</u> balancing test); <u>Green Party V</u>, 767 F.3d 533, 545-551 (6th Cir. 2014) (using same test for ballot-access and ballot-order statutes). The Sixth Circuit has articulated the <u>Anderson-Burdick</u> balancing test as follows:

> The Supreme Court has developed a three-part test to evaluate election statutes challenged under the First and Fourteenth Amendments. <u>See</u> <u>Burdick v. Takushi</u>, 504 U.S. 428, 434, 441 (1992); <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 788–89 (1983). . . . [O]ur cases hold that the <u>Anderson–Burdick</u> test serves as "a single standard for evaluating challenges to voting restrictions." <u>Obama for Am. v. Husted</u>, 697 F.3d 423, 430 (6th Cir.2012). . . .
>
> Under the <u>Anderson–Burdick</u> test, the court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." <u>Anderson</u>, 460 U.S. at 789. Second, it must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." <u>Id.</u> Finally, it must "determine the legitimacy and strength of each of those interests" and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." <u>Id.</u>
>
> When the burden on the right to vote is "severe," the statute will be subject to strict scrutiny and must be narrowly tailored and advance a compelling state interest. <u>Burdick</u>, 504 U.S. at 434. If the burden is "reasonable" and "nondiscriminatory," the statute will be subject to rational basis and survive if the state can identify "important regulatory interests" to justify it. <u>See id.</u> If the burden lies somewhere in between, courts will "weigh[ ] the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." <u>Green Party V</u>, 767 F.3d at 546.

44

Green Party VI, 791 F.3d at 692-93.

## 1. Character and Magnitude of the Burden on the Plaintiffs

The Court starts with determining the extent of the burden the 2.5% signature requirement contained in Tennessee Code Annotated § 2-1-104(a)(23) imposes on the Plaintiffs. Here, Plaintiffs allege that this statute burdens them in two ways: (1) it imposes a burdensome financial cost on them because they cannot collect the required signatures without paying signature collectors (Doc. No. 262 at 7-11); and (2) the State's signature verification system makes it difficult to collect the requisite number of signatures. (Id. at 11-14.) The Court considers these two specific forms of alleged burdens on the Plaintiffs, and then considers the way the 2.5% signature requirement fits into ballot-access scheme as a whole to determine the magnitude of the burden the 2.5% signature requirement imposes on Plaintiffs.

### a. Economic Burden

First, Plaintiffs assert that the signature requirement imposes a financial burden on them. The Court notes that the State itself imposes no costs on a party seeking minor party recognition. A party can use the State's sample petition free of charge or develop their own that is compliant with the statute, and the State does not charge for verifying signatures as they are collected. Contra Libertarian Party of Florida v. State of Fla., 710 F.2d 790, 794 (11th Cir. 1983) ("County election supervisors charge 10 cents per signature to cover the costs of verifying the petitions . . . ."). Instead, Plaintiffs argue that the financial burden arises from what they believe is the necessity of hiring paid signature collectors to collect the amount of signatures required by the statute.

Neither the Constitution Party nor the Green Party introduced any evidence that they are required to incur any financial costs to collect the necessary signatures. In the most recent appeal, the Sixth Circuit offered suggestions for ways Plaintiffs could prove their difficulty in collecting

the signatures required for the 2.5% signature petition:

> Although the plaintiffs cannot, at this point, present evidence of their own difficulties complying with Tennessee's new scheme, given that it has only recently been enacted, they should nevertheless be able to develop evidence relevant to this scheme. For example, they might survey states with ballot-access requirements similar to Tennessee's current ones to determine whether minor parties have had success in appearing on the ballot in those states. They might obtain affidavits from party organizers in other states describing the difficulties that they encounter complying with requirements similar to Tennessee's. Their experts might be able identify meaningful distinctions between Tennessee and other states—based on such factors as geography, population demographics, the educational attainments of its residents, etc.—that could conceivably influence the petitioning process. Additionally, more detailed evidence of the plaintiffs' own past attempts to meet Tennessee's petition-signature requirements could also be helpful. These suggestions are not intended to limit the type of evidence that the parties might develop on remand, but only to illustrate where they might begin.

Green Party V, 767 F.3d 533, 549 n.4 (6th Cir. 2014).

Despite this detailed suggested roadmap of the types of evidence Plaintiffs might produce to support their claim, they presented little evidence that would assist the Court in determining the burden imposed on them by the 2.5% signature requirement. The only type of evidence detailed in the Sixth Circuit's opinion that Plaintiffs did utilize was a description of their own past attempts to meet the signature requirements, but that evidence only suggests that the signature requirement is, in fact, quite achievable. As detailed above, in 2001, the Constitution Party collected 16,000 of the 24,406 signatures required in about three months, using eighteen volunteers, focusing primarily on West Tennessee, at no cost. The party's volunteers stopped trying to collect signatures a few months before the deadline, although Castle, who headed the Constitution Party's effort, could not remember why that decision was made. At the rate the party's volunteers were collecting signatures, it appears more likely than not that they could have collected the required number before the deadline.

The Court is puzzled by Castle's testimony that the party members were "demoralized" by

their petition drive, because their experience appears identify strategies for satisfying the petition requirement in its next effort. For example, based on the 2001 experience, the party leaders could decide to begin their next effort further in advance of the petition deadline, as the statute allows 3.5 years for the collection of signatures. They could also utilize more volunteers and/or focus on other parts of the state. Indeed, Mark Goins outlined an impressive plan that would allow a minor party to achieve the required the 2.5% petition signatures in the four major cities of Tennessee. The Constitution Party's petition drive took place under the prior statute, which required petition signers to declare their membership in the minor party. This requirement is clearly more difficult than the current one, which allows individuals to sign a 2.5% signature petition even though they are members of another party. Indeed, petition signers need not attest that they support the party or agree with its positions, only that they support the right of the party to appear on the ballot. Plaintiffs stipulated that the Constitution Party does not believe that there is anything about the actual voters in Tennessee, the actual individuals who would be signing the petitions to get the Constitution Party on the ballot, or about Tennessee's geography, population demographics, or otherwise, that would prevent it from asking individuals to collect and to sign petitions. (Stipulations of Fact, Doc. No. 242 at ¶ 46.)

Plaintiffs presented no evidence as to their difficulty recruiting sufficient volunteers to collect the required signatures. For example, the Constitution Party offers no evidence about whether they attempted to recruit volunteers to begin collecting signatures earlier, which would have provided more time to gather the necessary signatures, or whether they tried to collect signatures outside of western Tennessee where they focused their efforts. The Green Party has never attempted to collect signatures for a 2.5% signature petition, although Castle testified that the party has about twelve volunteers who collect signatures for candidates' nominating petitions.

47

Given the Constitution Party's 2001 experience and the Plaintiffs' failure to present evidence as to the difficulties in collecting the required signatures, the Court concludes that Plaintiffs have failed to prove by a preponderance of the evidence that the 2.5% petition signature requirement creates a burden that makes it not feasible for a reasonably diligent minor party to collect the required number of signatures without paying professional signature collectors.

Even if Plaintiffs had presented evidence from which the Court could conclude that Plaintiffs would need to hire signature collectors to meet the 2.5% signature requirement, they also presented insufficient evidence for the Court to determine the amount of any financial expense they would incur in that endeavor. For example, Plaintiffs could have presented evidence about the numbers of signatures each party anticipates being able to collect using volunteers and the number that would need to be collected by paid collectors. Plaintiffs could have requested bids for petition signature collectors in Tennessee, and presented the Court with the evidence of the financial cost of obtaining the signatures they could not collect using volunteers. Winger's estimation that paid signature collectors typically charge $1.50 to $3.50 per signature in other parts of the country is a wide estimate, and Plaintiffs made absolutely no effort to obtain or present to the Court the amounts charged in Tennessee. In sum, in addition to their failure to prove by a preponderance of the evidence that paid signature collectors are required to meet the 2.5% signature requirement, Plaintiffs also have not proven by a preponderance of the evidence the amount of any financial burden to them due to the 2.5% petition signature requirement.

Furthermore, even if the parties are required to incur some financial costs to gain ballot access, that alone would not render the burden severe. "Many features of our political system— e.g., single-member districts, 'first past the post' elections, and the high costs of campaigning— make it difficult for third parties to succeed in American politics." <u>Timmons v. Twin Cities Area</u>

New Party, 520 U.S. 351, 362 (1997). States need not "finance the efforts of every nascent political group seeking to organize itself and unsuccessfully attempting to win a place on the general election ballot." Am. Party of Texas v. White, 415 U.S. 767, 794 (1974); Green Party of Arkansas v. Martin, 649 F.3d 675, 683 (8th Cir. 2011) ("Although the Green Party may incur some costs because of its choice to hire individuals to collect signatures, the ballot access scheme does not impose severe burdens on the Green Party and Arkansas need not collapse every barrier to ballot access."). In this case, the Court finds that Plaintiffs have not met their burden of proving by a preponderance of the evidence that they would be required to incur *any* financial costs to collect the 2.5% signatures, and certainly have not shown that the burden imposed either by volunteer effort or by financial costs is severe.

### b. Signature-Verification Process

Plaintiffs next argue that the 2.5% signature requirement is burdensome because the State's procedures for verifying signatures result in the State's unjustifiably rejecting an excessive number of otherwise valid signatures. (Doc. No. 248 at 2.) The Plaintiffs' evidence falls far short of proving this assertion by a preponderance of the evidence. The standard for verifying signatures on petitions is specified by statute, and the county election offices apply this same standard to candidate petitions, recognized minor party petitions, and referenda petitions. TENN. CODE ANN. §§ 2-1-107, 2-5-101. The Tennessee Court of Appeals, in an opinion authored by Judge Sharon Lee, who currently serves on the Tennessee Supreme Court, held that the statute provides "clear and specific standards" for a county election commission to follow in verifying signatures on a petition. State ex rel. Potter v. Harris, No. E200700806COAR3CV, 2008 WL 3067187, at *5 (Tenn. Ct. App. Aug. 4, 2008). As the Sixth Circuit held in Green Party VI, "[f]ederal courts generally defer to a state supreme court's interpretation of the state's own statutes." 791 F.3d at

693-94 (citing Bush v. Palm Beach Cnty, Canvassing Bd., 5331 U.S. 70, 76 (2000)). Robertson testified that, in the event a petition signer changes his or her name after signing the petition and before the county verifies the petition, the county elections commission will verify the signature if enough of the name written on the petition remains the same as the name on the voter registration card to allow the county to compare a portion of the two signatures. Furthermore, both Robertson and Goins testified that parties can submit signatures to counties on a rolling basis for verification without any costs, which reduces the amount of time in which petition signers might have changed names or moved and will result in fewer signatures being rejected. Plaintiffs have failed to prove by a preponderance of the evidence that the system for verifying petitions imposes a burden on them, much less a severe burden.

Nor have Plaintiffs proven by a preponderance of the evidence that the statutory requirement that the party use a separate page for the signatures of registered voters in each county impose a severe burden. TENN. CODE ANN. § 2-1-104(a)(23). Petition signers do not have to be in the county of their voter registration when they sign the petition. Thus, for example, the Green Party can gather signatures from individuals who live all over the state at any large gathering of registered voters in any large city, as long as they maintain a separate page for each county in which the signers are registered to vote. The Green Party would then submit the pages to the respective counties for the county to verify the signatures of the voters who are registered in their county. Robertson and Goins testified that this process is necessary because, although the State has some voter registration cards in electronic form, many registration cards exist only in paper form in the individual county election offices. The Court finds that this is logical and reasonable in a state with ninety-five counties. In addition to the reasons given by the State, the Court finds that spreading the burden of petition verification over ninety-five county election commissions is

reasonable and sensible. Additionally, as the State election officials testified, the likelihood of finding a match to a signature such as "John Smith" is much higher when the search is in one county than if the search is across ninety-five counties, which benefits minor parties who are more likely to have common names successfully verified.

Plaintiffs also argue that they are burdened by the lack of standards providing a method for appealing a rejection of individual petition signatures or 2.5% signature petitions as a whole. (Doc. No. 248 at 2.) Plaintiffs' evidence does not support this assertion either. The State's election officials testified that an individual or party can ask the State or the county to review a signature that they believe was improperly rejected, and the State or the county will do a review, again at no cost. Thus, even though there is no statute that sets forth the process for challenging the rejection of a signature, the State does indeed have a process for such a challenge that can assist minor parties and, according to Goins, individuals have utilized that process. As Coordinator of Elections for the State of Tennessee, Goins is charged with "[a]uthoritatively interpret[ing] the election laws for all persons administering them." TENN. CODE ANN. § 2-11-202(a)(4). Thus, the Court accepts Goins's testimony about the administration of Tennessee's election laws. The Plaintiffs have failed to prove by a preponderance of the evidence that they are burdened by the State's procedure for challenging rejected signatures, much less that they are severely burdened.

### c. Ballot-Access Scheme as a Whole

In determining the severity of the 2.5% signature requirement on Plaintiffs, the Court also considers Tennessee's ballot-access scheme in its entirety. See Green Party V, 767 F.3d at 545 ("But we can evaluate the impact of this [2.5% signature] requirement only within the context of Tennessee's ballot-access scheme as a whole, including its new deadline for submitting petitions."). Tennessee places few restrictions on the ability of minor parties to collect the

51

necessary signatures. Minor parties are on notice of the number of signatures they are required to collect over three-and-a-half years before the filing deadline, beginning after the gubernatorial election when the State determines the number of signatures required. There is no limitation on the time period for collecting signatures or on how many signatures a minor party may submit. Voters are not precluded from signing petitions based on their party affiliations or participation in a party primary. Voters may sign multiple petitions. There are no residency or other requirements for signature collectors themselves. Individual signatures need not be notarized, nor must the petition itself be notarized. Parties have no geographic restrictions on where signatures are collected. That is, Plaintiffs can collect *all* the required signatures in one major city, or in several cities, or in one portion of the state. Parties may submit signatures immediately upon collecting them to avoid the problems created when petition signers move or change names. Furthermore, the August deadline for the 2.5% signature petition for minor parties not nominating their candidates by primary election—ninety days before the November general election—provides "ample opportunity to collect signatures when voters are engaged, such as during primaries and other elections." Pisano v. Strach, 743 F.3d 927, 934 (4th Cir. 2014). Even Plaintiffs' expert Winger testified that the deadline of ninety days before the November general election was "quite good," and that he had no opinion on the April deadline required for participation in an August primary election.

   The Supreme Court considered similar elements to these relevant to its determination that a Georgia statute was constitutional in Jenness v. Fortson, 403 U.S. 431 (1971), in which it held as follows:

> Anyone who wishes, and who is otherwise eligible, may be an independent candidate for any office in Georgia. Any political organization, however new or however small, is free to endorse any otherwise eligible person as its candidate for whatever elective public office it chooses. So far as the Georgia election laws are

52

concerned independent candidates and members of small or newly formed political organizations are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. They may confine themselves to an appeal for write-in votes. Or they may seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question. If they choose the latter course, the way is open. For Georgia imposes no suffocating restrictions whatever upon the free circulation of nominating petitions. A voter may sign a petition even though he has signed others, and a voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary. The signer of a petition is not required to state that he intends to vote for that candidate at the election. A person who has previously voted in a party primary is fully eligible to sign a petition, and so, on the other hand is a person who was not even registered at the time of the previous election. No signature on a nominating petition need be notarized.

Id. at 438-39. Tennessee's ballot-access scheme has similar elements that facilitate Plaintiffs' ability to collect the necessary signatures as those the Supreme Court found relevant in Jenness, although, notably, Tennessee requires fewer signatures and allows minor parties much longer than six months to collect the required signatures. Additionally, Plaintiffs are similarly free to express themselves in the ways articulated in Jenness, even if they choose not to collect the signatures to become a recognized minor party.

Similarly, in Pisano v. Strach, 743 F.3d 927, 929-30 (4th Cir. 2014), the Fourth Circuit upheld a district court's granting of summary judgment for the state of North Carolina on a claim that a May deadline for a new party to collect signatures equal to two percent of the total number of voters who voted in the most recent gubernatorial election from at least four congressional districts was unconstitutional. The plaintiff in Pisano did not challenge the signature requirement— only the May deadline. In determining that the May deadline did not constitute a severe burden on the plaintiff's rights, the Fourth Circuit considered "important alleviating factors in North Carolina's statutory framework," such as the three-and–a-half years groups had to collect signatures, the ability of voters to sign a petition regardless of their party affiliation, the ability of voters to sign multiple petitions, and the ability of new parties to collect signatures "during the

53

height of the primary season." Id. at 934-35; see also Libertarian Party of Fla. v. State of Fla., 710 F.2d 790, 794 (11th Cir. 1983) (considering similar factors in holding Florida's requirement of a petition signed by three percent of the state's registered voters (144,492 voters) to appear on the 1982 ballot).

Based on the evidence Plaintiffs presented at trial to support their claims that Tennessee's ballot-access statute imposes severe burdens on them along with consideration of the elements of the ballot-access scheme that ease the collection of the necessary signatures, the Court finds that Plaintiffs have failed to prove by a preponderance of the evidence *any* burden imposed by the 2.5% signature requirement other than that which is purely conjectural. Even if Plaintiffs had proven they are burdened by the requirement, any burden is not severe, but instead is reasonable and nondiscriminatory.[4]

### 2. State's Regulatory Interests

The second step under the Anderson-Burdick balancing test is to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Anderson v. Celebrezze, 460 U.S. 780, 789 (1985). The State asserts that its 2.5% signature petition signature requirement rationally serves the State's important interests in safeguarding the integrity of the election process by ensuring that a new political party is actually a political organization, avoiding voter confusion, and reducing the burden of additional administrative costs.

### a. Ensuring New Political Party Has a Significant Modicum of Support

The State maintains that the 2.5% signature requirement is necessary to ensure that a new

---

[4] Plaintiffs argue that the Court does not need to make an independent determination of whether the 2.5% signature requirement imposes a severe burden because the Tennessee Attorney General issued an opinion letter in 1999 stating that it thought a court would find the signature requirement severe. (Doc. Nos. 262 at 3 (referring to Doc. No. 253-2 at 3).) To the contrary, the character and magnitude of the burden imposed on Plaintiffs is a factual and legal question to be determined by this Court, as instructed by the Court of Appeals. Plaintiffs did not carry their burden of proof at the trial in this matter to establish that the burden imposed is severe.

political party is actually a political organization with a modicum of support among the electorate. One example given by the State to support the importance of this regulatory interest is that political parties have special privileges not provided to other organizations under Tennessee's campaign finance statutes. For example, political campaign committees controlled by a political party can contribute significantly more to a candidate in each election than other organizations are allowed. (Doc. No. 254 at 34-35.) Conversely, candidates themselves do not have to include contributions from political campaign committees controlled by a *political party* in the limits of contributions that they can accept from political campaign committees. (Id. at 35.)

### b. Avoiding Voter Confusion and Reducing Administrative Costs

The State asserts that it has an interest in protecting the integrity of the election process and avoiding voter confusion by preventing complication of the ballot design. Tennessee's election laws currently provide that all independent candidates for each office are to be listed in alphabetical order in a single column. TENN. CODE ANN. §§ 2-5-206(b)(2), 2-5-207(d)(1). According to Goins, with this configuration a larger number of independent candidates for an office does not confuse or overcrowd the ballot because the independent candidates are all placed together in one column. However, he testified that large numbers of political parties can create physical challenges that can make it more difficult to design ballots that are easy for voters to use and that are efficient at translating voter intent into actual votes. For example, Goins testified that a higher number of political parties makes it more difficult to design a ballot such that all parties and independent candidates for an office appear on the same page and/or to design a ballot that does not exceed the capacity of a voting machine. If a ballot were to exceed the capacity of a voting machine, state election laws require that paper ballots be provided at each polling place to hold the entire ballot. Alternatively, upon approval of the Coordinator of Elections and the county election commission,

55

only part of the ballot could be placed on paper ballots. TENN. CODE ANN. § 2-5-206(e). Goins testified that requiring either all or a portion of the ballot to be placed on separate paper ballots would involve substantial public expense, would make the recording of results more burdensome and potentially less accurate.

### 3. Legitimacy and Strength of State's Interests and Consideration of Whether the State's Interests Justify Any Burden on the Plaintiffs' Rights

Under the third-part of the Anderson-Burdick test, a court must determine the "legitimacy and strength" of each of the state's interests and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." Anderson v. Celebrezze, 460 U.S. 780, 789 (1985). The Court finds that the Plaintiffs have not shown *any* burden imposed on them by the 2.5% signature requirement by a preponderance of the evidence, but even if they had, the burden is not severe, but instead is reasonable and nondiscriminatory. Accordingly, the Court applies rational basis review, and the statute will survive if the state can identify "important regulatory interests" to justify it. Burdick v. Takushi, 504 U.S. 428, 434 (1992); accord Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 458 (2008) ("Because we have concluded that [the statute] does not severely burden respondents, the State need not assert a compelling interest."). Tennessee's "asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed on the party's rights." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997). Courts do not "require elaborate, empirical verification of the weightiness of the State's asserted justifications." Id. "When a state electoral provision places no heavy burden on associational rights, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" Clingman v. Beaver, 544 U.S. 581, 593 (2005) (quoting Timmons, 520 U.S. at 358).

The Court finds each of the State's interests to be legitimate and sufficiently weighty to

56

justify any limitations imposed on Plaintiffs. As to the State's interest in ensuring that a new party has a "modicum of support," the Supreme Court has held that "[t]he State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." Anderson v. Celebrezze, 460 U.S. 780, 788 n. 9 (1983). The Court rejects Plaintiffs' argument that the 2.5% signature does not actually advance that interest because petition signers are not required to indicate that they actually support a new party or its principles. This is a curious argument from the Plaintiffs, as a requirement that a petition signer indicate actual support for the party would clearly make gathering the requisite number of signatures more difficult. As it is, the State is only requiring that a new party demonstrate a modicum of support of individuals who agree that the new party should be allowed to appear on the ballot. The State need not demand a higher level of support by petition signers in order to justify its interest in the minor party's demonstrating *some* support among voters. The Supreme Court has held that an "obvious and well-known means of testing the 'seriousness' of a candidacy" is "impos[ing] on minor political parties the precondition of demonstrating the existence of some reasonable quantum of voter support by requiring such parties to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election." Lubin v. Panish, 415 U.S. 709, 718 (1974); accord Am. Party of Texas v. White, 415 U.S. 767, 786–87 (1974) ("A petition procedure may not always be a completely precise or satisfactory barometer of actual community support for a political party, but the Constitution has never required the States to do the impossible.").

The Supreme Court has consistently recognized that there is "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding

confusion, deception, and even frustration of the democratic process at the general election." Jenness v. Fortson, 403 U.S. 431, 442 (1971); accord Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986); Anderson v. Celebrezze, 460 U.S. 780, 788-89 n.9 (1983); American Party of Texas v. White, 415 U.S. 767, 782 (1974); Lubin v. Panish, 415 U.S. 709, 715 (1974); Jenness v. Fortson, 403 U.S. 431, 442 (1971). "The 'support' requirement is meant to safeguard the integrity of elections by avoiding overloaded ballots and frivolous candidacies, which diminish victory margins, contribute to the cost of conducting elections, confuse and frustrate voters, increase the need for burdensome runoffs, and may ultimately discourage voter participation in the electoral process. Libertarian Party of Maine v. Diamond, 992 F.2d 365, 371 (1st Cir. 1993).

The State's interests in avoiding voter confusion and additional administrative expenses are also clearly "important regulatory interest[s]." Burdick, 504 U.S. at 434. Because the Court has found that any burden on Plaintiffs is not severe, the State need only prove an important regulatory interest. However, the Supreme Court has held that states' interests in "preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion, are *compelling*." Am. Party of Texas v. White, 415 U.S. 767, 783 n.14 (1974) (emphasis added).

Furthermore, the Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." Munro v. Socialist Workers Party, 479 U.S. 189, 194–95 (1986).

> To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think,

58

should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.

Id. at 195–96.

The Court rejects Plaintiffs' arguments that the State's interests in the 2.5% signature requirement are not legitimate. First, the opinion of Plaintiffs' expert that the 2.5% signature requirement is not necessary to establish support for new parties because other states utilize less restrictive systems, is unavailing. That other states choose different methods for ballot access does not eviscerate the legitimacy of Tennessee's interests that support its own ballot-access scheme. Furthermore, "[a] court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature." Libertarian Party of Florida v. State of Fla., 710 F.2d 790, 794 (11th Cir. 1983) (citing Storer v. Brown, 415 U.S. 729–30, 736 (1974)). Instead, a court must determine whether the challenged laws provide a realistic means of ballot access. Id. at 793 (citing American Party of Texas, 415 U.S. at 783). Courts must focus on whether a "reasonably diligent [ ] candidate [can] be expected to satisfy the signature requirements." Storer v. Brown, 415 U.S. 724, 742 (1974).

Second, the Court rejects Plaintiffs' argument that the regulatory interests put forth by the State are not "legitimate" because they were not stated on the legislative record. [5] (Doc. No. 248

---

[5] Plaintiffs also urge the Court to consider a statement by Representative Michael Turner at a March 20, 2011 hearing in the House State and Local Government Subcommittee, in which he stated, "One thing Democrats and Republicans kinda unite on is keeping minor parties off the ballot." Plaintiffs argue that this statement demonstrates that the 2.5% signature requirement was to deny new parties access to the ballot. (Doc. No. 262 at 5.) The Court did not accept the transcript of this statement into evidence at trial, but instead instructed Plaintiffs to cite to a website containing this statement in their Findings of Fact and Conclusions of Law. (Doc. No. 261-1 at 19-24.) The Court finds that the statement is irrelevant to the Court's determination of the constitutionality of the 2.5% signature requirement. Turner's statement was made regarding a bill that was apparently introduced in 2011, and there is no indication about what ultimately happened with respect to this particular bill. Even assuming that the bill was ultimately adopted by the Tennessee Legislature, the Supreme Court has held that the motivations of individual legislators are not material once a valid, neutral justification has been articulated. See Crawford v. Marion Cnty Election Bd., 553 U.S. 181, 204 (2008) ("[I]f a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators.").

at 2.) In analyzing a challenge to an election restriction under the <u>Anderson-Burdick</u> test, the Supreme Court has never required the state's regulatory interests to be specifically stated in the legislative record. <u>See, e.g.</u>, <u>Crawford v. Marion Cty. Election Bd.</u>, 553 U.S. 181, 191 (2008) (finding state's interest adequate justification with no indication that the state's interests were stated in the legislative record); <u>Burdick</u>, 504 U.S. 439 (same).

Third, the Court rejects Plaintiffs' argument that the 2.5% signature requirement cannot be justified in the context of a statutory scheme that allows independent candidates and candidates for primary elections to qualify for ballot inclusion with petitions containing only twenty-five signatures. Tennessee's statutory scheme is undoubtedly candidate friendly. However, Tennessee's decision to make it easy for a candidate to appear on the ballot does not render its requirements for a minor party to gain access to the ballot unconstitutional. Again, this is a curious argument from the Plaintiffs, as the State's candidate-friendly statutory requirements clearly benefit their candidates. Indeed, there is no evidence that the candidates of either the Green Party or the Constitution Party have ever been unable to qualify to appear on the ballot. Furthermore, the State has articulated several legitimate reasons for its interest in ensuring that a party have a modicum of support, including the favorable treatment recognized political parties receive under the State's campaign finance laws and the State's interest in reducing complications on the ballot that could lead to voter confusion and additional administrative expenses. In any event, without more, this Court is not free to substitute its judgment on these matters for that of the Tennessee General Assembly.

Supreme Court precedent supports a finding that Tennessee's 2.5% signature requirement is constitutional. For example, as cited above, in <u>Jenness v. Fortson</u>, 403 U.S. 431 (1971), the Supreme Court upheld a Georgia statute that required that independent and minor-party candidates

seeking to appear on the general election ballot submit a petition signed by at least five percent of eligible voters in the state and allowed 180-days for the signatures to be collected. Id. at 433. This requirement is clearly more difficult to achieve than Tennessee's requirement of signatures of 2.5% of those who cast votes in the last gubernatorial election that can be collected over a three-a-half year period. Three years later, in Storer v. Brown, 415 U.S. 724 (1974), the Supreme Court vacated a judgment for the state of California in another five percent signature requirement case because the state placed a substantial limitation on the collection of signatures. The California statute at issue did not allow a voter to sign the petition if he or she had participated in another party's primary election, a restriction not imposed by Tennessee. Id. at 726-27. That same year, in American Party of Texas v. White, 415 U.S. 767 (1974), the Supreme Court held constitutional a one percent party-support requirement that also imposed additional restrictions on petition circulation, including a notarization requirement and a signature-disqualification provision similar to that in Storer, restrictions that Tennessee also does not impose. Id. at 777-80. As the Sixth Circuit noted in its most recent opinion in this case, these Supreme Court cases are still good law. Green Party V, 767 F.3d at 546.

In conclusion, the Court finds by the preponderance of the evidence that to the extent that the 2.5% signature requirement burdens Plaintiffs, they have failed to prove that any such burden is severe. The evidence demonstrates that the signature requirement is not an unachievable goal by a reasonably diligent minor party. The statutory scheme places very little impediments on the ability of minor parties to collect signatures and allows them up to three-and-a-half years to do so. The 2012 amendments to the statute now allow a minor party not nominating its candidate by primary election four additional months to file the 2.5% signature petition. A party choosing its candidate by its own procedures has until early August—one day before the primary election and

61

ninety days before the November general election—to file the 2.5% signature petition. TENN. CODE ANN. § 2-13-107(a)(2); see Green Party V, 767 F.3d at 548 ("By setting a later deadline, Tennessee has alleviated the burden of its ballot-access requirements to at least some extent, but we cannot say how much."). As discussed below, as Plaintiffs have no current intention of nominating their candidates by primary election, this new deadline operates to significantly lighten any burden on Plaintiffs. Thus, the Court finds that the signature requirement is justified by the State's important regulatory interests. Accordingly, the Court concludes that Tennessee's 2.5% signature requirement, as applied to Plaintiffs, does not violate Plaintiffs' First and Fourteenth Amendment rights. See Stein v. Alabama Sec'y of State, 774 F.3d 689, 699-701 (11th Cir. 2014); Pisano v. Strach, 743 F.3d 927, 937 (4th Cir. 2014).

### C. Count II (2.5% Signature Requirement in Addition to the April Filing Deadline for Minor Parties Nominating Candidates by Primary Election)

In Count II, Plaintiffs assert a facial and as-applied challenge to the constitutionality of the statutory requirement that the 2.5% signature petition be filed in April for minor parties who wish to nominate their candidates by primary election. (Doc. No. 248 at 2.) If a minor party chooses to nominate its candidates by a method other than by a primary election, then the 2.5% signature petition is to be filed ninety days prior to the general election. TENN. CODE ANN. § 2-13-107(a)(2). If, however, a minor party chooses to nominate its candidates by primary election, the 2.5% signature petition is to be filed by the same deadline as candidates seeking to qualify for the August primary election set forth in TENN. CODE ANN. § 2-1-101(a)—the first Thursday in April. TENN. CODE ANN. § 2-13-107(a)(1).

The State argues that Plaintiffs lack standing to challenge the April filing deadline for parties choosing to nominate their candidates by primary election because they did not present any evidence that they desire or intend to nominate their candidates by primary election. (Doc. No. 254

62

at 42.) In the alternative, the State argues that Count II fails on the merits.

### 1. Standing

Standing is a jurisdictional requirement because if a plaintiff does not have standing to bring a claim, a federal court is without power to rule on the issues presented. See Valley Forge Christian Coll. V. Am. United for Separation of Church and State, Inc., 454 U.S. 464, 475-76 (1982) ("[O]f one thing we may be sure: Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States."). The standing doctrine incorporates both constitutional requirements and prudential considerations and serves to limit federal jurisdiction to "cases and controversies," as required by Article III of the United States Constitution. Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61 (1992). In order to have standing: (1) the plaintiff must have suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable decision. Id. The elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof. . . . Id. at 561.

The Supreme Court has articulated the requirements for showing an injury as follows:

> Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions. Baker v. Carr, 369 U.S. 186, 204 (1962). Abstract injury is not enough. The plaintiff must show that he "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical."

City of Los Angeles v. Lyons, 461 U.S. 95, 101–02 (1983).

Kate Culver and Joan Castle both testified that their respective parties have no present

intention of selecting a candidate by primary, but might one day wish to do so. Both also testified that their respective parties' by-laws would have to be amended to allow nomination of a candidate by primary. Plaintiffs have not demonstrated by a preponderance of the evidence that they are "immediately in danger of sustaining some direct injury" as the result of the April filing deadline. Accordingly, the Court finds that Plaintiffs have only demonstrated a theoretical or hypothetical harm and, therefore, lack standing to raise Count II for purposes of Article III jurisdiction.

### 2. Merits

Even if Plaintiffs had standing to challenge the April deadline for the 2.5% signature petition for parties wanting to nominate their candidates by primary election, they cannot prevail on the merits under the three-part <u>Anderson-Burdick</u> test.

### a. Character and Magnitude of the Burden on the Plaintiffs

The Court begins with step one of the <u>Anderson-Burdick</u> test, consideration of the character and magnitude of the injury to the First and Fourteenth Amendment rights of Plaintiffs and other minor parties. First, Plaintiffs presented no evidence that the April filing deadline imposed a burden on them. The testimony of Culver and Castle addressed their belief that the 2.5% signature requirement is unachievable for minor parties, as a general matter. They provided no testimony about the inability of their respective parties to gather the required signatures by the April deadline for minor parties selecting their candidates by primary election in particular. In addition, the Plaintiffs' expert explicitly stated that he had no opinion about the April filing deadline. Thus, the Plaintiffs presented no evidence about any burden imposed by the April filing deadline contained in Tennessee Code Annotated § 2-13-107(a)(1) (which incorporates the April candidate nominating petition deadline contained in Tennessee Code Annotated § 2-5-101(a)(1)).

Second, the Court notes again that the Constitution Party's ability to collect 16,000

signatures in about three months, and Americans Elect's ability to collect 93% of the required signatures in a timeframe that would have allowed them to meet the April deadline if it had not abandoned its petition drive.

Third, the Court considers, as discussed above, the various ways the statutory scheme reduces the difficulty of complying with the 2.5% signature petition. Those include the three-and-a-half years minor parties have to collect signatures, the lack of restrictions on the time or place where signatures can be collected, the ability of voters to sign even if they belong to another party or will participate in another party's primary, no limits on who can collect signatures, the lack of notarization requirements for signers or for the petition itself, and the ability to have signatures verified on a rolling basis to reduce the rejection-rate of signatures.

Based on the preponderance of the evidence presented at trial, the Court finds that any burden the April filing deadline and petition requirement imposes on Plaintiffs and other minor parties wishing to nominate a candidate by primary election is not severe, but instead is reasonable and nondiscriminatory.

### b. State's Regulatory Interests

The testimony of Goins demonstrates that the April filing deadline is tied directly to the date the MOVE Act requires the State to distribute absentee ballots to members of the military and other registered voters residing overseas. Federal and state law mandate that the State mail absentee ballots to these voters no later than forty-five days before an election. 52 U.S.C. § 20302(a)(8)(A); TENN. CODE ANN. § 2-6-503(a). As Goins testified, the federal government zealously enforces this requirement.[6] Goins also testified that the April filing deadline is essential

---

[6] See also United States v. Alabama, 857 F. Supp. 2d 1236, 1238 (M.D. Ala. 2012) (issuing preliminary injunction against state for failure to comply with the Uniformed and Overseas Citizens Absentee Voting Act of 1986 as amended by the Military and Overseas Voter Empowerment Act); United States v. State of New York, No. 1:10-CV-1214

to allow the State enough time to discharge its election-related duties, account for unexpected disruptions, and comply with the MOVE Act. Plaintiffs introduced no evidence that contradicted the testimony offered by Goins as to the duties of his office or the timeframe necessary to accomplish those duties. The Court credits Goins's testimony as to the amount of time necessary for the State to comply with its various election-related duties.

### c. Legitimacy and Strength of State's Interests and Consideration of Whether the State's Interests Justify Any Burden on the Plaintiffs' Rights

As the Court finds the April filing deadline does not impose a severe burden on Plaintiffs, under the Anderson-Burdick framework the "State's asserted regulatory interest need only be sufficiently weighty to justify the limitation imposed." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997). A number of federal courts have found a filing deadline to be justified upon a showing by election officials of the need for that deadline in order to perform their election-related duties. See, e.g., Nader v. Keith, 385 F.3d 729, 734-35 (7th Cir. 2004) (considering state's need to resolve challenges to nominating petitions in upholding denial of preliminary injunction of a filing deadline 4.5 months before the election); Libertarian Party of Maine v. Dunlap, 659 F. Supp. 2d 215, 224–25 (D. Me. 2009) ("Maine's August 8 deadline [for November general election] is as generous as the State can afford to be while still discharging its election related duties."); Barr v. Ireland, 575 F. Supp. 2d 747, 751 (S.D.W. Va. 2008) (upholding August 1 deadline for November general election as necessary to allow the state to meet deadline for getting absentee ballots distributed to the military and other citizens).

The Court finds that the State has important regulatory interests in setting an April deadline for the submission of 2.5% signature petitions for parties nominating their candidate by primary

---

GLS/RFT, 2012 WL 254263, at *1 (N.D.N.Y. Jan. 27, 2012) ("It is unconscionable to send men and women overseas to preserve our democracy while simultaneously disenfranchising them while they are gone.").

election in August. The State seeks to ensure timely distribution of absentee ballots in compliance with federal and state law, to avoid disruption of election officials' ongoing responsibilities in assuring ballot accuracy and orderly, honest elections, and to avoid disruption of the integrity of the election process itself. These interests are sufficiently weighty to justify any burden on Plaintiffs and other minor parties. Accordingly, the Court finds that the April filing deadline contained in Tennessee Code Annotated § 2-13-107(a)(1) (which incorporates the April candidate nominating petition deadline contained in Tennessee Code Annotated § 2-5-101(a)(1)) for minor parties that nominate their candidates by primary election is constitutional as applied to Plaintiffs. As to Plaintiffs' facial challenge, "[i]f even one set of circumstances exists in which the state can constitutionally apply the statutes to recognized minor parties, plaintiffs' claim fails." Green Party VI, 791 F.3d 684, 692 (6th Cir. 2015). Given the Court's finding that the challenged statute is constitutional as to Plaintiffs, clearly the Plaintiffs' facial challenge fails as well. Women's Med. Prof'l Corp. v. Voinovich, 130 F.3d 187, 194 (6th Cir. 1997) ([A] facial challenge to a statute should fail if the statute has a constitutional application.") (interpreting United States v. Salerno, 481 U.S. 739, 745 (1987)).

### D. Count IV (Absence of Statutory Provision for Minor Party Candidates Not Nominated in Primary Election to Appear as Independent Candidate on General Election Ballot)

In Count IV, Plaintiffs assert a facial and as-applied challenge to the following:

The absence of a statutory provision for candidates of a new minor party to be included on the ballot if the party fails to satisfy the requirements to qualify as a "recognized minor party" with an August signature petition filing unconstitutionally excludes such a candidate from the ballot and the requirement that candidates be listed on the ballot as "Independent" candidates if the party does not satisfy the requirements to be "recognized minor parties" is unconstitutional.

(Doc. No. 248 at 2.)

If a minor party chooses to nominate its candidates in the August primary election, the

67

2.5% signature petition must be filed on the same date on which candidates must qualify for the August primary election—the first Thursday in April. TENN. CODE ANN. § 2-13-107(a)(1) (incorporating the candidate nominating petition deadline for primary elections contained in TENN. CODE ANN. § 2-5-101). Tennessee Code Annotated § 2-13-107(c) explicitly provides that a minor party candidate who timely files his or her candidate nominating petition for an August primary will appear on the November general election ballot as an Independent candidate if his or her party's 2.5% signature petition fails to meet the statutory requirements to qualify her party as a recognized minor party. When the Tennessee General Assembly changed the statute in 2012 to allow minor parties not wishing to participate in primary elections to choose their candidates "by any method authorized under the rules of the party," Tennessee Code Annotated § 2-13-203(a)(2), it did not create a parallel section to Tennessee Code Annotated § 2-13-107(c) that would explicitly state that a candidate chosen by a minor party's internal process would appear in the ballot as an Independent if the minor party failed to qualify as a recognized minor party. It is the *absence* of this parallel statutory provision that is the basis of Claim II.

According to Goins, even though there is no such parallel statute, nothing in Tennessee's election laws excludes a candidate of a minor party chosen by party rules from appearing on the November general election ballot as an Independent if his or her party fails to become a recognized minor party. All the candidate must do is file the candidate nominating petition all candidates are required to file.[7] A candidate running for any office other than president (whether in a primary or a general election) must file a nominating petition with the signatures of 25 registered voters.

_____

[7] Goins testified that this is the exact course of action taken by the Libertarian Party candidate for Governor in the November 2014 general election and the Libertarian Party candidate for President in the November 2016 presidential election. Indeed, according to Goins, the Libertarian Party's candidate for president in the 2016 election, Gary Johnson, has already, as of the date of Goins's testimony on July 12, 2016, filed his candidate nominating petition (which is not due until August 18), even though the Libertarian Party is currently engaged in a petition drive to try to obtain recognized minor party status for the 2014 November election (which is not due until August 10, 2016).

TENN. CODE ANN. § 2-5-101. If that candidate is running for an office that is filled at the November general election, then his candidate nominating petition must be filed by the first Thursday in April. Id. This requirement applies to all candidates, including candidates of major or minor parties in the August primary election and candidates running as independents in the November general election. With respect to the office of president, independent candidates are required to file a petition with the signatures of 275 registered voters by the third Thursday in August before the November general election. TENN. CODE ANN. § 2-5-101(a). This deadline is after the August deadline for a minor party selecting its candidate by party rules to file a petition to be recognized as a minor party pursuant to Tennessee Code Annotated § 2-13-107(a)(2). For example, for the November 2016 presidential election, a minor party selecting its candidate by party rules must file its 2.5% signature petition by August 10, 2016, and an independent presidential candidate must file his candidate nominating petition by noon on August 18, 2016.

There is no constitutional violation here. Goins testified that the system works as the Plaintiffs believe it should, even without an explicit statute so stating, and Plaintiffs presented no evidence to the contrary. The Court accepts Goins's interpretation of the administration of Tennessee's election laws. TENN. CODE ANN. § 2-11-202(a)(4) (providing that the coordinator of elections shall "[a]uthoritatively interpret the election laws for all persons administering them."). Plaintiffs' and other minor parties' candidates are not excluded from the ballot. To the contrary, Tennessee's statutory scheme is very candidate friendly, as Plaintiffs' expert, Winger, concedes, and about which Plaintiffs' elsewhere complain. There is no evidence that any of Plaintiffs' or other minor parties' candidates have ever been excluded from the ballot. Plaintiffs have failed to demonstrate any burden imposed by the absence of a statute parallel to Tennessee Code Annotated § 2-13-107(c).

However, assuming the <u>Anderson-Burdick</u> test applies to this claim, the Court considers first the character and magnitude of the asserted injury to the rights of Plaintiffs and other minor parties. As stated, Plaintiffs offered no evidence that would support a finding that they and other minor parties are burdened, much less severely burdened, by the absence of a statute specifically providing that candidates of minor parties chosen by their party's rules whose parties fail to obtain minor party recognition, will be on the ballot in the November general election as an independent candidate. Thus, the statutory scheme will survive if the state can identify "important regulatory interests" to justify it. <u>Burdick v. Takushi</u>, 504 U.S. 428, 434 (1992). The State's justification for its statutory scheme is that minor party candidates are merely required to file the same candidate nominating petition that every other candidate wishing to appear on the general election ballot must file. The Court finds that the State's important regulatory interest justifies any burden on minor parties. As the Supreme Court has held, "[W]hile an interest in securing the perceived benefits of a stable two-party system will not justify unreasonably exclusionary restrictions, States need not remove all of the many hurdles third parties face in the American political arena today." <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 367 (1997) (internal citation omitted). The Court finds that Tennessee's election statutes do not unconstitutionally deny access to the general election ballot to candidates of the Green Party or the Constitution Party or other minor parties that are unsuccessful in obtaining minor party recognition through the petitioning process. Plaintiffs have failed to prove this aspect of Tennessee's election laws are unconstitutional either facially or as applied to them.

### E.  Count V (Denying Candidate Their Party Label)

In Count V, Plaintiffs assert a facial and as-applied challenge to the constitutionality of the statutory requirement that they qualify as a recognized minor party in order to receive the benefit

of having their party label by their candidate's name on the ballot. (Doc. No. 248 at 3.) However, in order for the candidate of a minor party to have his party affiliation included on the ballot, the minor party must meet the 2.5% signature requirement to qualify as a recognized minor party. TENN. CODE ANN. § 2-1-104(a)(23). Thus, the Court finds that Count V does not state a claim that is analytically distinct from Count I, and concludes that it fails for the same reasons articulated in the Court's discussion of Count I.

To the extent that Count V raises claims that should be considered separate and apart from Count I, Plaintiffs have also failed to prove by a preponderance of the evidence that not having their party label beside their candidates' names on the ballot burdens them. Plaintiffs' expert Winger testified that listing a candidate as an independent instead of listing the party label imposes a severe burden on the candidate and the candidate's party, but he provided no underlying data for that assertion. Furthermore, he conceded on cross examination that in the 2000 presidential race, Ralph Nader received a lower percentage of the vote in Tennessee with the Green Party label than he did in several other statues, including our neighboring state of Alabama, with a label of "independent." He also testified that there are numerous examples in which candidates running with an independent label in Tennessee performed better than with the Green Party label in other states. He further conceded that his opinion did not take into account name recognition for different candidates. The Court does not credit his testimony that requiring a minor party candidate to be labeled as an independent imposes a severe burden on the candidate or the minor party. Instead, the Court is persuaded by the State's expert, Hood, who identified the lack of empirical verification to support Winger's opinion. Hood's own scientific analysis demonstrates that a third party candidate's vote share is expected to be the same whether or not the candidate is identified on the ballot with a party label. (Doc. No. 249-2 at 6-8.)

71

Thus, the Court concludes that requiring a minor party candidate to run with the label of "independent" rather than with his party name does not impose a burden on Plaintiffs or other minor parties, much less a severe burden. This takes the Court back to the Anderson-Burdick analysis conducted for Count I. The State's interest in requiring a minor party show a modicum of support, avoiding voter confusion, and avoiding additional administrative costs, are important regulatory interests that justify its 2.5% signature petition requirement. For these reasons and those stated in the discussion of Count I, the Court concludes, again, that Plaintiffs have failed to meet their burden of proving by a preponderance of the evidence that Tennessee Code Annotated § 2-1-104(a)(23) is unconstitutional either facially or as applied to Plaintiffs.

### F. Count VI (Ballot-Order Statute)

In Count VI, Plaintiffs assert an as-applied challenge to the constitutionality of Tennessee's ballot-order statute, Tennessee Code Annotated § 2-5-208(d)(1), which lists the candidate of the party in the majority in the combined houses of the general assembly first on the ballot, the candidate of the minority party second, and the candidate of a recognized minor party last. Plaintiffs argue that the ballot-order statute violates the Equal Protection Clause. (Doc. No. 248 at 3.) The Sixth Circuit has recognized that Plaintiffs' "ballot-ordering claim presents a question of first impression in our circuit." Green Party V, 767 F.3d 533, 550 (6th Cir. 2014). The Court noted that Plaintiffs' claim "draws not only on the Equal Protection Clause, but also on the First Amendment: essentially, the plaintiffs argue that they have been denied an equal opportunity to exercise their rights to association and political expression." Id. at 551. As a result, the Sixth Circuit concluded, the claim "is most appropriately evaluated under the [Anderson-Burdick] framework." Id.

## 1. Character and Magnitude of the Burden on the Plaintiffs

Plaintiffs presented no competent statistical evidence or expert testimony demonstrating that a party's position on the ballot affects its performance in an election, much less the extent of any such effects. As stated above, the Court does not credit the testimony of Plaintiffs' expert on this issue. As he conceded on cross-examination, Winger has never testified about the effects of ballot order and voting behavior and that this is not his "strong area." He cited a handful of outdated books and articles and provided no information about the statistical analysis found in those sources. Instead, the Court credits the State's expert witness, Ho, whose research and expertise is specifically and impressively focused on ballot order effects. Based on the studies cited by Ho and his own research, the Court concludes by the preponderance of the evidence that the credible evidence proves that the effect on the vote share of minor party candidates in general elections, if any, is quite low and is far below what would change the outcome of an election for a minor party.[8] The preponderance of the evidence supports the Court's conclusion that any burden imposed by Tennessee's ballot-order statute on minor parties is not severe.

## 2. State's Regulatory Interests

The State has given three justifications for its tiered ballot-order statute: avoiding voter confusion, party-order symmetry, and favoring parties with demonstrated public support. (Doc. No. 254 at 54.) First, the State asserts that the ballot-order statute maintains an orderly ballot, which avoids voter confusion and assures the integrity and reliability of the election. The State asserts that random ordering risks requiring voters to decipher lengthy multi-office, multi-

---

[8] The Court also finds that Plaintiffs have failed to prove by a preponderance of the evidence that positional bias could have an adverse effect on a minor party's ability to satisfy the 5% vote share required by the ballot-retention statute. The .75 percent potential difference in vote share resulting from positional bias discussed by Ho and cited by Plaintiffs (Doc. No. 262 at 54) was in the context of primary elections, not general elections that are at issue here.

73

candidate ballots in order to find their preferred candidates, while the tiered system created by the statute for general elections—unlike randomized and rotating ordering—allows voters to easily and quickly find their candidates by party affiliation, thus avoiding voter confusion. (Id. at 55.) Second, the State asserts that its tiered ballot ordering system for general election ballots makes party symmetry across party offices possible, making it easier for voters to find the party-affiliated candidate of their choosing or to vote along party lines. (Id.) Third, the State asserts that by distinguishing between parties that have garnered more widespread electoral support and those that have not, Tennessee's general election ballot-order statute provides a logical order that makes voting easier and more efficient for the vast majority of voters. (Id. at 56.)

### 3. Legitimacy and Strength of State's Interests and Consideration of Whether the State's Interests Justify Any Burden on the Plaintiffs' Rights

As the Court finds the ballot-order statute does not impose a severe burden on Plaintiffs, under the Anderson-Burdick framework, the "State's asserted regulatory interest need only be sufficiently weighty to justify the limitation imposed." Timmons, 520 U.S. at 364. In Libertarian Party of Virginia v. Alcorn, --- F.3d ---, 2016 WL 3387313 (4th Cir. June 20, 2016), the Fourth Circuit Court of Appeals noted that the district court and all parties "agreed that the burden imposed by the three-tiered ballot ordering law was not severe enough to warrant strict scrutiny" because the Virginia law does not entrench particular political parties in favorable positions nor exclude any prospective candidate from the ballot altogether. Id. at *3. Although the ordering system at issue in Alcorn was somewhat different than that presented here, Tennessee's also does not entrench particular political parties in favorable positions. If the "political party whose members hold the largest number of seats in the combined houses of the general assembly" changes, as it has in the past, the order in which parties appear on the ballot also changes. TENN. CODE. ANN. § 2-1-104(a)(11); TENN. CODE ANN. § 2-5-208(d)(1). Nor does Tennessee exclude

74

prospective candidates from the ballot altogether. As noted, Tennessee's election laws are quite candidate friendly.

Plaintiffs argue that the State is required to demonstrate through empirical evidence that a problem exists that justifies the ballot-order statute and that this statute furthers or advances the State's interest with respect to that problem. However, in <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351 (1997), the Supreme Court was clear that it did not require "elaborate, empirical verification of the weightiness of the State's asserted justification." <u>Id.</u> at 364. "[I]t is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." <u>Id.</u> at 358 (citing <u>Tashjian v. Republican Party of Connecticut</u>, 479 U.S. 208, 215 (1986); <u>Burdick v. Takushi</u>, 504 U.S. 428, 433 (1992); <u>Storer v. Brown</u>, 415 U.S. 724, 730 (1974)).

The Court finds that the State's asserted regulatory interests for its ballot-order statute are sufficiently weighty to justify any burden it imposes on minor parties. First, as to the State's interest in avoiding voter confusion by maintaining an orderly ballot:

> [T]his Court takes note of the compelling nature of the State's interest in organizing a comprehensible and manageable ballot. A manageable ballot is one where the parties, offices and candidates are presented in a logical and orderly arrangement. Were the ballot to be arranged in a scattershot fashion, the average voter would be unable to discern an underlying rationale to the ballot's organization. Identifying candidates who can demonstrate the support to qualify for party affiliation and separating them from those who cannot is one method of keeping the ballot in a format that the voter can easily read and assimilate.

<u>New All. Party v. New York State Bd. of Elections</u>, 861 F. Supp. 282, 295–96 (S.D.N.Y. 1994).

In addition, as the Fourth Circuit Court of Appeals recently held:

> Random ordering risks requiring voters to decipher lengthy multi-office, multi-candidate ballots in order to find their preferred candidates. Election officials have good reason to adopt a ballot format that minimizes this sort of confusion. For each extra minute that a voter spends deciphering his ballot in the voting booth, dozens or more voters may spend another minute in line. This all adds up. Long election

75

lines may frustrate voters attempting to exercise their right to vote. Hour long lines at some polling locations have led many to complain that election officials had discouraged their exercise of the franchise. See, e.g., Fernanda Santos, In Arizona, Voters Demand: Why the Lines?, N.Y. Times, March 25, 2016, at A13. Reducing the risk of this sort of disincentive is undoubtedly an important state interest.

Libertarian Party of Virginia v. Alcorn, --- F.3d ---, 2016 WL 3387313, at *7 (4th Cir. June 20, 2016) (internal quotation marks and citation omitted).

Second, the State's interest in party-order symmetry is also an important interest that is sufficiently weighty to justify the ballot-order statute. The State asserts that the need to streamline the process and to improve the speed and ease with which voters cast their ballot is particularly important in elections with a high voter turnout, such as in the November 2008 Presidential Election when over 2.6 million people voted in Tennessee, or when there are a large number of offices on the ballot, such as the August general election, which Goins testified some years has a very large number of offices on the ballot. (Doc. No. 254 at 55.) The State's interest in making the ballot easy for voters to understand is clearly important. Alcorn, 2016 WL 3387313 at *8 ("Virginia's ballot ordering law also has the advantage of maintaining party-order symmetry across many offices on the ballot. . . . This again advances the state's interest in efficient procedures for the election of public officials."); Meyer v. Texas, No. CIV.A. H-10-3860, 2011 WL 1806524, at *5 (S.D. Tex. May 11, 2011) (holding state's use of "party levers" to facilitate "straight party voting" "safeguards important interests by regulating elections," as they "speed up the election process").

Last, the State's interest in favoring parties with demonstrated public support is also sufficiently weighty to justify the ballot-order statute. Timmons, 520 U.S. at 367 ("[T]he States' interest [in the stability of their political systems] permits them to enact reasonable election regulations that may, in practice, favor the traditional two-party system."); Alcorn, 2016 WL

76

3387313 at *8 ("While minor parties have long been an important feature of political protest and American democratic life, it is also entirely legitimate for states to correlate ballot placement with demonstrated levels of public support.").

In sum, the State's interests in avoiding voter confusion, creating party-order symmetry, and favoring parties with demonstrated public support are sufficiently weighty to justify its ballot-order statute.

## IV. Conclusion

Based upon the foregoing, the Court concludes that Plaintiffs have failed to prove that the challenged Tennessee election statutes offend the First and Fourteenth Amendments. Accordingly, Plaintiffs' motion for preliminary injunction is DENIED.

An appropriate order shall issue.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

Case 3:11-cv-00692   Document 265   Filed 08/17/16   Page 77 of 77 PageID #: 4737